UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| DOCTORS HOSPITAL OF HYDE PARK, INC. | ) | Chapter 11 |
| | ) | Bankruptcy No. 00 B 11520 |
| Debtor. | ) | |
| | ) | |
| DOCTORS HOSPITAL OF HYDE PARK, INC. | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 02 A 00363 |
| v. | ) | |
| | ) | |
| DR. JAMES H. DESNICK, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON DOCTORS HOSPITAL
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
THE LASALLE TRUST CLAIM, AND ON LASALLE'S
CROSS MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM**

This Adversary case relates to the Chapter 11 bankruptcy proceeding of Debtor Doctors

Hospital of Hyde Park, Inc. ("Doctors Hospital"). A Plan was filed jointly by Doctors Hospital

and the Official Committee of Unsecured Creditors on May 21, 2001. It is the only Plan that has

been proffered and no objections have been filed thereto. The Plan provides for the liquidation

of the Debtor's assets by a Liquidating Trust.

Doctors Hospital filed the above-entitled Adversary proceeding seeking to render null and

void certain guarantees as fraudulent transfers and to recover rental payments.

LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate

Holders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates,

Series 1997, D5, by and through its Servicer, Orix Capital Markets, LLC ("LaSalle" or the

"LaSalle Trust") filed a proof of secured claim (the "Claim") on March 28, 2001 in the amount

of $60,139,317.04. Doctors Hospital filed an objection to the Claim.

This Adversary proceeding and the Claim are factually related because resolution of

issues in the Adversary proceeding may impact on certain agreements between the LaSalle Trust

and Doctors Hospital, agreements that are the underlying basis for the Claim. Therefore, the

Adversary proceeding allegations against LaSalle and Doctors Hospital's objection to the Claim

were consolidated for trial set to begin March 20, 2006.

Doctors Hospital moved for partial summary judgment seeking to limit the LaSalle Trust

Claim to the value of its collateral. Doctors Hospital argues that certain terms of the guarantees

provided for nonrecourse debt, and also contends that § 1111(b) of the Bankruptcy Code, Title 11

U.S.C., is not applicable. Therefore, the Claim is asserted to be limited to value of the collateral.

The LaSalle Trust filed a cross motion for summary judgment arguing that the language

of certain guarantee provisions demonstrate that Doctors Hospital has a recourse obligation, and

therefore the Claim should not be limited to the value of Collateral. The LaSalle Trust also

asserts that § 1111(b) of the Bankruptcy Code mandates that the Claim be treated as a recourse

obligation, and for that additional reason the full Claim amount should be allowed as filed.

## BACKGROUND

The Defendant Desnick purchased Doctors Hospital in 1992 for approximately $2.4

million. Ownership of the real estate and certain fixtures were titled in HPCH LLC ("HPCH"), a

Delaware limited liability company. HPCH is owned 99% by HPCH Partners, L.P. and 1% by its

managing member, HP Membership. (Stip. ¶ 13). Desnick owns 100% of HP Membership and a

controlling interest in HPCH Partners, L.P. (Stip. ¶ 13). Doctors Hospital managed the

2

hospital's business operations. Doctors Hospital rented the hospital property from HPCH for approximately $470,000 per month.

On August 28, 1997, Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Loan"). The Loan was primarily for the benefit of Desnick. The Loan was secured by the hospital real estate, equipment, accounts receivable, and certain other intangibles relating to Doctors Hospital. As further security, HPCH assigned to Nomura all of its rights in the lease with Doctors Hospital and the rental payments due thereunder. Doctors Hospital also executed a Guaranty and Suretyship Agreement (the "Guaranty") in favor of Nomura. Pursuant to the Guaranty, Doctors Hospital became surety to Nomura for the loan amount. Nomura transferred all title, rights, and obligations relating to the Loan to Asset Securitization Corporation ("ASC"), which later conveyed such rights and obligations to the LaSalle Trust.

## PLEADINGS

Doctors Hospital filed its Chapter 11 bankruptcy petition on April 17, 2000. On March 28, 2001 the LaSalle Trust filed its proof of secured claim for $60,139,317.04 assertedly based on obligations of Doctors Hospital arising from its guarantee of the Loan. Doctors Hospital filed this Adversary proceeding on April 15, 2002 seeking to render null and void certain guarantees as fraudulent transfers and to recover rental payments from the LaSalle Trust.

