UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE                                          )
                                               )
DOCTORS HOSPITAL OF HYDE PARK, INC.            )     Chapter 11
                                               )     Bankruptcy No. 00 B 11520
            Debtor.                            )
                                               )
_____        )
DOCTORS HOSPITAL OF HYDE PARK, INC.            )
            Plaintiff,                         )
                                               )     Adversary No. 02 A 00363
      v.                                       )
                                               )
DR. JAMES H. DESNICK, et al.,                  )
            Defendants.                        )

## MEMORANDUM OPINION ON THE LASALLE TRUST'S
## MOTION FOR SUMMARY JUDGMENT AGAINST DOCTORS HOSPITAL

This Adversary case relates to the Chapter 11 bankruptcy case filed by Debtor Doctors

Hospital of Hyde Park, Inc. ("Doctors Hospital"). The Adversary Complaint pleaded a total of

twenty-eight various counts ("Complaint"). Only three counts of this Adversary proceeding

pertain to Defendant LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee

for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass-Through

Certificates, Series 1997, D5, by and through its Servicer, Orix Capital Markets, LLC ("LaSalle"

or the "LaSalle Trust"), those Counts being VIII, IX, and X ("LaSalle Counts"). Pursuant to the

LaSalle Counts, Doctors Hospital seeks to have rent payments adjudicated as fraudulent

transfers, and also to recover rental payments transferred to an entity named HPCH LLC

("HPCH") pursuant to the HPCH Lease. Counts VIII and IX allege Doctors Hospital made rent

payments to HPCH that exceed fair market rental value, and seek to avoid these transfers as

fraudulent under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the

"Illinois Act"), as made applicable by § 544 of the Bankruptcy Code. Likewise, Count X asserts that the same rent payments from Doctors Hospital to HPCH can be avoided under § 548 of the Bankruptcy Code. Counts VIII, IX and X all assert that these allegedly fraudulent rent payments may be recovered from the LaSalle Trust under § 550 of the Bankruptcy Code.

The LaSalle Trust moved for summary judgment on Counts VIII, IX, and X, asserting that Doctors Hospital never made rent payments to HPCH. It also argues that if payments found to be rent were made, LaSalle Trust was not "initial" transferee of any rent payments, but rather a "mediate" transferee and is thus protected by § 550(b)(1) of the Bankruptcy Code, Title 11 U.S.C.

In response, Doctors Hospital presented facts seeking to demonstrate that rent payments did go to HPCH and that the LaSalle Trust was the initial transferee of certain rent payments. It seeks findings of undisputed facts pursuant to Fed.R.Bankr.P. 7056(d) that: (1) pursuant to the HPCH Lease, Doctors Hospital made rent payments to HPCH, which the LaSalle Trust received and applied to the debt service on the Nomura Loan; and (2) the LaSalle Trust is the initial transferee of all rent payments that Doctors Hospital made to HPCH.

In its Response to the summary judgment motion, Doctors Hospital also indicates that it limits its assertions as to those transfers to three categories: (1) Transfers made from Doctors Hospital's operating account #6111100385 to the Nomura Account from October 1997 through July 1998; (2) Transfers made from account #6700021493 (Collections Account) to the Nomura Account from July 1998 to April 2000; and (3) Transfers made from the Daiwa Account to the Nomura Account from July 1998 to April 2000. While LaSalle Trust disputes its liability to Doctors Hospital for the transfers defined under categories (1) and (2), the Trust does not dispute

2

that Doctors Hospital has accurately identified transfers of money to the Nomura Account. Accordingly, its arguments in Reply focused on transfers made from the Daiwa Account to the Nomura Account from July 1998 to April 2000 (the "Disputed Transfers").

For reasons discussed below, the motion for summary judgment is denied. Also, Doctors Hospital's requested findings will not be entered, as triable issues are posed regarding both issues. But undisputed facts set forth below are deemed established for trial under Rule 56(d) Fed.R.Civ.P. [Rule 7056 Fed.R.Bankr.P.].

