UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE ) | |
| ) | |
| DOCTORS HOSPITAL OF HYDE PARK, INC. ) | Chapter 11 |
| ) | Bankruptcy No. 00 B 11520 |
| Debtor. ) | |
| ) | |
| DOCTORS HOSPITAL OF HYDE PARK, INC. ) | |
| Plaintiff, ) | |
| ) | Adversary No. 02 A 00363 |
| v. ) | |
| ) | |
| DR. JAMES H. DESNICK, et al., ) | |
| Defendants. ) | |

### MEMORANDUM OPINION REGARDING
### DEFENDANT LASALLE BANK N.A.'s MOTION FOR STAY
### OF COUNT VIII JUDGMENT PENDING APPEAL

Following trial and entry of judgment against it, the Defendant LaSalle Bank N.A. ("Defendant") filed its Motion for Stay Pending Appeal as to the Amended Judgment on Count VIII. For reasons set forth below, Defendant's Motion for Stay Pending Appeal as to Count VIII will be denied by separate order, and any temporary order for such stay pending this ruling on the Motion will be vacated.

### Background

Doctors Hospital of Hyde Park, Inc. ("Debtor") filed its Chapter 11 petition on April 17, 2000. This related Adversary Complaint was filed on April 15, 2002. Three counts of the Complaint were severed for trial. Pursuant to § 544 of Title 11 and the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), Count VIII sought (a) to void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement ("Guaranty and related

-1-

lien agreements"), (b) to recover all proceeds from the sale of hospital assets that formed the collateral associated with the Guaranty and related lien agreements, and (c) pursuant to Section 550 of the Bankruptcy Code to recover an amount equal to the aggregate payments made on the loan.[1] In re Doctors Hosp. of Hyde Park, Inc., 360 B.R. 787, 793 (Bankr. N.D. Ill. 2007). Pursuant to §§ 544 and 550 of Title 11 and the IUFTA, Count IX sought (a) to void the Lease between an entity referred to as HPCH and the Debtor, and (b) to recover Lease payments made by Debtor to the extent that they exceeded a fair market rental. Id. Finally, pursuant to § 548 of Title 11, Count X sought (a) to avoid transfers made pursuant to the Lease, and (b) to recover those payments to the extent that they exceeded a fair market rental. Id.

The original Debtor/Plaintiff was replaced by the Chapter 11 Trustee ("Trustee" or "Plaintiff"). Following trial of the Trustee's claims against Defendant on the severed Counts VIII, IX and X, on March 2, 2007, Findings of Fact and Conclusions of Law were made and entered. It was concluded therein as to Count VIII that Defendant's purported liens on certain of Debtor's assets were based on fraudulent transfers and were therefore void. Doctors Hosp., 360 B.R. at 874. That issue was resolved by declaratory judgment contained in Paragraph 1 of the Amended Judgment, which is the judgment to which Defendant's instant stay motion pertains. A money judgment was entered against Defendant on Counts IX and X. That money judgment was stayed pending appeal when Defendant posted an adequate supersedeas bond.

Both parties filed post-trial Motions to Alter or Amend the Amended Judgment pursuant to Rule 9023 Fed. R. Bankr. P. On July 25, 2007, those motions were denied for reasons set

---

[1] By his filing of January 18, 2007, the Trustee expressly abandoned his claim to recover loan payments under § 550.

forth in the Additional Findings of Fact and Conclusions of Law. In re Doctors Hosp. of Hyde Park, Inc., No. 02-A-00363, 2007 WL 2206887 (Bankr. N.D. Ill. July 25, 2007). Those motions sought to alter or amend the Amended Judgment only with regard to Counts IX and X, but not as to the judgment on Count VIII.

There are three separate sources of funds currently being held in escrow by the Trustee as to which some or all of the Defendant's liens were asserted. There is no dispute between the parties that if the judgment on Count VIII were overturned and Defendant's liens reinstated, Defendant would have a viable lien claim against the Equipment Sale Proceeds totaling approximately $500,000. These funds are being held in a separate escrow account pursuant to the February 22, 2001 order by Judge Doyle. Second are the so-called Residual Funds, which according to Defendant consist of cash collateral from Medicare/Medicaid receivables, and a settlement with Dan K. Webb for $270,000. During oral argument, the Trustee asserted that all Medicare/Medicaid monies were paid to the first lienholder. In addition, the Trustee argued that the Webb settlement is a general intangible, that the applicable version of UCC Article 9 excludes commercial tort claims from general intangibles and, therefore, Defendant would not have a security interest in the Webb settlement funds. Thus, in the event of reversal of Count VIII of the Amended Judgment, there would be an issue as to both the amount and validity of Defendant's claim against the Residual Funds.