On June 25, 2003, the LaSalle Trust filed cross-claims and counter-claims against other defendants, including Doctors Hospital. The LaSalle Trust included in those filings fraud allegations against Doctors Hospital. Doctors Hospital filed a motion to dismiss the cross-claims and counter-claims. An Order and supporting memorandum opinion was entered on February

3

26, 2004 dismissing all of the LaSalle Trust's cross-claims and counter-claims against Doctors Hospital except for the claim for breach of guaranty.

Despite the fact that the LaSalle Trust's fraud allegations against Doctors Hospital were dismissed, the LaSalle Trust filed an amended claim ("Amended Claim") on March 10, 2004 including amounts based on the original fraud allegations. On October 18, 2004, Doctors Hospital filed a motion to disallow the Amended Claim ("Motion to Disallow"), arguing that the LaSalle Trust was not entitled to claim damages for the fraud allegations that were previously dismissed. Doctors Hospital and the LaSalle Trust reached an agreement with regards to the Motion to Disallow whereby the Amended Claim would be withdrawn by the LaSalle Trust and the Motion to Disallow would stand as an objection to the contract claims. (Agreed Order (Dec. 6, 2004)). Therefore, the LaSalle Trust's original Claim is its only existing claim.

In its Motion to Disallow, Doctors Hospital objected to and requested disallowance of the Claim for the following reasons: (1) the agreements are non-recourse and the LaSalle Trust can look only to its collateral to the extent the agreements are not rendered null and void in this Adversary;[1] (2) the LaSalle Trust is precluded from recovering pre-petition default interest that accrued between March 31, 2000 to April 17, 2000, as Doctors Hospital alleges that it was not in default at that time; (3) the LaSalle Trust is precluded from recovering interest that accrued between March 11, 2000 and April 17, 2000 as Doctors Hospital alleges that it has already satisfied said obligation; and (4) the "Yield Maintenance Premium" sought by the LaSalle Trust is an unrecoverable penalty.

---

[1] Doctors Hospital alleges that the collateral at issue has been sold under § 363 of the Bankruptcy Code. (Drs. Hosp. Mot. For Partial Summ. J. at 9). The LaSalle Trust, however, asserts that Doctors Hospital has not sold all of its collateral. (Trust Resp. ¶¶ 13-20).

4

In response to the Motion to Disallow, the LaSalle Trust asserted the following: (1) Section 1111(b) of the Bankruptcy Code mandates that the Claim be treated as a recourse obligation; (2) the Guaranty by its terms is a recourse obligation of Doctors Hospital; and (3) the Yield Maintenance Premium is recoverable as liquidated damages. The LaSalle Trust agreed to withdraw that part of the amount in the Claim for interest accruing between March 11, 2000 and April 17, 2000 and for pre-petition default interest arising between March 31, 2000 and April 17, 2000. (Trust Resp. at 9).

On April 22, 2005 Doctors Hospital filed a motion for partial summary judgment seeking a judgment limiting the LaSalle Trust's claim against the estate to any extent that it exceeds the value of its collateral.[2] On June 1, 2005 the LaSalle Trust filed a cross motion for summary judgment. In the cross motion, the LaSalle Trust seeks summary judgment arguing that the language of the Guaranty demonstrates that it was a recourse obligation of Doctors Hospital, and also argues that § 1111(b) of the Bankruptcy Code mandates that the Claim be treated as recourse. The recourse issue is the only dispute presented by the cross-motions.

A trial has been set for March 20, 2006 on the claims consolidated with the trial of the Adversary Counts eight, nine, and ten against the LaSalle Trust.

Pursuant to the Pretrial Order, Doctors Hospital and the LaSalle Trust filed a Stipulation of uncontested material facts on August 18, 2005. In addition, the parties filed required materials supporting and opposing summary judgment. Those filings provide the relevant undisputed facts set forth below.

---

[2] On April 22, 2005 Doctors Hospital also filed a second motion for partial summary judgment against the LaSalle Trust for various issues. Pursuant to an oral ruling from the bench on May 11, 2005, an Order was entered denying the second motion.

## MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

1.      On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the

"Nomura Loan") to HPCH, the entity from whom Doctors Hospital leased the Hospital Property.

The obligations of HPCH under the Nomura Loan were secured, *inter alia,* by the Hospital

Property and a lease between HPCH and Doctors Hospital.  (Stip. ¶ 70).