## BACKGROUND

The Defendant Dr. Desnick purchased Doctors Hospital in 1992 for approximately $2.4 million. Ownership of the real estate and certain fixtures were titled in HPCH, a Delaware limited liability company. HPCH is owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick owns 100% of HP Membership and a controlling interest in HPCH Partners, L.P. Doctors Hospital managed the hospital's business operations. Doctors Hospital entered into a lease to rent the hospital property located at 5800 South Stoney Island Avenue, Chicago, Illinois (the "Hospital Property") from HPCH for approximately $470,000 per month.

On August 28, 1997, Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Loan"). The Loan was primarily for the benefit of Desnick. The Loan was secured by the hospital real estate, equipment, accounts receivable, and certain other intangibles relating to Doctors Hospital. As further security, HPCH assigned to Nomura all of its rights in the HPCH Lease with Doctors Hospital and the rental payments due thereunder. Doctors Hospital also executed a Guaranty and Suretyship Agreement (the "Guaranty") in favor of

3

Nomura.   Pursuant to the Guaranty, Doctors Hospital became surety to Nomura for the loan

amount.  Nomura transferred all title, rights, and obligations relating to the Loan to Asset

Securitization Corporation ("ASC"), which later assigned such rights and obligations to the

LaSalle Trust.

## PLEADINGS

Doctors Hospital filed its Chapter 11 bankruptcy petition on April 17, 2000.  On March

28, 2001, the LaSalle Trust filed its Proof of Claim in the bankruptcy case in the amount of

$60,139,317.04 based on obligations of Doctors Hospital arising from its guarantee of the Loan.

Doctors Hospital filed this Adversary proceeding on April 15, 2002.

As earlier noted, in Counts VIII, IX, and X asserted against the LaSalle Trust, Doctors

Hospital seeks to render null and void certain guarantees as fraudulent transfers and to recover

rental payments from the LaSalle Trust.  Counts VIII and IX assert that the Guaranty, the

Operator Pledge and Security Agreement, the Equity Pledge Agreement, and all rent payments

made to HPCH pursuant to the HPCH Lease were fraudulent transfers under the Illinois Uniform

Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.*, as made applicable under § 544 of the

Bankruptcy Code.  (Compl. ¶ 160-176).   Count X asserts that certain rental payments are

recoverable under § 548 of the Bankruptcy Code, as certain of the transfers were made to HPCH

during the one-year period prior to the bankruptcy filing by Doctors Hospital.

The LaSalle Trust answer pleaded eight affirmative defenses: (1) the initial transferee of

payments in issue was Nomura; (2) the LaSalle Trust was an immediate or mediate good faith

transferee of ASC which was itself the immediate good faith transferee of Nomura which took

the transfers for value, in good faith, and without knowledge of their voidability; (3) HPCH is the

4

initial transferee of the HPCH Lease and rent transfers; (4) the Complaint is barred because it fails to state a claim upon which relief can be granted; (5) the Complaint is barred by failure of consideration or failure of conditions precedent; (6) the Complaint is barred by various principles or estoppels; (7) the Complaint is barred by the principles or doctrines of *in pari delicto* or unclean hands; (8) and the Complaint is barred by virtue of the information, knowledge, or belief, at all relevant times, held by the Debtor or the Estate. (Amend. Ans. ¶¶ 1-10).

On June 25, 2003, the LaSalle Trust filed cross-claims and counter-claims against several co-defendants, including Doctors Hospital. The LaSalle Trust included in those filings fraud allegations against Doctors Hospital. Doctors Hospital moved to dismiss those cross-claims and counter-claims. An Order and supporting memorandum opinion were entered February 26, 2004 dismissing all of the LaSalle Trust's cross-claims and counter-claims against Doctors Hospital except a claim for breach of guaranty.

Despite the fact that the LaSalle Trust's fraud allegations against Doctors Hospital in this Adversary proceeding were thereby dismissed, LaSalle Trust filed an amended claim ("Amended Claim") on March 10, 2004 seeking amounts based on the original fraud allegations. On October 18, 2004, Doctors Hospital moved for disallowance of Amended Claim ("Motion to Disallow") arguing that the LaSalle Trust was not entitled to claim damages for fraud allegations that were previously dismissed in this Adversary proceeding. Doctors Hospital and the LaSalle Trust reached an agreement with regards to the Motion to Disallow whereby the Amended Claim would be withdrawn by the LaSalle Trust and the Motion to Disallow would stand as an objection to the contract claims. (Agreed Order (Dec. 6, 2004)). Therefore, the LaSalle Trust's original Claim is its only existing proof of claim.