The largest fund now held by the Trustee resulted from settling claims against Debtor's sole shareholder, Dr. James Desnick, and other defendants. The settlement netted approximately $6.4 million for the estate, and the proceeds were placed in escrow pending appeal ("Desnick settlement"). The settlement was approved by the bankruptcy court over Defendant's objection.

Following appeal, that decision was affirmed on January 12, 2007. See In re Doctors Hosp. of Hyde Park, 474 F.3d 421 (7th Cir. 2007). The Desnick settlement funds held by the Trustee have increased to $7.6 million, having accrued interest at U.S. Treasury rates. Following approval of the Desnick settlement, the only thing preventing the use and distribution of those funds by the Trustee was the liens claimed by Defendant.

The Desnick settlement proceeds comprised the most important fund in contention here. If the stay as to Count VIII is denied, the Trustee will be free to use those proceeds to pay dividends to claimants and administrative expenses. Defendant argues that the Trustee is protected from any loss if he prevails on appeal without need for any supersedeas bond, and that a stay pending appeal serves to maintain the status quo. The Trustee responds that because of their low risk, Treasury rates do not represent a fair rate of return on monies that could and should be distributed to creditors now, and therefore it is in the best interest of the estate and creditors to make such distribution from the Desnick settlement funds. More to the point on the stay issue, the Trustee argues that Defendant has not met its burden to entitle it to a discretionary stay order of the Amended Judgment on Count VIII pending appeal.

## Jurisdiction

This issue arises under 28 U.S.C. § 157, and is referred here by District Court Operating Procedure 15(a) of the United States District Court for this District. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies under 28 U.S.C. § 1409. This issue constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## Discussion

Rule 7062(d) Fed. R. Bankr. P. provides for a stay pending appeal conditioned on the

posting of a supersedeas bond. Local Rule 2070-2 of the Bankruptcy Court for this District requires the supersedeas bond to be in the amount of the judgement, plus one year's interest at the statutory rate provide in 28 U.S.C. § 1961, plus $500 for costs. On May 3, 2007, Defendant, in compliance with Local Rule 2070-2, posted a supersedeas bond in the amount of $4,555,762 to stay the money judgment entered in Paragraph 2 of the Amended Judgment against them on Counts IX and X.

The separate non-monetary judgment entered on Count VIII in Paragraph 1 of the Amended Judgment was not covered by that bond. Defendant makes a preliminary argument that upon filing of any supersedeas bond, the appealing party is entitled, as a matter of right, to a stay of a money judgment pending appeal. Fed. R. Civ. P. 62(d). Relying on the reasoning in In re Miranne, 94 B.R.413, 415 (E.D. La. 1988), Defendant tries to stretch that concept, asserting that Count VIII of the Amended Judgment can properly be viewed as a money judgment, and therefore it is entitled to a stay of Count VIII pending appeal as a matter of right. Even though its posted bond only related to Counts IX and X, Defendant argues that the amount of supersedeas bond posted is adequate to protect the status quo as to the Judgments entered on all three Counts, because that bond is supplemented by the Trustee holding larger funds from the Desnick settlement, which funds are earning a U.S. Treasury rate of interest.

Defendant's reliance on Miranne is misplaced. While that opinion recognized that "this Court's judgment is not literally a money judgment . . ." it reached the conclusory decision that "it is best understood as such for stay purposes since the ultimate issue in dispute is who between Miranne and appellees should recover a sum certain of money." Id. The Amended Judgment as to Count VIII declared void the Defendant's asserted liens, and the absence of such liens frees up

-5-

monies held by the Trustee. But this is not a money judgment, and no persuasive rationale is seen for following Miranne.

Therefore, the issue as to the requested stay must be analyzed using commonly recognized standards for a discretionary stay pending appeal under Rule 8005 Fed. R. Bankr. P. Four factors are considered in deciding whether a discretionary stay pending appeal is appropriate. In re Forty-Eight Insulations, Inc., 115 F.3d 1294, 1300 (7th Cir. 1997) (citations omitted). Those factors are: "1) whether the appellant is likely to succeed on the merits of the appeal; 2) whether the appellant will suffer irreparable injury absent a stay; 3) whether a stay would substantially harm other parties in the litigation; and 4) whether a stay is in the public interest." Id. The moving party has the burden of establishing each of these elements. In this case, Defendant has failed to meet its burden and, therefore, its Motion for Stay Pending Appeal will be denied.