2.      The Nomura Loan was memorialized in several key documents: (i) the Nomura

Loan; (ii) a Promissory Note; (iii) Mortgage, Assignment of Rents, Security Agreement and

Fixture Filing (the "Mortgage"); an Assignment of Leases and Rents (the "Lease Assignment");

(iv) a Guaranty and Suretyship Agreement (the "Guaranty"); (v) an Operator Security and Pledge

Agreement (the "Pledge"); (vi) an Assignment of Management Agreement and Agreements

Affecting Real Estate (the "Assignment"); (vii) an Equity Pledge Agreement; (viii) an

Intercreditor Agreement; (ix) a Cash Collateral Account Agreement; and (x) a Collection

Account Agreement (collectively, the "Nomura Loan Documents").  (Stip. ¶ 71).

3.      The Nomura Loan was evidenced by a Promissory Note in the principal sum of

$50,000,000 in favor of Nomura (the "Promissory Note") and was secured, *inter alia,* by a

Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Mortgage") and an

Assignment of Leases and Rents (the "Lease Assignment"). The Lease Assignment pledged to

Nomura the lease between HPCH and Doctors Hospital.  (Stip. ¶ 72).

4.      In connection with the Nomura Loan, Doctors Hospital, as Operator, executed a

Guaranty and Suretyship Agreement, dated August 28, 1997, in favor of Nomura (the

"Guaranty"). By executing and delivering the Guaranty, Doctors Hospital guaranteed and became

surety to Nomura for the Nomura Loan. The obligations under the Guaranty were secured by the

equipment, accounts receivable and other intangibles owned by Doctors Hospital. (Stip. ¶ 73).

5.      Paragraph 1(a) of the Guaranty provides:

(a)      Guarantor hereby unconditionally, absolutely and irrevocably
guarantees and becomes surety to Lender for the prompt payment of the entire
amount of the Indebtedness in strict accordance with the terms of the Loan
Agreement. The obligations of Guarantor constitute a guarantee of payment and
not merely of collection, are absolute and unconditional under all circumstances
and shall not in any event be discharged, impaired, or otherwise affected except by
payment to Lender. Guarantor agrees that it will upon notice from Lender that
any Event of Default has occurred under the Note or under any Loan Document,
pay directly to Lender all of the then outstanding Indebtedness. Guarantor further
agrees that any payment required hereunder will be made to Lender regardless of
whether such sums have become due by reason of the maturity of the Note,
acceleration of the Indebtedness or otherwise. The proceeds of any amounts paid
pursuant to this Guaranty will be applied in such order and in such manner as
Lender may elect in its sole discretion.

6.      The exculpation provision of the Guaranty provides:

16.      Exculpation. Notwithstanding any provisions of the Security
Agreement, this Guaranty or the Assignment to the contrary, including, but not
limited to any waivers contained therein, except as, otherwise set forth in this
Section, Lender shall not enforce the liability and obligation of the Guarantor or
any partner, member, officer, director, stockholder of Guarantor to perform and
observe the obligations contained in this Guaranty, the Security Agreement or the
Assignment except that Lender may pursue any action for specific performance,
action for money judgment, or other appropriate action or proceeding (including,
without limitation, to obtain a deficiency judgment) against Guarantor or any
other Person solely for the purpose of enabling Lender to realize upon the
Collateral (as defined in the Security Agreement) to the extent that (i) any
amounts are received by Guarantor or its shareholders, or partners or members, as
applicable, or affiliates, after the occurrence of an Event of Default or (ii) any
amounts are distributed to Guarantor or its shareholders, or partners or members,
as applicable, or affiliates during or with respect to any period for which Lender
did not receive the full amounts it was entitled to receive as prepayments of the
Loan pursuant to Section 2.7 of the Loan Agreement (all amounts covered by
clauses (i) and (ii) above being hereinafter referred to as the "Recourse
Distributions") and (iii) any other collateral given by Guarantor to Lender under
the Security Agreement, this Guaranty or the Assignment ((i), (ii), and (iii)

7

collectively, the "Default Collateral"); provided, however, that any judgment in any such action or proceeding or any other of Lender's rights or remedies shall be enforceable only to the extent of any such Default Collateral. The provisions of this Section shall not, however, (a) impair the Liens of the Security Agreement or the Assignment or the right of Lender to bring any action or suit against any of the Collateral (as defined in the Security Agreement) following an Event of Default; (b) impair the right of Lender to name any Person as a party defendant in any action or suit against any of the Collateral (as defined in the Security Agreement); (c) affect the validity or enforceability of this Guaranty, the Security Agreement or the Assignment; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the right of Lender to bring suit for any damages, losses, expenses, liabilities or costs resulting from fraud or material misrepresentation by any Person in connection with this Guaranty, the Security Agreement or the Assignment; (f) impair the right of Lender to obtain the Recourse Distributions received by any Person; (g) impair the right of Lender to bring suit with respect to any misappropriation of Rents (as defined in the Security Agreement) collected more than one month in advance; (h) impair the right of Lender to obtain insurance proceeds or condemnation proceeds due to Lender; (i) intentionally omitted; (j) prevent or in any way hinder Lender from exercising, or constitute a defense, or counterclaim, or other basis for relief in respect of the exercise of, any other remedy against any or all of the Collateral (as defined in the Security Agreement); (k) impair the right of Lender to bring suit with respect to any misapplication of any funds; or (l) impair Lender's rights under the other Loan Documents or the other Loan Documents which are not security for this Guaranty.