5

On April 22, 2005 Doctors Hospital filed a motion for partial summary judgment seeking a judgment limiting the LaSalle Trust's Claim against the estate to the extent that it exceeds the value of its collateral.[1] On June 1, 2005 the LaSalle Trust filed a cross motion for summary judgment. An Order and supporting memorandum opinion was entered on September 22, 2005 limiting the LaSalle Trust's Claim to the value of its collateral.

A trial has been set for March 20, 2006 on the LaSalle remaining proof of claim consolidated with the trial of the LaSalle Counts.

Pursuant to the Pretrial Order, Doctors Hospital and the LaSalle Trust filed a Stipulation of uncontested material facts on August 18, 2005. In addition, the parties filed required materials supporting and opposing summary judgment. Those are the sources of uncontested material facts set forth.

### MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

#### Parties and Related Entities

1.     Daiwa Healtchco-2 LLC ("Daiwa") is a Delaware limited liability company with a place of business in New York, New York. (Stip. ¶ 3).

2.     HPCH LLC ("HPCH") is a Delaware limited liability company. In approximately July or August 1997, HPCH acquired the record title of the Hospital Property from HPCH Partners, L.P. (Stip. ¶ 4).

---

[1] On April 22, 2005 Doctors Hospital also filed a second motion for partial summary judgment against the LaSalle Trust for various issues. Pursuant to an oral ruling from the bench on May 11, 2005, an Order was entered denying the second motion.

6

3.    Medical Management of America, Inc. ("MMA") is a Delaware corporation and was a purported manager of Doctors Hospital and ETCH. Desnick, Desnick Trust 1, and Desnick Trust 2 own 100% of MMA. (Stip. ¶ 10).

4.    MMA Funding, Inc. is a special purpose Delaware corporation and the special purpose manager of MMA Funding L.L.C. Desnick is 100% owner of MMA Funding, Inc. (Stip. ¶ 11).

5.    MMA Funding L.L.C. ("MMA Funding") is a Delaware limited liability corporation. MMA Funding is owned 99% by Doctors Hospital and 1 % by MMA. (Stip. ¶ 12).

6.    Doctors Hospital's revenue largely came in the form of reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield. (Stip. ¶ 31).

7.    On August 24, 1992, HPCH Partners, L.P. leased the real estate located at 5800 South Stoney Island Avenue, Chicago, Illinois (the "Hospital Property") to Doctors Hospital. Doctors Hospital leased and utilized the Hospital Property as a hospital. (Stip. ¶ 32).

8.    On March 31, 1997, Daiwa, pursuant to a healthcare receivables securitization program, agreed to lend up to $25,000,000 to MMA Funding (the "Daiwa Loan"). Under language of the loan transaction documents, Doctors Hospital contributed its receivables to MMA Funding, and Daiwa, in turn, loaned funds to MMA Funding according to a specified formulae. (Stip. ¶ 40).

9.    The introductory paragraph of the Daiwa Loan Agreement identifies MMA Funding as the "Borrower." (Stip. ¶ 42).

7

10.     The Daiwa Loan was signed by two parties: MMA Funding and Daiwa (identified as the "Lender").  (Stip. ¶ 43).

11.     Pursuant to the Daiwa Loan, Daiwa issued new borrowings from account #205779 at the Bank of New York (the "Daiwa Account").  (Stip. ¶ 56).

12.     The new borrowings forwarded from Daiwa represented new borrowings under the Daiwa Loan.  (Stip. ¶ 57).

13.     Section 2.02 of the Daiwa Loan provided that the Daiwa Account was under the sole dominion and control of Daiwa. Section 2.02 also stated that the Daiwa Account was established "for the purpose of receiving funds from [MMA Funding] to be distributed towards repayment of the Daiwa Loan."  (Stip. ¶ 58).

14.     Doctors Hospital's receivables were always reflected as its assets on its audited financial statements for fiscal years 1997, 1998 and 1999.  (Stip. ¶ 63).