*Likelihood of Success on the Merits*

Likelihood of success is not certainty of success; neither is it a mere possibility. "[T]he Claimants need to demonstrate a substantial showing of likelihood of success, not merely the possibility of success, because they must convince the reviewing court that the lower court, after having the benefit of evaluating the relevant evidence, has likely committed reversible error." Forty-Eight Insulations, 115 F.3d at 1301 (citing Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991)). Defendant falls far short of meeting this standard.

In its motion, Defendant argues the likelihood of success in the most general terms. The following is Defendant's entire written argument on the subject:

> Although Defendant has not yet filed a notice of appeal from the Judgment in this case, Defendant expects to present arguments that the Judgment should be reversed based on questions of law. For example, Defendant expects to argue that under the Seventh Circuit's decision in Bonded Financial Services, Inc. v. European American Bank, 890 F.2d 838 (7th Cir. 1988), the Judgment incorrectly concluded that Defendant was an "initial transferee" under Section 550 of the Bankruptcy Code. In addition, Defendant expects to argue on appeal that the Cash Collateral Account Agreement established a "true escrow," and that the Court mistakenly decided certain legal aspects of the solvency determination. These and other legal issues presented on appeal will be reviewed *de novo*.

(Def.'s Memo. in Support of Mot. for Stay Pending Appeal at 6 (footnotes and citations omitted).) Those particular points were not expanded on in subsequent briefs or oral argument.

Defendant's argument suggests that the Conclusions of Law entered in support of Count VIII of the Amended Judgment did not properly apply Bonded Financial Services, Inc. v. European American Bank, 890 F.2d 838 (7th Cir. 1988). However, Bonded Financial was a case interpreting the meaning of "initial transferee" under Bankruptcy Code § 550, which was a question of law applicable to Counts IX and X. Similarly, whether the Cash Collateral Account Agreement established a "true escrow" is relevant only to Defendant's status as an initial transferee as the absence of a true escrow proved Defendant's dominion and control over the transfers rather than mere agency. The judgment on those Counts has already been stayed.

The reasoning in the Conclusions of Law as to Count VIII is at issue in this discretionary stay analysis. That reasoning did not rely on any issue decided in Bonded Financial. Rather, Count VIII dealt with allegations in the Adversary Complaint that the pledge agreement was a fraudulent transfer under the IUFTA and 11 U.S.C. § 544. There was some reasoning in the

Findings and Conclusions that discussed <u>Bonded Financial</u>, but that was discussed as to Counts IX and X in which the money judgment has been stayed by filing of the supersedeas bond. As earlier noted (see fn.1 supra), any issue as to § 550 in Count VIII as pleaded was abandoned by Plaintiff. Thus, any argument regarding <u>Bonded Financial</u> has no bearing whatsoever on Defendant's likelihood of success on appeal with regard to Count VIII of the Amended Judgment.

Count VIII was an action by the Debtor to void certain liens as fraudulent transfers under the IUFTA by using the strong-arm powers of § 544(a)(2) of the Code. Under Illinois law, a transfer is fraudulent as to a creditor whose claim arose before the transfer if the transfer is for less than reasonably equivalent value while the debtor was insolvent. 740 ILCS 160/5(a)(2). It was found and held that the Debtor did not receive any direct or indirect benefit from making the Guaranty and related lien agreements. <u>Doctors Hosp.</u>, 360 B.R. at 871. There was no direct benefit because the loan proceeds were disbursed to Dr. Desnick and his spouse, and not to Doctors Hospital. Nor was there an indirect benefit. <u>Id.</u> While Doctors Hospital made representations in the Guaranty that it was receiving some benefit, those representations were not conclusive, it was not an arm's length transaction, and Dr. Desnick took out as much money as he put into Doctors Hospital. <u>Id.</u> at 872. The full discussion of the Count VIII issue in the Conclusions of Law, which referred to the evidence and Findings (including facts to which this Defendant stipulated) is appended to the Opinion as "Exhibit to Opinion."

Defendant's sparse argument in favor of a stay does not question the legal conclusions that warranted entry on Count VIII of the Amended Judgment, but rather infers an attack on the factual Findings that were entered. Questions of fact are reviewed on appeal using a clearly

erroneous standard, Klingman v. Levinson, 114 F.3d 620, 626 (7th Cir. 1997), further heightening the burden Defendant has to overcome to prove likelihood of success in contesting the Findings. According to Defendant's Memorandum in Support of Motion for Stay Pending Appeal, "the Court mistakenly decided certain *legal aspects* of the solvency determination." (Emphasis added.) The Conclusions of Law contain extensive discussion of the evidence and applicable law regarding insolvency and concluded that Plaintiff had satisfied its burden of proving Debtor's insolvency at the time the Guaranty and related lien agreements were executed. Doctors Hosp., 360 B.R. at 853-70, 874. Insolvency is a question of fact. Klein v. Tabatchnick, 610 F.2d 1043, 1048 (2d Cir. 1979); In re Join-In Int'l. (U.S.A.) Ltd., 56 B.R. 555, 560 (Bankr. S.D.N.Y. 1986). Simply labeling it a legal issue, without citing any authority for the proposition, does not make it so and does not change the standard of appellate review.