7.     Absent the occurrence of an Event of Default as such term is defined in the Nomura Loan documents, Doctors Hospital had no obligation to make debt service payments or other payments under the terms of the Nomura Loan transaction documents. HPCH had no source of income other than the Lease payments from Doctors Hospital. MMA Funding had no obligation to make payments of rent to HPCH or satisfy the obligations due to Nomura under the Nomura Loan.  (Stip. ¶ 74)

8

8.    As security for the performance of its obligations under the Guaranty, Doctors

Hospital executed an Operator Security and Pledge Agreement, dated August 28, 1997 (the

"Pledge"). Section 2 of the Pledge granted to Nomura a security interest in and lien on:

(a)    All Inventory, fixtures relating to the Facility, Equipment, Permits,
Licenses, General Intangibles, Instruments, Accounts, Account Collateral,
Leases, Money, investment properties relating to the Facility, rights to
proceeds of letters of credit relating to the Facility and goods, now existing
or hereafter arising or acquired (other than Permits and Licenses which by
their terms or applicable law prohibit a collateral assignment thereof);

(b)    All present and future contract rights, lease rights and Rents, not otherwise
included as collateral under the foregoing clause (a);

(c)    All other property relating to or necessary to operate the Facility;

(d)    To the extent related to the property described in clauses (a) through (c)
above, all books, correspondence, credit files, records, invoices, bills of
lading and other documents including, without limitation, to the extent so
related, all tapes, cards, computer runs, computer programs and other
papers and documents in the possession or control of [Doctors Hospital] or
any computer bureau from time to time acting for [Doctors Hospital] and,
to the extent so related, all rights in, to and under all policies of insurance,
including claims or rights to payments thereunder and proceeds therefrom,
including credit insurance;

(e)    any other property relating to the Facility in which Lender may create or
perfect a security interest; and

(f)    all proceeds and products of any of the foregoing.  (Stip. ¶ 75).

9.    As further security for the performance of its obligations under the Guaranty,

Doctors Hospital executed an Assignment of Management Agreement and Agreements Affecting

Real Estate, dated August 28, 1997, in favor of Nomura (the "Assignment").  Doctors Hospital

thereby assigned to Nomura all of its rights in contracts with third parties made in connection

9

with the management, construction, renovation, use, operation or maintenance of Doctors

Hospital's facilities.  (Stip. ¶ 79).

10.     Section 1 of the Assignment provides:

1.     <u>Definition of Additional Collateral.</u> The items which shall be the subject
of this Assignment and which are sometimes collectively referred to herein
as <u>"Additional Collateral"</u> are as follows:

1.1     All of Assignor's right, title and interest in and to all contracts
between Assignor and third parties in connection with the management,
construction, renovation, use, operation or maintenance of the Facility, including
without limitation, the Management Agreement applicable to the Facility, any
franchise agreements, any agreements regarding parking facilities for the Facility,
any architect's agreements, construction contracts, licensing agreements,
subcontracts, service and supply agreements, "provider or participation
agreements" under Medicaid, Medicare, Blue Cross and/or Blue Shield and any
other private commercial insurance managed care and/or employee assistance
program, receivables agreements, patient and resident care agreements, any other
agreements with design professions, all agreements, allocations, and rights with
all utility services serving the Facility and all development agreements,
reservation agreements, agreements of sale, options to purchase, rights of first
refusal or any other preferential right and Permits and Licenses, which have
heretofore been or will hereafter be executed by or on behalf of Assignor or any
manager under any management agreement (the <u>"Manager"</u>),or which have been
or will hereafter be assigned to Assignor, as the same may thereafter from time to
time be supplemented, amended, modified or extended by one or more written
agreements supplemental thereto applicable to the Facility (collectively, the
<u>"Agreements"</u>; the parties with whom or to whom such Agreements have been or
may hereafter be given are, along with the Contractors, hereinafter collectively
referred to as the <u>"Contractors"</u>).