15.     Doctors Hospital's audited financial statements for years 1997, 1998 and 1999 did not reflect any accounts receivable transferred to MMA Funding.  (Stip. ¶ 64).

16.     No balance sheets or profit-and-loss statements were prepared for MMA Funding after the Daiwa Loan closed, and MMA Funding never filed a tax return.  (Stip. ¶ 65).

17.     On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the "Nomura Loan") to HPCH, the entity from whom Doctors Hospital leased the Hospital Property. The obligations of HPCH under the Nomura Loan were secured, *inter alia,* by the Hospital Property and a lease between HPCH and Doctors Hospital.  (Stip. ¶ 70).

18.     The Nomura Loan was evidenced by a Promissory Note in the principal sum of $50,000,000 in favor of Nomura (the "Promissory Note") and was secured, *inter alia,* by a

8

Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Mortgage") and an Assignment of Leases and Rents (the "Lease Assignment"). The Lease Assignment pledged to Nomura the lease between HPCH and Doctors Hospital. (Stip. ¶ 72).

19.    Absent the occurrence of an Event of Default as such term is defined in the Nomura Loan documents, Doctors Hospital had no obligation to make debt service payments or other payments under the terms of the Nomura Loan transaction documents. HPCH had no source of income other than the Lease payments from Doctors Hospital. MMA Funding had no obligation to make payments of rent to HPCH or satisfy the obligations due to Nomura under the Nomura Loan. (Stip. ¶ 74).

20.    As further security for the performance of its obligations, Doctors Hospital executed an Equity Pledge Agreement, dated August 28, 1997, in favor of Nomura. Section 2 of the Equity Pledge Agreement granted to Nomura a security interest in and lien on all of Doctors Hospital's 99% interest in MMA Funding. (Stip. ¶ 81).

21.    Contemporaneously with the Nomura Loan, on August 28, 1997, HPCH (then the record owner of the Hospital Property), and Doctors Hospital entered a lease agreement (the "Lease"). (Stip. ¶ 86).

22.    Exhibit B of the Nomura Loan established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan. (Stip. ¶ 88).

23.    Section 2.1 of the Lease provided:

[HPCH] acknowledges, so long as the Loan is outstanding, that the Rent may be paid by way of transfer of funds by Daiwa to the Cash Collateral Account. To the extent that the aggregate amount of any such transfer shall exceed the Rent then due and subject to the terms of the Loan Agreement, Landlord agrees to promptly remit such excess to [Doctors Hospital]. (Stip. ¶ 89).

9

24. Other than the Lease, there are no agreements between Doctors Hospital and HPCH. (Stip. ¶ 93).

25. As part of the Nomura Loan transaction, HPCH assigned to Nomura all of its rights in the Lease and the rental payments due thereunder (the "Lease Assignment"). (Stip. ¶ 94).

26. Pursuant to Section 2 of the Lease Assignment, HPCH assigned the HPCH Lease to Nomura which gave Nomura "the right to collect the Rents and to apply the Rents in partial payment of the [Nomura Loan]." (Stip. ¶ 95).

27. Subsequent to HPCH's acquisition of the Hospital Property, rent due under the Lease continued to be reported on the tax returns of HPCH Partners, L.P. The tax returns of HPCH Partners, L.P. indicate receipt of rents, and it had no tenants other than Doctors Hospital. HPCH owned no property other than the Hospital Property. (Stip. ¶ 96).

28. The Hospital Property had an assessed value of $1,017,541.00, according to the Cook County, Illinois taxing authorities in 1997, which was based on 38% of the fair market value. HPCH obtained an appraisal in July, 1997, valuing the property (as of January 1, 1997) at $2,675,000.00, which appraisal was used by the HPCH to protest the ad valorem tax valuation of the Hospital Property. (Stip. ¶ 97).

29. Daiwa forwarded to an account titled in the name of MMA Funding ("The MMA Funding Account") new borrowings as dictated by the Daiwa Loan agreement. The diagram used to describe the cash flow reflected in the Stipulation is undisputed. (Stip. ¶ 113). (See Ex. A to this Opinion).