Finally, in both their motion and at hearing, Defendant argued that it is impossible to determine the likelihood of success because the precise issues on appeal are not yet known. However, Defendant's original Memorandum in Support of stay was filed on April 9, 2007, its Notice of Appeal from the Amended Judgment was filed on August 6, 2007, its supplemental brief on stay issues was filed on September 5, 2007, and oral argument on the motion for stay was held on September 10, 2007. At oral argument, Defendant argued that the issues to be appealed were not known in April, because the Court was still considering the parties' post-trial motions to alter or amend the Amended Judgment. However, it bears repeating that Defendant did not move to alter or amend the Amended Judgment as to Count VIII. In other words, Defendant was not waiting for the Court to decide any issue relating to Count VIII, thereby waiving another opportunity to raise any factual or pertinent legal issue to be argued here or on

appeal. Defendant did not provide any further explanation why it did not supplement its theories regarding likelihood of success between April and September 5, when it filed its Reply brief.

Thus, Defendant has failed to carry its burden regarding likelihood of success on the merits because a portion of its asserted appellate issues as to Count VIII of the Amended Judgment are irrelevant to Count VIII, and the relevant portion relates to questions of fact that will be reviewed on appeal using the clearly erroneous standard. Defendant has failed to demonstrate any likelihood let alone a significant likelihood of success because it did not even assert any error in the relevant Findings of Facts.

## *Harm to Movant*

Both parties strenuously argued the second prong of the test. In doing so, the parties raised the interesting, some might say esoteric, issue of whether the voided liens, if reinstated on appeal, would be broad enough to cover the Desnick settlement funds. The Trustee argued that Defendant will not suffer any harm because even if Count VIII of the Amended Judgment is overturned on appeal and Defendant's liens are held to be valid, the Desnick settlement funds are not within the scope of the liens. However, the issue as to coverage of the asserted liens was severed from trial by agreement of the parties and therefore never tried or decided. Count VIII of the Amended Judgment held that Defendant had no lien whatsoever. Upon being asked from the bench during argument whether the parties now want the lien coverage issue set for trial, they both declined. Having agreed to sever this issue from the trial and declined to try the issue now, the parties now argue for ruling on an issue that was not tried. From the arguments presented in writing and orally, such decision would have to be based in part on evidence presented at trial and in part on evidence not presented at trial. The present record is clearly not complete enough

to decide the hypothetical question as to the scope of the liens if they are reinstated following appeal. Therefore, it would be improper to weigh the untried issue based on partial evidence and oral argument. The issue pending is whether the judgment actually entered on Count VIII should be stayed, not how the severed issue should be decided if it ever must be decided.

If Defendant's motion is denied and the Trustee disburses some or all of the Desnick settlement funds, it is argued that Defendant's appeal as to Count VIII of the Amended Judgment may be rendered moot. In response, the Trustee cites a long line of opinions, which appear to reflect the majority rule, "that an appeal being rendered moot does not itself constitute irreparable harm." In re 203 North LaSalle Street Partnership, 190 B.R. 595, 598 (N.D. Ill. 1995). A minority view argues to the contrary that mooting any appeal "is a quintessential form of prejudice." In re Adelphia Communications Corp., 361 B.R. 337, 347-48 (S.D.N.Y. 2007) (see also for a discussion and list of citations to majority and minority rule cases). The latter reasoning will sometimes be applicable, but only if the appellant can show a substantial appellate issue and likelihood of success. See Northern Border Pipeline Co. v. 64.111 Acres of Land, 125 F. Supp.2d 299, 301 (N.D. Ill. 2000) (citing Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 386-88 (7th Cir. 1984)) (finding that there is an "inverse relationship" between the burden of proving likelihood of success and proving irreparable harm; that is, the more likelihood of success can be found, the less irreparable harm needs to be shown). Because Defendant here is unable to carry its burden regarding likelihood of success and has not shown a substantial appellate issue, possible mootness alone is not enough to establish irreparable injury. Thus, Defendant has failed to show that it will suffer irreparable harm under Rule 8005 Fed. R. Bankr. P. if its motion for stay is denied.