1.2     All of Assignor's right, title and interest in and to all warranties,
guarantees, and other rights of Assignor or any manager under any management
agreement, direct and indirect, against manufacturers, dealers, suppliers,
Contractors, and others in connection with the work done or to be done and the
materials supplied or to be supplied for the Facility (together, the <u>"Warranties"</u>).
(Stip. ¶ 80).

10

11.     As part of the Nomura Loan transaction, HPCH assigned to Nomura all of its
rights in the Lease and the rental payments due thereunder (the "Lease Assignment"). (Stip. ¶ 94).

12.     Pursuant to Section 2 of the Lease Assignment, HPCH assigned the HPCH Lease
to Nomura which gave Nomura "the right to collect the Rents and to apply the Rents in partial
payment of the [Nomura Loan]." (Stip. ¶ 95).

## DISCUSSION

### Jurisdiction

Subject matter jurisdiction lies under 28 U.S.C. § 1334.  This Adversary concerns the
determination, allowance, and amount of claims asserted by Doctors Hospital, therefore this is a
core proceeding under 28 U.S.C. § 157(b)(2)(C), (E), and (F).  Reference of the matters and
issues herein were made to the bankruptcy court under District Court Internal Operating
Procedure 15(a).  Venue is proper in this District under 28 U.S.C. § 1409(a).

### Doctors Hospital Motion for Partial Summary Judgment

Doctors Hospital requests an order limiting the LaSalle Trust's Claim to the extent that it
exceeds the value of its collateral.  Doctors Hospital does not seek full adjudication of the Claim;
rather it requests a determination that would adjudicate the maximum amount that can be
recovered by the secured Claim.  In doing so, Doctors Hospital seeks relief characterized as
"Partial Summary Judgment."

Partial Summary Judgment cannot be granted unless the judgment disposes of one or
more counts of a complaint or counterclaim.  One cannot obtain summary judgment for a portion
of a single claim or issue in a suit. Biggins v. Oltmer Iron Works, 154 F.2d 214, 216 (7th Cir.
1946); Commonwealth Insurance Company of New York v. O. Henry Tent & Awning

Company, 266 F2d. 200 (7th Cir. 1959); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice & Procedure, § 2737 (ed. 1998 and Supp. 2003). Neither party here seeks

judgment disposing of all claim issues.

In urging that partial summary judgment can nevertheless be granted, Doctors Hospital

cites an array of District Court decisions. However, it fails to cite any applicable Seventh Circuit

Court of Appeals opinions for the proposition that granting a motion for partial summary

judgment may be entered here. We are bound here by stare decisis in this Circuit. Indeed,

District Court Judges and Bankruptcy Judges in this District have continued to follow the

Seventh Circuit rulings on this subject. (Search of Westlaw, KeyCite (Sept. 6, 2005) (keyciting

Biggins v. Oltmer Iron Works, 154 F.2d 214, 217 (7th Cir. 1946) and finding 190 citing

references)).

Doctors Hospital argues that Seventh Circuit precedent holding that summary judgment

cannot be entered for a portion of a single claim is inconsistent with the modern view of Rule 56

Fed.R.Civ.P. and cited recent Seventh Circuit decisions. (Mem. Concerning Mots. For Partial

Summ. J. at 3). It cites Deimer v. Cincinnati Sub-Zero Products, Inc., 990 F.2d 342 (7th Cir.

1993) and Minority Police Officers Ass'n of South Bend v. City of South Bend, 721 F.2d 197

(7th Cir. 1983) to support this contention.

In Deimer v. Cincinnati Sub-Zero Products, Inc., a grant of summary judgment was

reviewed on the issue of proximate cause in a product liability claim. 990 F.2d 342 (7th Cir.

1993). While Doctors Hospital asserts that the Seventh Circuit "implicitly blessed" the

procedure of granting summary judgment on a single claim, such is not indicated by the ruling.

Rather, it was noted, "In our view, however, it would have been more appropriate for the district

court to have considered its earlier ruling with respect to the cord wrap as a ruling under Rule

56(d). Such a ruling is not a 'judgment' within the meaning of the Rules." Deimer 990 F.2d at

345. In Deimer, the Seventh Circuit Panel endorsed a ruling under Rule 56(d) which allows for

a finding of material facts not in dispute, including the amount of damages or other relief not in

controversy. See Fed. R. Civ. P. 56(d). That ruling did not endorse a partial summary judgment.