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334.  This Adversary concerns actions

under 11 U.S.C. §§ 544, 548, and 550, as well as a claim filed by LaSalle Trust.  Therefore this is

a core proceeding under 28 U.S.C. § 157(b)(2)(C), (E), and (F).  Reference of the matters and

issues herein were made to the bankruptcy court under District Court Internal Operating

Procedure 15(a).  Venue lies in this District under 28 U.S.C. § 1409(a).

## STANDARDS FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) is applicable here pursuant to Fed.R.Bankr.P. 7056.  Summary

judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions

on file, and other pre-trial documents show that no genuine issue of material fact exists and the

movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322,

106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986); Tyler v. Runyon, 70 F.3d 458, 464 (7th Cir.

1995).

Summary judgment is granted to avoid unnecessary trials when there is no genuine issue

of material fact in dispute.  Wainwright Bank & LaSalle Trust Co. v. Railroadmens Fed. Sav. &

Loan Ass'n of Indianapolis, 806 F.2d 146, 149 (7th Cir. 1986).  In deciding to grant a summary

judgment motion, inferences to be drawn from the underlying facts must be viewed in the light

most favorable to the party opposing the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242

at 255 (1986); Marine Bank Nat'l Ass'n v. Meat Counter, Inc., 826 F.2d 1577, 1579 (7th Cir.

1987). Existence of a material fact in dispute is sufficient to block judgment only if the disputed

fact is determinative of the outcome under applicable law.  Anderson, 477 U.S. at 248.

11

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motions and must identify those portions of the pleaded materials which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in his pleading, but a response must set forth specific facts showing a genuine issue for trial. Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 248; Tyler v. Runyon, 70 F.3d 458, 464 (7th Cir. 1995). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is approved. But otherwise it is not approved. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 574 at 587 (1986).

## APPLICATION STATE LAW

Pursuant to the choice of law provision found in the Guaranty and Suretyship Agreement and the Operator Security and Pledge Agreement between the LaSalle Trust and Doctors Hospital, as well as the Daiwa MMA Loan, the laws of the State of New York apply in this case. (Guaranty ¶ 7; Operator and Security Pledge Agreement ¶ 12.15); see also Spinozzi v ITT Sheraton Corp., 174 F.3d 842, 846 (7th Cir. 1999) (finding contractual choice of tort law provisions are generally enforceable).

## I.   WHETHER RENT TRANSFERS WERE MADE TO HPCH PURSUANT TO THE HPCH LEASE IS A MATERIAL FACT IN DISPUTE

Doctors Hospital argues that all rent payments were made to HPCH pursuant to the

HPCH Lease and were fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act,

740 ILCS 160/1 *et seq.* as made applicable by § 544 of the Bankruptcy Code. (Compl. at 39-40).

However, LaSalle Trust argues that rent payments were never made to HPCH pursuant to

the HPCH Lease. (Trust Mem. at 6). It contends that the supposed rent transfers are therefore

not avoidable under the Illinois Act or § 548, and Counts VIII, IX, and X fail as a matter of law.

(Trust Mem. at 2). As shown below, whether or not rent payments were made to HPCH pursuant

to the HPCH Lease is a material issue of fact in dispute precluding summary judgment.

Doctors Hospital argues that transfers of rent were made to HPCH in three ways:

(1) directly from a Collection Account at Grand National Bank that received miscellaneous

receipts of Doctors Hospital; (2) before July 1998, directly from a Doctors Hospital bank

account; and (3) from a Daiwa bank account - all to the Cash Collateral Account controlled by

the LaSalle Trust. (Doctors Hosp. Resp. Mem. at 5). It argues that all of those transfers were

payments of rent because Doctors Hospital's Lease with HPCH was assigned to the LaSalle

Trust, which controlled the Cash Collateral Account; and therefore the LaSalle Trust had a right

to receive rent payments. (Doctors Hosp. Resp. Mem. at 5).