### *Harm to Third Parties*

Defendant argues that "[a] stay will preserve the *status quo* for Defendant and will furthermore not alter the *status quo* for Plaintiff and creditors of estate [sic]." (Def.'s Memo. in Support of Mot. for Stay Pending Appeal at 6.) The underlying bankruptcy was filed in April 2000, and this Adversary Proceeding has been pending since April 2002. Defendant essentially argues that the *status quo* is prolonged litigation, but that history does not mean that creditors of the estate have not been and will not be harmed by further delay. The Desnick settlement funds are invested conservatively in Treasury paper (under standards set by the U.S. Trustee). Because those are the safest investment, they achieve the smallest rate of return. Not only might creditors invest their dividends in higher yield investments on the open market or in their businesses, but the estate continues to accrue administrative expenses that draws down the amount of money that will eventually be disbursed to creditors. One does not have to poll the creditors to discern their view as to whether five years of delay in recovering a dividend has harmed them and whether two more years of waiting out an appeal will harm them further. Thus, Defendant's argument that there is no harm to third parties is without merit.

### *Public Interest*

The public policy behind bankruptcy is the equality of distribution to creditors within the priorities established by the Code within a reasonable time. See Bergier v. I.R.S., 496 U.S. 53, 58 (1990). In light of the discussion above regarding harm to unsecured creditors as a result of the long standing litigation, further delay is contrary to that public policy, and therefore would not be in the public interest.

## Conclusion

For the foregoing reasons, Defendant's Motion for Stay Pending Appeal as to Count VIII of the Amended Judgment will be denied by separate order.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 27th day of September 2007.

98 C 4615, 2000 WL 889846, at *10 (Bankr.N.D.Ill. June 23, 2000) Unreasonably small capital "encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *Vadnais Lumber*, 100 B.R. at 137. "Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992). The *Moody* court adopted a test based on reasonable foreseeability, which requires an objective assessment of the firm's financial projections. *Id.* at 1073 ("The critical question is whether the parties' projections were reasonable.").

Although acknowledging that Doctors Hospital's internal financial statements were unreliable (Tr. III: 108–09), plaintiff's experts showed that Doctors Hospital's capital was unreasonably small from August 28, 1997 through April 17, 2000. In analyzing the cash available to fund Doctors Hospital's operations, Lane/Peltz concluded that the company had inadequate net working capital, unacceptable levels of debt as a percentage of total invested capital, significant losses on operations, worsening accounts payable days outstanding, and extensive physical deterioration and functional obsolescence of its facilities. As for Doctors Hospital's cash available to fund principal and interest on its debt obligations, the experts showed that its interest coverage ratio was highly volatile and generally at or below industry averages and that its days cash on hand steadily declined from 1996 on.

In summary, plaintiff proved that Doctor's Hospital was engaged in business for which its remaining property constituted unreasonably small capital from August 1997 to April 2000, thus satisfying the second alternative test in section 548(a)(1)(B)(ii).

### III. *COUNT VIII*

Pursuant to Count VIII, Doctors Hospital still seeks the following:

(a) to void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement; and

(b) to recover all proceeds from the sale of hospital assets that formed the collateral associated with the Guaranty, Assignment, and pledges.

Other relief was abandoned by a post-trial filing.

Doctors Hospital has the burden to prove that the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement (the "Guaranty and Related Agreements") were constructively fraudulent pursuant to § 160/5(a)(2) of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"). *See* 740 ILCS 160/5(a)(2). Under the IUFTA,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6.

Plaintiff seeks to void the Guaranty and Related Agreements as fraudulent transfers under the IUFTA by using the strong-arm powers under § 544 of the Bankruptcy Code.

Doctors Hospital has the burden of proving each element of a fraudulent transfer claim by a preponderance of the evidence. *In re McCook Metals, L.L.C.*, 319 B.R. 570, 587 (Bankr.N.D.Ill.2005); *In*

EXHIBIT TO OPINION

re Joy Recovery Tech. Corp., 286 B.R. 54, 73 (Bankr.N.D.Ill.2002). Therefore, the Trustee has the burden of proving that in making the Guaranty and Related Agreements, Debtor incurred an obligation without receiving reasonably equivalent value while Debtor was insolvent.

The Guaranty and Related Agreements were executed by Doctors Hospital on August 28, 1997. They were made in favor of Nomura, the Trust's predecessor. The agreements were thus transfers of an interest of the Debtor. See In re Image Worldwide, Ltd., 139 F.3d 574 (7th Cir. 1998) (corporate guaranty found to be fraudulent transfer). In making the Guaranty and Related Agreements, Debtor also incurred an obligation.