In Minority Police Officers Ass'n of South Bend v. City of South Bend, the panel opinion

reviewed a granting of partial summary judgment on three issues: whether a claim was barred by

the statute of limitations, class certification, and whether plaintiffs had standing. Doctors

Hospital argues that this opinion endorsed use of partial summary judgment as a means to resolve

issues before trial. (Mem. Concerning Mots. For Partial Summ. J. at 3). However, in discussing

use of the word "judgment" in order appealed from the District Court, the opinion stated:

> We can get no help from the caption of the judge's order. The word "judgment"
> in the term "partial summary judgment" is a misnomer. A partial summary
> judgment is merely an order deciding one or more issues in advance of trial; it
> may not be a judgment at all, let alone a final judgment on a separate claim.

Under Rule 56(d) Fed.R.Civ.P. [Rule 7056 Fed.R.Bankr.P.], rulings may be entered on

summary judgment motions as to specific issues if that will narrow issues for trial. Carillo v.

Bridgestone/Firestone, Inc. (In re Bridgestone/Firestone, Inc.), 2002 U.S. Dist. LEXIS 8845 (U.S.

Dist. May 13, 2002); First Nat'l Ins. v. F.D.I.C., 977 F. Supp. 1051, 1055 (S.D. Cal. 1997); 10B

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2737

(ed. 1998 and Supp. 2003). In interpreting a ruling under Rule 56(d) Fed.R.Civ.P., Seventh

Circuit precedent tells us that:

> It appears plain that a summary judgment is not contemplated or authorized for
> any portion of a claim less than the whole. When the court is confronted with

13

such a motion as it was in the instant case, it is authorized only to make an "order"
as to the non-controverted facts, "including the extent to which the amount of
damages or other relief is not in controversy.

Biggins v. Oltmer Iron Works, 154 F.2d 214, 217 (7th Cir. 1946). That leaves lower

courts with power to make an "order" finding material facts that are not in dispute. In addition,

authority exists to make an "order" that includes the amount of damages not in controversy.

Therefore, while a partial summary judgment cannot be entered here, an order can be entered that

"includes the extent to which the amount of damages or other relief is not in controversy."

Fed.R.Civ.P. 56(d). Such will be done here.

### The LaSalle Trust's Cross Motion for Summary Judgment

The LaSalle Trust filed a cross motion for summary judgment seeking a finding that the

unambiguous language of the Guaranty provides full recourse against Doctors Hospital. The

LaSalle Trust also asserts that § 1111(b) of the Bankruptcy Code mandates that the Guaranty be

treated as a recourse obligation against Doctors Hospital.

### Standards for Summary Judgment and Rule 56(d) Orders

Fed.R.Civ.P. 56(c) is applicable here pursuant to Fed.R.Bankr.P. 7056. Summary

judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions

on file, and other pre-trial documents show that no genuine issue of material fact exists and the

movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322,

106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247, 106 S. Ct. 2505, 2509, 91 L. Ed. 2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1355-56, 89 L. Ed. 2d 538 (1986); Tyler v.

Runyon, 70 F.3d 458, 464 (7th Cir. 1995).

14

Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis, 806 F.2d 146, 149 (7th Cir. 1986). In deciding to grant a summary judgment motion, inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 586; Marine Bank Nat'l Ass'n v. Meat Counter, Inc., 826 F.2d 1577, 1579 (7th Cir. 1987). Existence of a material fact in dispute is sufficient to block judgment only if the disputed fact is determinative of the outcome under applicable law. Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motions and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in his pleading, but his response must set forth specific facts showing a genuine issue for trial. Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 248; Matsushita, 475 U.S. at 587; Tyler v. Runyon, 70 F.3d 458, 464 (7th Cir. 1995). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is approved. Matsushita, 475 U.S. at 587.

Those standards also apply to the fact findings and orders that can be entered here even though partial summary judgment may not be entered.

## The Language of the Guaranty Provides
## That it is Non-Recourse Against Doctors Hospital

Doctors Hospital and the LaSalle Trust agree that terms of the Guaranty are

unambiguous. (Trust Resp. at 4; Drs. Hosp. Mot. For Partial Summ. J. at 5-6). Because the issue

here involves reading of an unambiguous contract, a ruling on that issue is appropriate.

International Union of United Auto., Aerospace & Agric. Implement Workers of Am. v.

Rockford Powertrain, Inc., 350 F.3d 698, 703 (7th Cir. 2003) (citing Ryan v. Chromalloy

American Corp., 877 F.2d 598, 602 (7th Cir. 1989)).   In reading the Guaranty at issue, state law

applies.   N. Shore Gas Co. v. Salomon, Inc., 152 F.3d 642, 652 (7th Cir. 1998).  In this case, the

Guaranty provides that the laws of the State of New York shall govern its interpretation.