Doctors Hospital reasons that provisions in agreements between HPCH and Nomura and

the corresponding obligations of Doctors Hospital under § 5.8 of the Operator Security and

Pledge Agreement between Doctors Hospital and Nomura mandated the creation of two bank

accounts for payment of rent pursuant to the HPCH Lease: the Collection Account and the Cash

13

Collateral Account. (Doctors Hosp. Resp. Mem. at 3-4). Doctors Hospital asserts that it directed funds to the Collection Account, which were then swept daily into the Cash Collateral Account controlled by the LaSalle Trust. (Doctors Hosp. Resp. Mem. at 4). Doctors Hospital argues that there was no reason for it to direct funds to a Collection Account which would then be sent to a Cash Collateral Account controlled by the LaSalle Trust other than to facilitate rent payments on the Lease. (Doctors Hosp. Mem. at 7). Doctors Hospital argues that this arrangement is evidence that Doctors Hospital made rent payments to HPCH. Id.

The LaSalle Trust, in response, argues that "it was entitled to principal and interest payments from HPCH, who along with Daiwa agreed to the transfer of funds directly from Daiwa to the Trust. The Trust had a clear legal right to receive the Disputed Transfers from Daiwa." (Trust Reply Mem. at 10). Therefore, according to the LaSalle Trust it did not receive any rent payments pursuant to the HPCH Lease, but rather it received principal and interest that it was entitled to.

While Doctors Hospital has shown evidence of an arrangement suggesting that rent payments were made to HPCH, a trial to present a full picture of relationships between parties is needed to shed more light on those relationships. A motion for summary judgment must be denied where a material issue of fact argued by the non-moving party could lead rational trier of fact to find for the non-moving party. Construing the facts here in the light most favorable to the nonmovant, a triable dispute is found over whether rent transfers were made to HPCH.

14

## II.    WHETHER THE LASALLE TRUST IS THE
### INITIAL TRANSFEREE IS A MATERIAL FACT IN DISPUTE

Even assuming arguendo that "rent" was paid, other related issues cannot be decided by

summary judgment. LaSalle Trust also argues that it is entitled to summary judgment as a matter

of law because undisputed evidence establishes that even if rent was paid, it was not the "initial"

transferee of any rent payments from Doctors Hospital, but rather was a "mediate" transferee

who gave value for the payments, in good faith and without knowledge of the voidability of the

transfers. (Trust Mem. at 4). Therefore, LaSalle Trust argues that Doctors Hospital is precluded

from recovering any transfers, as it is protected pursuant to 11 U.S.C. § 550(b). (Trust Mem. at

4). Section 550 provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if the
> court so orders, the value of such property, from-
>> (1) the initial transferee of such transfer or the entity for whose
>> benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.
> (b) The trustee may not recover under section (a)(2) of this section from-
>> (1) a transferee that takes for value, including satisfaction or
>> securing of a present or antecedent debt, in good faith, and without
>> knowledge of the voidability of the transfer avoided; or
>> (2) any immediate or mediate good faith transferee of such
>> transferee.

Doctors Hospital, however, contends that the LaSalle Trust has improperly interpreted the

Daiwa/MMA Loan and is not protected by § 550(b) as it was the initial transferee of said

transfers.

First, Doctors Hospital argues that it was the Borrower under the Daiwa/MMA Loan, not

MMA. Thus, Doctors Hospital reasons that it pledged its receivables to Daiwa, who then issued

new borrowings to the LaSalle Trust rendering it the initial transferee. Second, Doctors Hospital

argues that if it is not treated as the Borrower under the Daiwa/MMA Loan, the LaSalle Trust is

still the initial transferee of new borrowings. Under that scenario, Doctors Hospital argues that

receivables were pledged to MMA, who then transferred them to Daiwa. Doctors Hospital

argues that Daiwa then transferred new borrowings to the LaSalle Trust rendering it the initial

transferee.

Daiwa, pursuant to a healthcare receivables securitization program agreed to lend up to

$25,000,000 to MMA Funding. (Material Facts ¶ 8). Under language of the loan documents,

Doctors Hospital contributed its receivables to MMA Funding and Daiwa, in turn, loaned funds

to MMA Funding according to a specified formulae. (Material Facts ¶ 8). While the Daiwa

Loan Agreement identifies MMA as the "Borrower" and was signed by MMA Funding and

Daiwa (Material Facts ¶ 9-10), Doctors Hospital argues that it was the Borrower on the Daiwa

Loan, not MMA. (Doctors Hosp. Resp. Mem. at 13).    Doctors Hospital argues that it never

contributed its receivables to MMA, but rather pledged its receivables to Daiwa. Doctors

Hospital argues that Daiwa took what it was due, and then issued new borrowings to LaSalle

Trust, thus making LaSalle Trust the initial transferee.