### A. REASONABLY EQUIVALENT VALUE NOT RECEIVED DIRECTLY

The question of whether Doctors Hospital received reasonably equivalent value is a question of fact. In re Image Worldwide, Ltd., 139 F.3d 574, 576 n. 2 (7th Cir.1998).

[39] It is clear from evidence presented at trial that Doctors Hospital did not receive any direct benefits from making the Guaranty and Related Agreements. All of the proceeds of the Nomura Loan were initially deposited in an account in the name of Desnick and his spouse. (Jt.Ex.202, ¶ 85.) None of the proceeds of the Nomura Loan were disbursed to Doctors Hospital. (Jt. Ex. 135, Stipulated Facts 31.) Desnick was the only party that benefitted from this transaction. Doctors Hospital wound up with a $50 million obligation on the Guaranty, which was a direct obligation because HPCH had no ability to repay the Nomura Loan in the absence of the Lease. Doctors Hospital certainly did not receive any direct value or meaningful direct consideration for the Guaranty and Related Agreements, or otherwise in connection with the Nomura Loan.

### B. VALUE NOT RECEIVED INDIRECTLY

In determining reasonably equivalent value, "indirect benefits may also be taken into account." In re Image Worldwide, Ltd., 139 F.3d 574, 578 (7th Cir.1998). "The most straightforward indirect benefit is when the guarantor receives from the debtor some of the consideration paid to it." Id. at 579. Indirect benefits can also be realized when "the loan strengthened the corporate group as a whole, so that the guarantor corporation would benefit from 'synergy' within the corporate group." Id. at 578–79. Indirect benefits can also include intangibles, such as goodwill, and an increased ability to borrow working capital. Id. "[I]ndirect benefits to a guarantor [also] exist when 'the transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship.'" Id. (citation omitted).

While Doctors Hospital did not realize any direct benefits, the Trust argues that Doctors Hospital received indirect benefits in making the Guaranty and Related Documents. The Trust argues that indirect benefits should be recognized for several reasons: (1) a representation that in the Guaranty, Doctors Hospital represented and acknowledged that the "indebtedness evidenced by the Note is and will be of direct benefit, interest, and advantage to it" (Jt.Ex.17); (2) the Guaranty and Related Documents were made at arm's length with Doctors Hospital as the "primary credit party;" (3) the Nomura Loan provided "synergistic benefits" to Doctors Hospital, including capital contributions from Desnick that came from the Nomura Loan

proceeds, and (4) benefits from the "cross stream" guaranty of the Nomura Loan.

However, Doctors Hospital did not thereby realize indirect benefits.

### 1. *Language of the Guaranty*

[40] The Trust argues that Doctors Hospital represented and acknowledged that the Nomura Loan indebtedness "will be of direct benefit, interest, and advantage to it." (Jt.Ex.17.) This representation alone does not create a benefit to Doctors Hospital. Moreover, the Trust fails to cite authority supporting the proposition that based on this representation, Doctors Hospital is estopped from arguing it received no benefit. Courts have held that estoppel based on conduct of the debtor cannot be used to restrain a trustee from pursuing avoidance actions. *Pine Top Ins. Co. v. Republic Western Ins. Co.*, 123 B.R. 277, 285 (N.D.Ill.1990) ("The rationale is simply that the trustee, when seeking to avoid such preferential transfers, does not assert a cause of action belonging to the debtor, but instead asserts an action in his representative capacity vis a vis the debtor's general unsecured creditors."). Therefore, despite this representation, there is no evidence that Doctors Hospital realized any actual benefit.

### 2. *No Arm's Length Transaction*

The Trust attempts to argue that Doctors Hospital received benefits from the Nomura Loan because it was the "primary credit party" in an arm's length transaction. The transaction, however, was not at arm's length. Desnick was on both sides of the deal, as 100 percent owner of Doctors Hospital and 96.2 percent owner of HPCH. A single law firm represented HPCH, Doctors Hospital, Desnick, and Medical Management of America-all controlled by Desnick. (Pl.Ex. 36 (Wall) at 25–26.)

Even if the transaction was at arm's length, it still provided no direct or indirect benefit to Doctors Hospital. As the Trust acknowledged, the only way HPCH could repay the Loan was by using the cash flow of Doctors Hospital, including the rent payments. While Doctors Hospital may therefore be viewed as the "primary credit party," it received nothing in return from being that party except liabilities on the Guaranty and the Lease. Desnick benefitted from the Loan proceeds and provided no guaranty. Despite being the "primary credit party," Doctor's Hospital received no benefit from being such a party.