(Guaranty ¶ 7).

Under New York law, when a contract is unambiguous on its face, the intent of the

parties must be gleamed from the four corners of the contract.  Fetner v. Fetner, 293 A.D.2d 645,

646 (N.Y. App. Div. 2002).  The Guaranty must be read in its entirety to determine its purpose

and intent of the parties.  W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (N.Y. 1990).

When reading the Guaranty in its entirety, a practical interpretation to the language must be

employed so that the parties' reasonable expectations are realized.  Snug Harbor Square Venture

v. Never Home Laundry, Inc., 252 A.D.2d 520, 521 (N.Y. App. Div. 1998).

The Guaranty provides, "Guarantor hereby unconditionally, absolutely and irrevocably

guarantees and becomes surety to Lender for the prompt payment of the entire amount of the

indebtedness in strict accordance with the terms of the Loan Agreement." (Material Facts ¶ 5).

The LaSalle Trust argues that this provision provides for full recourse against the Debtor in the language "entire amount of the indebtedness." While reading that paragraph lends support to the LaSalle Trust's argument, it is subject to other provisions in the Guaranty. "It is well settled that a contract must be read as a whole to determine its purpose and intent, and * * * single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." Aimco Chelsea Land, LLC v. Bassey, 773 N.Y.S.2d 908, 909 (N.Y. App. Div. 2004) citing Matter of Friedman, 64 A.D.2d 70, 81 (N.Y. App. Div. 1978).

When the Guaranty is read as a whole, the above quoted provision is shown to be subject to the Guaranty's exculpation clause. (Material Facts ¶ 6). The first sentence of the exculpation clause makes clear that it trumps any other provisions in the Guaranty that may conflict with it.

The exculpation provision then provides that:

> Lender may pursue any action for specific performance, action for money judgment, or other appropriate action or proceeding (including, without limitation, to obtain a deficiency judgment) against Guarantor or any other Person solely for the purpose of enabling Lender to realize upon the Collateral. (Material Facts ¶ 6, emphasis supplied).

The LaSalle Trust improperly interprets the clause, "solely for the purpose of enabling Lender to realize upon the Collateral," as only applying to "any other person" and not also limiting the collection rights against the Guarantor. (Trust Resp. ¶ 6). But it is clear from a plain reading of this provision that while the lender may pursue any action against the "Guarantor or any other Person," the lender is limited in both situations to realizing upon the collateral.

17

When interpreting provisions in the Guaranty, "the words and phrases used in an agreement must be given their plain meaning so as to define the rights of the parties." Mazzola v. County of Suffolk, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988). Where "a descriptive or qualifying phrase follows a list of possible antecedents, the qualifying phrase generally refers to and modifies all of the preceding clauses." A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, 87 N.Y.2d 574, 579-580 (N.Y. 2004). "[W]here general words appear at the end of a sentence and following several possible antecedents, they usually refer to, and modify, the whole sentence and not merely the last preceding antecedent." Podiatry Society of the State of New York v. Regents of the University of the State of New York, 358 N.Y.S.2d 276, 276 (1974). Therefore, it is clear that the lender may pursue an action against the "Guarantor or any other Person" solely for the purpose of enabling Lender to realize upon the Collateral.

The exculpation clause contains a provision allowing for a deficiency judgment under certain exceptions. (Material Facts ¶ 6). The LaSalle Trust asserts that interpreting the Guaranty as non-recourse would render that provision meaningless. This assertion, however, ignores exceptions in the exculpation provision that do provide for recourse. Where one of the exceptions applies, the lender is entitled to obtain a deficiency judgment. Under exception (e), for example, the lender may bring suit for fraud damages in connection with the Guaranty without having such damages limited to the value of collateral. (Material Facts ¶ 6). If any listed exception were to apply and the damages exceed the collateral value, lender would then be allowed to seek a deficiency judgment. Absent such an exception, however, the Guaranty is a nonrecourse agreement. None of the exceptions in the exculpation clause are asserted to apply to the issue presented.

The LaSalle Trust further argues that because the Guaranty does not contain an explicit provision describing it as "nonrecourse" or "without recourse," it should be treated as recourse: "A waiver of LaSalle Trust's right to recourse must be clear, unmistakeable, without ambiguity and should not be lightly presumed." (Trust Resp. ¶ 8). The LaSalle Trust cites Caldor Corp. v. S. Plaza Assoc., L.P. (In re Caldor, Inc.) 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) to support this notion. In Caldor, waiver was defined as "the voluntary and intentional abandonment of a known right which but for the waiver, would have been enforceable." Id. at 133. Pursuant to that definition, in order for there to be a valid waiver, a known right must first exist. In this case, however, it does not appear from clear language of the Guaranty that any right to recourse ever existed. Therefore, the Guaranty need not explicitly waive or disclaim a non-existent right to recourse for the document to be treated as a nonrecourse agreement.