To support its contention, Doctors Hospital offers evidence of its financial records that

reflected its receivables. (Doctors Hosp. Resp. Mem. at 14). According to Doctors Hospital,

"There were no entries on the books and records showing contributions of Doctors Hospital

receivables to MMA. No balance sheets or profit-and-loss statements were prepared for MMA

after the Daiwa Loan closed, and MMA never filed a tax return." (Doctors Hosp. Resp. Mem. at

at 14).

Doctors Hospital has also brought forth testimony of certain employees to support its

argument that receivables were not pledged to MMA. Victor Brown, an employee of the LaSalle

Trust's loan servicer testified by deposition that he was not aware of any funds that flowed

through an account in the name of MMA Funding. (Dep. Victor Brown at 44). When Richard

Felbinger, executive vice president of finance, was deposed and questioned about his

interpretation of the Daiwa Loan, he stated, "It was described to me as it was a pledge of

accounts receivable to Daiwa. Basically Daiwa would front us the money for our receivables,

and they would get all the cash collections from that." (Dep. Richard Felbinger at 11). Nelson

Vasquez, a chief financial officer, testified that he never heard of MMA Funding and didn't

recall seeing transactions with MMA Funding reflected on the books and records of Doctors

Hospital. (Dep. Nelson Vasquez at 36).

The LaSalle Trust, however, argues that the original agreement between Daiwa and

MMA should not be rewritten to treat Doctors Hospital as the Borrower, as it was an

unambiguous contract. (Trust Reply Mem. at 2-3). The LaSalle Trust cites precedents to support

the proposition that extrinsic evidence cannot be introduced to contradict the terms of an

unambiguous contract. (Trust Reply Mem. at 3).

However, "it is well established that a written contract may be modified by the parties'

post-agreement course of performance." General Electric Capital Commercial Automotive

Finance, Inc. v. Spartan Motors, Ltd., 246 A.D.2d 41, 52 (N.Y. App. Div. 1998); Recon Car

Corp. of N.Y. v. Chrysler Corp., 130 A.D.2d 725, 729 (N.Y. App. Div. 1987); CT Chems.

(U.S.A.) Inc. v. Vinmar Impex Inc., 81 N.Y.2d 174, 179-80 (N.Y. 1993). Parol evidence can be

considered to determine course of dealing and course of performance between parties. Big Tree

17

Energy Partners v. Braford, 219 A.D.2d 27 (N.Y. App. Div. 1996). While LaSalle Trust argues that the subsequent course of performance argument may not be used by a non-party to rewrite an agreement, such is not always clear under New York law. Indeed, the New York authorities cited above make clear that a written contract may be modified by the parties' course of performance. Therefore, it is again clear that a rational fact finder cannot at this stage say that the non-moving party is wrong on this issue, and a material fact is in dispute regarding who should be treated as borrower under the Daiwa Loan.

If Doctors Hospital is not treated as the Borrower under the Daiwa/MMA Loan, Doctors Hospital argues that the LaSalle Trust is nevertheless still the initial transferee. According to the LaSalle Trust, Doctors Hospital pledged its receivables to MMA, rendering MMA the "initial" transferee. (Trust Mem. at 8-11). The LaSalle Trust argues that MMA then transferred the receivables to Daiwa, who became the "immediate" transferee. Id. The LaSalle Trust argues that when the transfers were sent to it from Daiwa, it became a "mediate" transferee. Id.

Doctors Hospital argues in response that transfers received by the LaSalle Trust were not the same receivable proceeds that were initially pledged to MMA. (Doctors Hosp. Resp. Mem. at 12-13). According to it, proceeds from the accounts receivable went from MMA to Daiwa to repay funds previously loaned and to pay other fees and costs. Id. At that point, Doctors Hospital argues, the funds became assets of Daiwa. Doctors Hospital argues that from those assets Daiwa took what it was due under the Daiwa Loan and then issued *new* borrowings. Id. According to Doctors Hospital, proceeds were then sent to the LaSalle Trust making it the initial transferee of said new borrowings. Once again a full trial is needed to illuminate the proper perspective of complex relationships between the parties.