### 3. *No "Synergistic" Benefits*

The Trust argues that Doctors Hospital received "synergistic benefits" from the Nomura Loan because Desnick's entire "corporate group" was "strengthened" by the Nomura Loan. Neither Doctors Hospital nor HPCH received any of the Loan proceeds. Rather, those entities received only the burdens of the Loan. The only party that was "strengthened" by the Loan was Doctor Desnick, as the proceeds were used for his benefit. Doctors Hospital could not have benefitted by a Loan in which it saw none of the proceeds.

In its counterclaim and cross-claim in this case, the Trust stated, "Substantially all of the proceeds of the loans were used not for the business operations of the Desnick entities, however, but were diverted for the personal benefit of Desnick." (Jt.Ex.142, ¶ 24.) It also stated, "While the proceeds of the [Daiwa and Nomura Loans] passed through one or more entities, the proceeds, in fact, were utilized for the personal benefit of Desnick and select individuals." *Id.* at 39. In stipulated facts on its motion for summary judgment in *LaSalle Bank as Trustee v. Nomura Asset Capital Corp.*, No. 00 Civ 8720 (S.D.N.Y),

the Trust stated, "The loan proceeds were not reinvested back into the hospital; rather, more than $48 million of the proceeds went directly into the pockets of Desnick." (Jt.Ex.136, ¶ 23.)

In the face of its own admissions and other evidence that Doctors Hospital did not receive any of the Nomura Loan proceeds, the Trust cannot now say that Doctors Hospital benefitted from the Nomura Loan. There is no evidence to support the proposition that the Nomura Loan somehow "strengthened" Doctors Hospital.

The Trust also argues that Doctors Hospital benefitted from the Nomura Loan because Desnick made substantial contributions to Doctors Hospital after the consummation of the Nomura Loan. While Desnick made contributions to Doctors Hospital, the record shows that he withdrew as much cash from Doctors Hospital as he put in. (Tr. IV: 97.) Thus, on a net basis Desnick did not make "substantial contributions of cash" to Doctors Hospital from the Nomura Loan or elsewhere.

Moreover, Desnick had no obligation to make any contributions to Doctors Hospital. There are no documents in evidence to suggest that Desnick was required to make contributions to Doctors Hospital based on the Guaranty. Rather, the Nomura Loan documents contain no restrictions on the use of the Loan proceeds. (Jt.Ex.11, sec.2.2.) The documents allowed HPCH, after payment of transaction costs, to use the funds "for any lawful purpose." Id. The Nomura Loan proceeds "were not reinvested back into the Doctors Hospital" (Jt.Ex.136, ¶ 23), and Desnick had no obligation to make any contributions to Doctors Hospital.

There is no evidence to suggest that by guaranteeing the Nomura Loan, Doctors Hospital was somehow "strengthened" or received "synergistic benefits." Therefore, despite the Trust's argument, Doctors Hospital received no direct or indirect benefit from guaranteeing the Nomura Loan.

### 4. *No Indirect Benefit From "Cross Stream" Guarantee*

The cases relied on by the Trust do not support the finding the Doctors Hospital received any indirect benefits from guaranteeing the Nomura Loan. In *In re Image Worldwide, Ltd.*, a Seventh Circuit panel affirmed the lower court's finding that the debtor did not receive reasonably equivalent value where one subsidiary corporate received all of the proceeds of a loan while an affiliated subsidiary guaranteed the loan. 139 F.3d 574 (7th Cir.1998). Although recognizing that such a "cross-stream" guaranty could provide an indirect benefit to the guarantor, it was noted that such an indirect benefit must be "fairly concrete," such as the guarantor receiving some of the consideration paid. *Id.* at 578. Indirect benefits from a guaranty may also be found where a loan strengthens a corporate group as a whole, so that the guarantor corporation would benefit from a "synergy" within a corporate group. *Id.* at 578–79. It was found, however, that there was no consideration for the guaranty. *Id.* at 580. By the time of the guaranty, the guarantor had wound down and was inactive so there could be no synergy as "there were not two functioning corporations that benefitted mutually from the loan." *Id.* at 581.

In this case, HPCH was a special purpose entity with no operations. It simply held title to the hospital real estate and repaid the Nomura Loan via Doctors Hospital's lease payments. The loan proceeds were not used to acquire or improve the real estate (Jt.Ex.136, ¶ 64) and Doctors Hospital already had a lease for the hospital premises when the new lease was executed. (Jt.Ex.155.) Because there was no functioning corporate group and no syner-

**874                    360 BANKRUPTCY REPORTER**

gy, there is no way that Doctors Hospital could benefit, directly or indirectly, from the Guaranty and Related Agreements. The purpose of the Nomura Loan was not to promote synergy among related companies, rather it was to provide the means for Desnick to extract the perceived equity out of Doctors Hospital.