Further, the reasoning of LaSalle Trustee is inconsistent with rules governing contract construction under New York law. "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." South Road Ass., LLC. V. International Business Machines Corp., 2 A.D.3d 829, 831 (N.Y. App. Div. 2003). While the Guaranty does not explicitly say that it is "nonrecourse" or "without recourse," the explicit words in the Guaranty earlier quoted render it nonrecourse against Doctors Hospital.

## The LaSalle Trust's Claim Is Not Converted to a
## Recourse Claim Pursuant to 11 U.S.C. § 1111(b)

The LaSalle Trust argues that should the Guaranty itself be read as nonrecourse,

§ 1111(b) of the Bankruptcy Code requires that it be treated as a recourse obligation. (Trust

Resp. ¶ 11, citing 11 U.S.C. § 1111(b)). Section 1111(b) provides:

> A claim secured by a lien on property of the estate shall be allowed or disallowed
> under § 502 of this title the same as if the holder of such claim had recourse
> against the debtor on account of such claim, whether or not such holder has such
> recourse, unless . . . such holder does not have such recourse and such property is
> sold under § 363 of this title or is to be sold under the plan.

Pursuant to that provision, the LaSalle Trust would be entitled to recourse if: (1) it was

not initially entitled to recourse treatment, and (2) the property in question has not been sold

under 11 U.S.C. § 363 and is not to be sold under a confirmed plan. Therefore, in order to

qualify for recourse treatment pursuant to § 1111(b), the LaSalle Trust's collateral must not have

been sold pursuant to § 363 and a confirmed plan must not provide for its disposition.

Doctors Hospital argues that the LaSalle Trust's collateral has been sold pursuant to

§ 363 of the Bankruptcy Code. (Drs. Hosp. Mot. For Partial Summ. J. at 9). The LaSalle Trust,

however, contends that its collateral is much more extensive than the property already sold.

(Trust Resp. ¶ 14). The LaSalle Trust argued that, "In fact, the most valuable collateral likely has

not been sold. Instead, Dr. Desnick, as part of the estate's settlement with him, has been

recruited to help recover it." (Trust Resp. ¶ 14). The LaSalle Trust also cites provisions of

certain agreements to demonstrate the extent of its collateral.

There is no need to pin down the details of collateral sales that were or will be held.

Assuming arguendo that the LaSalle Trust is correct in asserting that not all of its collateral has

20

yet been sold, the Guaranty is still not entitled to recourse treatment because any remaining

property "is to be sold" [§ 1111(b)] under the proposed plan. As correctly pointed out by

Doctors Hospital:

> Because this case is a liquidating chapter 11 case, to the extent that the Debtor's
> adversary proceeding is not successful in avoiding the guarantee and the pledges,
> all of the property will be either sold or abandoned to the secured creditor and
> therefore the Trust will never be entitled to a recourse against Doctors Hospital or
> its estate. Doctors Hospital will not keep any creditor's property.

(Reply Mem. of Doctors Hosp. at 10-11). Section 1111(b) does not discuss abandonment of

property. However, if the property is not sold, but is abandoned or returned to the secured party,

any claim of nonrecourse deficiency would disappear. Collier on Bankruptcy, ¶ 1111.03(2)(b)

(15th ed. rev. 2004); see also In re DRW Property Co., 57 B.R. 987 (Bankr. N.D. Tex. 1986).

Therefore, in no possible event can the Guaranty meet the requisite standards under

§ 1111(b) of the Bankruptcy Code mandating treatment as a recourse obligation.

## CONCLUSION

For the foregoing reasons, the Doctors Hospital Motion for Partial Summary Judgment on

the LaSalle Trust Proof of Claim is denied, and the LaSalle Trust Cross Motion for Summary

Judgment is likewise denied. However, under Rule 56(d) Fed.R.Civ.P. [Rule 7056

Fed.R.Bankr.P.], the LaSalle Trust Claim will be limited to value of its collateral, as the

Guaranty is a nonrecourse obligation of Doctors Hospital. Under the same authority, undisputed

facts set forth above in ¶¶ 1 through 12 are deemed to be established for and at trial.

A separate order consistent with these rulings will be entered.  Pursuant to pretrial order,

trial remains set on all other issues.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 22 day of September 2005