18

## III.   COMPLEX FACTS IN THIS CASE DO NOT
LEND IT TO DISPOSITION BY SUMMARY JUDGMENT

Summary judgment is not necessarily precluded merely because the legal issues are

complex.  S.E.C. v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978).  In certain

cases, however, summary judgment may be inappropriate when the legal issue is so complex,

difficult, or insufficiently highlighted that further facts need to be explained for a prudently

considered resolution.  Eby v. Reb Realty, Inc., 495 F.2d 646, 649 (9th Cir. 1974); citing

Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Palmer v.

Chamberlain, 191 F.2d 532, 540 (5th Cir. 1951); 10 C.A. Wright & A. Miller, supra at § 2725,

pp. 501-05.  The Supreme Court has noted that "summary procedures, however salutary where

issues are clear-cut and simple, present a treacherous record for deciding" very complex cases.

Kennedy v. Silas Mason Co., 334 U.S. 249, 256-257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948).

"A long line of cases have held that summary judgment should not be granted if there is

the 'slightest doubt' as to the facts; which is actually another way of stating that there is no

genuine issue as to any material fact."  Devex Corp. v. Houdaille Indus., Inc., 382 F.2d 17, 21

(7th Cir. 1967) (also citing American Securit Co. v. Hamilton Glass Co., Inc., 254 F.2d 889, 892

(7th Cir. 1958) and Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 356 F.2d

442, 446 (7th Cir. 1966) to demonstrate cases in the Seventh Circuit which have emphasized that

caution should be exercised when granting summary judgment).  The evidence produced by

Doctors Hospital has more than satisfied the burden of creating doubt as to the truth of

dispositive fact issues raised by LaSalle's Motion for Summary Judgment.

19

In <u>Warsco v. Preferred Technical Group</u>, a Seventh Circuit panel reversed a granting of summary judgment. 258 F.3d 557 (7th Cir. 2001). In <u>Warsco</u>, there were several complicated transactions involved in the case which the opinion held precluded summary judgment. <u>Id.</u> When discussing the transactions at issue there, it was noted, "There are important questions about these transactions that simply remain unanswered." <u>Id.</u> at 569. The ambiguous nature of those transactions, when considered as part of one complex transaction, precluded summary judgment. <u>Id</u>. at 568.

Similarly, in this case it is clear that when viewing all of the transactions and flow of funds at issue, some important questions remain unanswered or ambiguous at this stage. To illustrate the flow of funds in this case, several charts and diagrams were submitted. (<u>See</u> Stip. ¶ 113; Stip. ¶ 116; Stip. ¶ 121; Stip. Ex. A). A copy of one of those is appended as an exhibit to this opinion as illustrative. (Ex. A to Opinion). It is clear from that and other various transactions that dealings of the parties involved in this case were highly complex in their history and relationship. Further, as extensive as the diagram appears to be, it does not depict all aspects of the Daiwa and LaSalle Trust relationships with Doctors Hospital and its affiliates. It is evident at this stage of the case that a determination of the complicated issues can only be resolved by taking evidence at trial.

## CONCLUSION

For the foregoing reasons, the LaSalle Trust has failed to show that there are no material issues for trial, and its motion for summary judgment will be denied by separate order. However,

20

Desnick

100% Owner

Stoney Island Ventures

Limited Partners

99% Owners

General Partner
1% Owner

HPCH Partners

99% Owner

Desnick

100% Owner

MMA Funding, Inc.

Manager

99% Owner

MMA Funding, L.L.C.

Doctors Hospital

Lease

HPCH

1% Owner

Manager

100% Owner

Desnick

1% Owner
Managing Partner

Medical Management of America, Inc.

HP Membership

100% Owners

100% Owner

Desnick
Desnick Trust 1
Desnick Trust 2

Desnick

**EXHIBIT A**

Doc. No.: 799788 v4

under Fed.R.Civ.P. 56(d) [Rule 7056 Fed.R.Bankr.P.], the undisputed facts set forth above in

¶¶ 1 through 29 are deemed to be established for and at trial.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this _17th_ day of October 2005