Courts generally find indirect benefits from a cross-stream guaranty where it "was the result of arm's length negotiations at a time when the common enterprise was commercially viable." J.F. Williams, *The Fallacies of Contemporary Fraudulent Guaranties: Fraudulent Transfer Law as a Fuzzy System*, 15 Cardozo L.Rev. 1403, 1437 (1994). Reasonably equivalent value arises in the context of joint corporate operations, where the guarantor may benefit from things like "[g]oodwill in a business context, the maintenance of a parent's financial strength, the enhanced ability to borrow money, and the ability of a business to use an affiliate's distribution system to distribute its own products." *Id.*

The other cases relied on by the Trust are easily distinguished from the facts in this case. In *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981), the court found that an indirect benefit would exist where two affiliates, through a system of guaranties and cross-guaranties, guaranteed loans to their independent third-party distributors, and as a result actually received more cash on a daily basis from the borrowing third-party distributors. In this case, there was no single enterprise, and Doctors Hospital received no cash or benefits that it did not already have.

In *In re Royal Crown Bottlers of North Alabama, Inc.*, 23 B.R. 28 (Bankr.N.D.Ala. 1982), it was held that a payment made by debtor on an obligation by its parent corporation could not be recovered as a fraudulent transfer where debtor and its parent corporation shared an identity of interest. No such circumstances exist in this case. In *In re Lawrence Paperboard Corp.*, 76 B.R. 866 (Bankr.D.Mass.1987), on a motion for summary judgment the court found that a genuine issue existed on the question of fair consideration. The defendant argued that indirect benefits arose because part of the loan funds were distributed to the guarantor, the guaranties were reciprocal, and there was identity of interests between one supplier parent and the manufacturing subsidiary-circumstances that again do not exist here.

### Conclusions as to Count VIII

Based on the above, it is clear that Doctors Hospital received no direct or indirect benefits as a result of making the Guaranty and Related Agreements. Therefore, Debtor did not receive reasonably equivalent value in incurring the obligations of the Guaranty and Related Agreements.

In order to void the Guaranty and Related Agreements as fraudulent transfers, it must also be found that Debtor incurred the obligations at a time when Debtor was insolvent. The Guaranty and Related Agreements were consummated on August 28, 1997. As extensively discussed supra, Debtor was insolvent on August 28, 1997. Therefore, Plaintiff satisfied its burden in proving that Debtor incurred an obligation, without receiving reasonably equivalent value at a time when Debtor was insolvent.

As such, the Guaranty and Related Agreements will be found void as fraudulent transfers pursuant to Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* and all proceeds from sale of hospital assets that comprised collateral associated with those documents (now held in escrow pending this ruling) will be declared to belong to the Plaintiff Trustee.

Judgment will separately enter for Plaintiff on Count VIII.

## IV. COUNT IX
### SECTIONS 544 AND 550 OF THE BANKRUPTCY CODE

Count IX was brought pursuant to §§ 544 and 550(a)(1) of the Bankruptcy Code, and the Uniform Fraudulent Conveyance Act as adopted in Illinois, 740 ILCS 160/1 et seq. The Trustee seeks to void the Lease and in any event, to recover payments made under the Lease to the extent they exceed a fair market rental pursuant to 11 U.S.C. § 544(b)(1) which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). "Under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576–77 (7th Cir.1998). The applicable state law asserted by the Trustee under § 544(b)(1) is the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq. (the "UFTA").

If transfers are avoidable under § 544(b)(1), the trustee can recover them under 11 U.S.C. § 550. 11 U.S.C. § 550. Section 550 provides:

> [T]o the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550.

Pursuant to Count IX, it must be determined whether the Lease and any rental payments to the extent they exceed a fair market value were constructively fraudulent under § 160/5(a)(2) of the IUFTA. *See* 740 ILCS 160/5(a)(2). Under the IUFTA,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6; *Creditor's Committee of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 946–47 (7th Cir.2007).

[41] Trustee has met all of the elements to prove a cause of action under 740 ILCS 160/5(a)(2). Because the elements of a cause of action under § 548 of the Bankruptcy Code mirrors those found in § 160/5(a)(2) of the IUFTA, the findings made with respect to § 548 apply to the requirements of § 160/5(a)(2). For reasons articulated below, it is found and concluded that payments of rent that exceed fair market value made by the Debtor to the Trust pre-July 1998 were constructively fraudulent under § 160/5(a)(2) of the IUFTA. Those payments are therefore avoidable under § 544(b)(1) of the Bankruptcy Code and the Trustee may recover those payments under § 550(a)(1) from the Trust for the benefit of Debtor's estate.