UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | Bankruptcy No. 00 B 11520 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Gus A. Paloian, Chapter 11 Trustee of | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 02 A 00363 |
| | ) | |
| LaSalle Bank National Association, | ) | |
| f/k/a LaSalle National Bank, as Trustee for | ) | |
| Certificate Holders of Asset Securitization | ) | |
| Corporation Commercial Pass-Through | ) | |
| Certificates, Series 1997, D5, by and through | ) | |
| its servicer, Orix Capital Markets, LLC | ) | |
| | ) | |
| As Defendant to Counts VIII, IX, and X. | ) | |

**MEMORANDUM OPINION ON PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Following judgment herein and remand by the Seventh Circuit Court of Appeals to consider specified issues, the Plaintiff Chapter 11 Trustee Paloian filed a Motion for Partial Summary Judgment. That Motion is denied by separate order for reasons set forth below.

## I.   Introduction

Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital" or "Hospital") filed a Chapter 11 Bankruptcy case on April 17, 2000. On March 28, 2001, LaSalle filed its proof of claim in the bankruptcy case in the amount of $60,139,317.04 based on asserted obligations of Doctors Hospital arising from its guarantee of a loan. Doctors Hospital filed the above titled Adversary Complaint pleading 28 counts against a number of individuals and entities, Dr. James Desnick and many others.[1] However, Counts VIII, IX, and X of the Adversary Complaint asserted claims

---

[1] On or about April 1, 2004, Doctors Hospital filed with this Court a Settlement Agreement between Doctors Hospital, Desnick, and all the other defendants except LaSalle, Stephen Weinstein, and Robert Krasnow. The Hospital's claims against Weinstein and Krasnow were severed from Counts against LaSalle for purposes of trial.

only against LaSalle Bank National Association, f/k/a LaSalle National Bank as trustee for

certain asset certificateholders of Asset Securitization Corporation Commercial Mortgage Pass-

Through Certificates, Series 1997, D5 ("LaSalle"). Those counts serve as a counterclaim to the

LaSalle claim. On April 22, 2004, Gus A. Paloian ("Chapter 11 Trustee" or "Trustee Paloian")

was appointed as Chapter 11 Trustee for Doctors Hospital, and he became responsible for those

counts.

Counts VIII, IX, and X against LaSalle seek (1) to void as fraudulent transfers a guaranty

and related security agreement that Doctors Hospital made in connection with a loan from

LaSalle's predecessor, Nomura Asset Capital Corporation, to Doctors Hospital's landlord (Count

VIII) and (2) to void a lease held by Defendant as Nomura's assignee or to recover as fraudulent

transfers payments of rent that Doctors Hospital had made to LaSalle in excess of the property's

fair market rental value (Counts IX and X). Count X was brought pursuant to 11 U.S.C. §

548(a)(1)(B). Count IX was brought pursuant to the Illinois Uniform Fraudulent Transfer Act

and 11 U.S.C. § 544(b)(1), which is asserted to permit the trustee to avoid a transfer of the

debtor's property under applicable non-bankruptcy law.

Trial on these counts concluded in March of 2007. Findings of Fact and Conclusions of

Law were made and entered and a Final Judgment Order entered. *In re Doctors Hosp. of Hyde

Park, Inc.*, 360 B.R. 787 (Bankr. N.D. Ill. 2007). It was held therein that rental payments made

after July 7, 1998 were not fraudulent transfers because they were not made with assets of

Doctors Hospital. *Id.* at 853. LaSalle's request to void the lease pursuant to which rental

payments were made was denied in the Judgment and not appealed. For rental payments made

prior to July 7, 1998, the Chapter 11 Trustee was awarded damages to the extent that rental

payments were found to have exceeded fair market value plus interest, resulting in judgment in

favor of the Chapter 11 Trustee allowing his counterclaim in the amount of $4,342,238.43. Both

parties filed motions to alter or amend the judgment, which were denied in Additional Findings

of Fact and Conclusions of Law dated July 25, 2007. *In re Doctors Hosp. of Hyde Park, Inc.*, 373

---

*Initial Findings*, at 798 ¶ 30. Krasnow was dismissed as a party to the case and all counts against him dismissed,
both with prejudice on May 21, 2007. (Docket No. 653) Counts against Weinstein were dismissed, and he from the
case, with prejudice on October 22, 2007 (Docket No. 702). Additionally, LaSalle filed a counterclaim in the
Adversary proceeding, seeking approximately $60 million based on the guaranty and security agreement related to
the loan. (Docket No. 183). All Counts of that Counterclaim were dismissed on February 26, 2004 except for
LaSalle's breach of guaranty claim (Count II) against Doctors Hospital. (Docket No. 309). The grant of Summary
Judgment entered against LaSalle on Count II of its counterclaim was affirmed by the District Court Judge on appeal
and was undisturbed by the Seventh Circuit Remand Opinion. *LaSalle Bank N.A v. Paloian.*, 406 B.R. 299, 310
(N.D. Ill. 2009); *Paloian*, 619 F.3d 682, 692 (7th Cir. 2010).

B.R. 53 (N.D. Ill. 2007). Separate appeals were filed and were consolidated by a District Court Judge. That Judge affirmed all Findings and Conclusions. *LaSalle Bank N.A. v. Paloian*, 406 B.R. 299, 310 (N.D. Ill. 2009).

A.  *Remanded Issues*

The proceeding is now before the court on remand from the Court of Appeals for the Seventh Circuit. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010). At issue following remand is the holding following trial here that post-July 1998 rental payments were not fraudulent transfers. The remand order sought further consideration of two issues: *First*, whether there was a true sale of accounts receivable from the Hospital, and that issue further involves the question whether MMA Funding was in fact an actual business entity and not a part, department, or function of the Debtor. *Paloian*, 619 F.3d at 696. The status of MMA Funding is therefore relevant to Counts IX and X of the Adversary Complaint, because if it was not a true business entity dealing with its own funds, then payments made by it to LaSalle were from the Debtor's assets and may be recoverable by the Chapter 11 Trustee. *Second*, whether Doctors Hospital was insolvent at any time before filing for bankruptcy. Solvency is a significant issue because if the Hospital was not insolvent when the payments in issue took place, then Trustee Paloian may not recover as fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B) the payments that were made to LaSalle even if those payments are found to have been from property of the Debtor.

At the first trial it was determined that certain payments to LaSalle beginning in July 1998 were made with property owned by MMA Funding, LLC, not by Doctors Hospital and therefore did not represent fraudulent transfers by the Hospital. *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787, 847 (Bankr. N.D. Ill. 2007). In support of this conclusion, it was held that (a) the post-Agreement conduct of the parties did not modify the terms of the Loan and Security Agreement dated March 31, 1997 between Daiwa Healthco-2 and MMA Funding, *In re Doctors Hospital of Hyde Park, Inc.*, 373 B.R. 53, 60–63; (b) the loans by Daiwa pursuant to the MMA Funding Loan Agreement were not in substance a loan to Doctors Hospital, *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787, 847–50 (Bankr. N.D. Ill. 2007); (c) MMA Funding functioned as a special purpose entity, *Id.* at 851–52; (d) the transfer of the Doctors Hospital receivables was a true sale, *Id.* at 848; (e) MMA Funding was not the alter ego or instrumentality

3

of Doctors Hospital, *Id.* at 849–52; and (f) viewing the agreements as written, the post-July 1998 transfers were not made with funds belonging to Doctors Hospital; *Id.* at 847–49.

Further Findings and Conclusions entered here after the first trial relevant to the pending Motion for Summary Judgment include:

1. **Legal Issues**

- Trustee Paloian argued MMA was a "classic shell company." *Id.* at 847. That assertion was generally rejected, the Conclusions entered stated that MMA had a specific purpose "to serve as a bankruptcy-remote entity" in order to "isolate the financial assets in the SPE and thereby protect the lender from the bankruptcy risk of the operating company. *Id.* To support this conclusion, this court originally pointed to Daiwa's reliance on separateness and the legal conclusion stating that the special purpose entity would not be subject to substantive consolidation. *Id.* at 848. That opinion relied on UCC-1 statements and loan closing documents. *Id.*

- In finding that MMA should not be treated as an alter ego of Doctors Hospital, it was earlier concluded that:
  - o Use of common officers and directors does not of itself render one corporation liable for the obligations of another. *Id.* at 852.
  - o Even though MMA had no officers or employees, filed no tax returns and had no assets other than Contribution Agreement – still had its own function as a special purpose entity limited to receiving and pledging the receivables as collateral. *Id.*
  - o MMA was not an operating company and was never intended to be an operating company. *Id.*

2. **Findings of Fact at Issue**

The remand order requires further inquiry related to some Findings of Fact that were earlier made:

- No. 92: Doctors Hospital's receivables were always reflected as its assets on its audited financial statements for fiscal years 1997, 1998, and 1999. *Id.* at 803.

- No. 93: Doctors Hospital's audited financial statements for years 1997, 1998 and 1999 did not reflect any accounts receivable transferred to MMA Funding. *Id.*

- No. 94. No balance sheets or profit-and-loss statements were prepared for MMA Funding after the Daiwa Loan closed, and MMA Funding never filed a tax return. *Id.*

- No. 95. However, when the Daiwa Loan closed, a balance sheet for MMA Funding was prepared, which showed MMA Funding as owner of the receivables. *Id.*
- No. 97. MMA Funding had no active checking-account, no insurance, and no phone. *Id.*
- No. 98. Doctors Hosp. audited financial statements showed the loan. *Id.*

Although the Court of Appeals Opinion accepted lower court resolution of most issues[2], it left for further resolution the status of MMA Funding, LLC and payments of money from it to LaSalle. Nevertheless, the remand opinion disputed "Key Finding" No. 7 (Docket No. 588) that MMA Funding was separate from Doctors Hospital. *See Paloian*, 619 F.3d at 696. If that money actually belonged to Debtor at the time paid, then the question of whether Debtor was then solvent will determine whether the Trustee Plaintiff may recover it.

   *B. Post-remand Motion*

After remand, the Chapter 11 Trustee has now moved for partial summary judgment under Fed. R. Civ. P. 56 (made applicable in bankruptcy by Fed. R. Bankr. P. 7056) seeking a determination that "MMA Funding, LLC, from and after July 7, 1998, was not a bankruptcy remote entity and therefore that all payments of rent from Doctors Hospital of Hyde Park, Inc. after July 7, 1998 were transfers of Doctors Hospital's funds." (Mot. Summ. J., at 2). The issue thus presented is whether MMA Funding was actually separate from Doctors Hospital so that it was a legitimate "bankruptcy-remote" entity, and if so whether there was a "true sale" of assets to it later used to make the payments in issue here.

If MMA Funding became and remained a legitimate "bankruptcy-remote" vehicle arising out of the Daiwa loan, then payments by it would not have come from the Debtor's assets, so that the Chapter 11 Trustee would be prevented from recovering payments made on the Nomura loan. Under § 548 of the Bankruptcy Code, "the trustee may avoid any transfer . . . of an interest of the debtor in property. . . made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than reasonably equivalent value in exchange for such obligation; and was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer . . . ." The language of the Illinois Uniform Fraudulent Transfer Act mirrors this language. *See* 745 ILCS 160/ et seq. The date of the

---

[2] Of the other issues in the proceeding, the Panel Opinion stated: "In bypassing other questions, we do not necessarily approve the bankruptcy judge's or district judge's reasoning; we approve only the result. And some of the results . . . are approved only because vital arguments have not been preserved for appellate decision." *Paloian*, 619 F.3d at 692. The Opinion also commented that, "[t]he subjects that this opinion pretermits [i.e., as to which prior Conclusions are not questioned] are the law of the case." *Id.*

Hospital's insolvency was an issue remanded by the Seventh Circuit in addition to the question regarding MMA Funding's status. However, as noted, if MMA Funding was separate from and not part of the Debtor, then payments made to LaSalle by it were not made with the Hospital's property. If those payments were not made with the Hospital's property, then they are not recoverable under the pleaded theories.

According to argument by Trustee Paloian, to be a separate "bankruptcy-remote" vehicle, such a special purpose vehicle must be separate as described in 7th Circuit's Opinion in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010).

In the remand Opinion, the Panel said the following in regards to MMA Funding:

> As far as we can tell from this record, however, MMA Funding lacked the usual attributes of a bankruptcy-remote vehicle. It was not independent of Desnick or the Hospital; Desnick owned MMA Funding (99% of which was owned by the Hospital, and 1% of which was owned by a firm that Desnick owned directly or through a trust), and MMA Funding operated as if it were a department of the Hospital. It did not have an office, a phone number, a checking account, or stationary; all of its letters were written on the Hospital's stationary. It did not prepare financial statements or file tax returns. It did not purchase the receivables for any price (at least, if it did, the record does not show what that price was). . . . Perhaps LaSalle can offer on remand evidence to show that there was a bona fide sale of accounts receivable from the Hospital to MMA Funding in March 2007 [sic, the Panel likely meant 1997], and that MMA Funding was more than a name without a business entity to go with it.

*Id.* at 696. The judgment of the district court affirming the judgment entered here was vacated and ultimately remanded here for proceedings consistent with that opinion.

C. *Applicable Standard*

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable in bankruptcy by Fed. R. Bankr. P. 7056). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the initial burden is met, the non-moving party that bears the burden of proof on a dispositive issue at trial must affirmatively demonstrate a genuine issue for trial on that issue. *See*

*id.* Under Fed. R. Civ. P. Rule 56(a) and Rule 7056(a) Fed. R. Bankr. P., a party may move for summary judgment on separate issues thereby seeking to resolve those issues before trial. Partial summary judgment is permitted if the movant shows there is no genuine issue of material fact on that part or all of a claim or defense. Fed. R. Civ. P. 56(a).

## II.     Jurisdiction

This Adversary proceeding arises out of and relates to the Chapter 11 case of Doctors Hospital, No. 00 B 11520. Jurisdiction lies under 28 U.S.C. §§ 157 and 1334 and District Court Internal Operating Procedure 15(a).

As Counts VIII, IX, and X comprise counterclaims to the LaSalle claim against the Bankruptcy Estate and to recover fraudulent conveyances, under statute "core" authority lies under 28 U.S.C. § 157(b)(2)(C) and (H) to adjudicate finally those Counts. However, on July 13, 2011, the parties here were required to submit supplemental briefs on a bankruptcy judge's authority to enter final judgment in this Adversary proceeding in light of the Supreme Court holding in *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011). The order called on the parties to discuss first whether the Constitution permits a bankruptcy judge to enter final judgment on the Chapter 11 Trustee's fraudulent conveyance action that is defined by statute as a core matter under 28 U.S.C. § 157(b)(2)(C) and (H). Second, if such authority is not Constitutional under reasoning in *Stern* in absence of consent of the parties, they were asked whether they will consent to entry of final judgment under 28 U.S.C. § 157(c)(2) should such consent eliminate Constitutional concerns as to entry of final judgment by a bankruptcy judge.

Under 28 U.S.C. § 157(b)(2)(H), fraudulent conveyance actions are core proceedings, which by statute permit a bankruptcy judge to enter final judgment on the action. 28 U.S.C. § 157(b)(1). That authority was arguably called into question by the Supreme Court decision in *Stern v. Marshall*. That decision held that the Constitution requires the "removal of [certain trustee] counterclaims . . . from core bankruptcy jurisdiction" and placed within the purview of an Article III judge for entry of final judgment. 131 S.Ct. at 2620. The *Stern* holding was directed at non-bankruptcy law counterclaims that are not resolved in the process of ruling on a creditor's proof of claim. *Id.* at 2619–20. Based on this holding, a bankruptcy judge's authority to enter final judgment on non-bankruptcy law matters statutorily designated as "core proceedings" has been called into question. For example, in an article in the *Bankruptcy Law Letter*, University of Illinois law professor Ralph Brubaker argues that § 157(b)(2)(H) is likewise

unconstitutional to the extent it would allow a bankruptcy judge to enter final judgment. Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judge's Core Jurisdiction*, Bankr. L. Letter, Sept. 2011, at 1–2.

In this case, the parties are apprehensive, in the absence of authority interpreting *Stern*, that a bankruptcy judge may lack authority to enter final judgment on proceedings to recover fraudulent conveyances. The *Stern* decision has arguably called into question the authority of a bankruptcy judge to enter final judgment on actions to recover a fraudulent conveyance and in other actions based on non-bankruptcy law. If that be so, then the proceeding here would constitute a "related matter," in which the parties could consent to entry of judgment by a Article I judge under 28 U.S.C. 157(c)(2). *Stern* did not either impliedly or expressly end a litigant's right to consent to entry of final judgment by an Article I judge. 11 U.S.C. § 157(c)(2); *see In re Olde Prairie Block Owner, LLC*, No. 10 B 22668, 2011 Bankr. LEXIS 3170, 2011 WL 3792406 (Bankr. N.D. Ill. Aug. 25, 2011). However, the parties here did not both consent to entry of final judgment by a bankruptcy judge. Therefore, after the remanded trial, proposed Findings of Fact and Conclusions of Law must be prepared here and submitted to a District Court Judge for review and possible entry of judgment.

All of the foregoing calls into question this court's authority to grant Trustee Paloian's Motion for Summary Judgment as to the status of MMA Funding. Assuming *arguendo* that fraudulent conveyance actions are impacted by *Stern* and therefore removed from a bankruptcy judge's Constitutional authority to enter final judgment, Trustee Paloian's adversary claims still affect the amount available to pay Doctors Hospital's creditors. This places Counts VIII, IX, and X of the Adversary Complaint within the "related-to" jurisdiction of the bankruptcy judge under 28 U.S.C. § 157(c)(1). Bankruptcy judges with related jurisdiction may still propose Findings of Fact and Conclusions of Law to a District Court Judge for decision whether to enter final judgment. But Summary judgment cannot be granted by a Bankruptcy Judge where that a Bankruptcy Judge lacks authority to enter judgment. As noted by Judge Wedoff in this District, "[d]enial of summary judgment is consistent with related-to jurisdiction, in that it leaves the entry of ultimate judgment to the district court." *In re Emerald Casino*, 2011 Bankr. LEXIS 3324 (Bankr. N.D. Ill. Aug. 26, 2011) (Wedoff, J.). Accordingly, the Motion for Summary Judgment may be denied upon finding issues of material fact. But, if the Motion were to have merit, it cannot be granted except by a District Judge.

### III.   Undisputed Background Facts

*A.  Parties Relevant to this Motion*

**Doctors Hospital of Hyde Park, Inc.** was an Illinois Subchapter-S corporation that had
its principal place of business at 5800 South Stony Island Avenue, Chicago, Illinois. From
approximately August 24, 1992 until April 17, 2000, it was owned and controlled by Dr. James
Desnick. (Jt. Ex. 202 ¶ 1.)

**James Desnick** was, at all relevant times, the sole shareholder and director of Doctors
Hospital. (Jt. Ex. 202 ¶ .)

**Daiwa Healthco-2 LLC** ("Daiwa") is a Delaware limited liability company with its place
of business in New York City, New York. (Jt. Ex. 202 ¶ 3.)

**HPCH  LLC** ("HPCH") was a Delaware limited liability company that acquired in 1997
the Doctors Hospital property. HPCH was owned 99% by HPCH Partners, L.P and 1% by its
managing member, HP Membership. Desnick was HPCH's managing partner, owned 100% of
HP Membership and approximately 99% of HPCH Partners, L.P. (Jt. Ex. 202 ¶ 4.)

**LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for
Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass-
Through Certificates, Series 1997, D5,** by and through its Servicer, Orix Capital Markets, LLC
("LaSalle"), is a trust whose Trustee, LaSalle Bank National Association is a national banking
association with its principal place of business in Illinois. (Jt. Ex. 202 ¶ 2.)

**Medical Management of America, Inc.** was a Delaware corporation and purported
manager of Doctors Hospital substantially owned and controlled by James Desnick. (*see* Jt. Ex.
202 ¶ 12.)

**MMA Funding, LLC** ("MMA Funding") was an Illinois limited liability corporation
owned 99% by Doctors Hospital and 1% by MMA Funding, Inc. (also owned and controlled
entirely by Desnick), the special purpose manager of MMA Funding, LLC.  (Jt. Ex. 202 ¶ 11.)

**Nomura Asset Capital Corporation** ("Nomura") is a Delaware corporation with its
principal place of business in New York City, New York. (Jt. Ex. 202 ¶ 14.)

*See generally In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. 787, 795–97 (Bankr. N.D. Ill.
2007).

### B.  *History of Doctors Hospital*

HPCH Partners, LP, an entity controlled entirely by Desnick, purchased the real estate and facilities for approximately $2,400,000.00 in 1992. On August 24, 1992, HPCH Partners LP leased the real estate located at 5800 South Stony Island Avenue to Doctors Hospital until HPCH acquired the property some time in 1997. On August 28, 1997, Doctors Hospital entered into a lease agreement with HPCH, discussed below. Throughout its existence, Doctors Hospital used the property as a hospital.

### C.  *The Daiwa Loan*

Trustee Paloian appealed from the ruling that certain transfers to LaSalle's account were not property of Doctors Hospital and therefore could not be recovered by the Hospital (as debtor) as fraudulent transfers. The transfers at issue arise from a March 31, 1997 loan from Daiwa to MMA Funding, LLC, a wholly-owned subsidiary of Doctors Hospital. Loans were made during a period from October 1997 until Doctors Hospital's bankruptcy petition was filed in April 2000. The Daiwa loan was a revolving loan designed as a healthcare securitization program. Under this type of program, Daiwa loaned funds to the wholly-owned subsidiary of participating entities and in exchange, participating entities contributed receivables to their wholly-owned subsidiaries as security for a loan. The Daiwa Loan was memorialized in several documents: (i) The Loan and Security Agreement between MMA Funding and Daiwa ("Daiwa Loan Agreement"); (ii) The Healthcare Receivables Contribution Agreement between MMA Funding and Doctors Hospital ("Contribution Agreement"); (iii) The Depository Agreement between Doctors Hospital, MMA Funding, Daiwa and Grand National Bank; and (iv) Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding in favor of Daiwa ("MMA Funding Assignment"). (Jt. Ex. 202 ¶ 40.)

Parties to the Daiwa loan, MMA Funding and Daiwa, indicated through certain documents that they intended MMA Funding to be a special purpose vehicle that would protect Daiwa from the possibility of a bankruptcy case to be filed by Doctors Hospital. *See e.g.*, Credit Approval Memorandum Daiwa Securities America Medical Management of America, Inc. (Jt. Ex. ¶ 117); Shefsky and Froelich Legal Opinion (Def. Ex. 16.) For this reason, transaction documents identified the subsidiary (MMA Funding) as the borrower but not the participating entity (Doctors Hospital), and Daiwa as the lender. According to the terms of the transaction documents in this case, Doctors Hospital was to contribute its accounts receivable to MMA

10

Funding. In return for loan disbursals from March 1997 to March 2000, Doctors Hospital allegedly contributed all of its healthcare receivables to MMA Funding pursuant to the Contribution Agreement. MMA Funding then assigned the receivables as collateral security in favor of Daiwa under an agreement titled "Assignment of Healthcare Receivables Contribution as Collateral Security by MMA Funding in Favor of Daiwa." Daiwa then agreed to loan funds in the amount of $25 million to MMA Funding in exchange for a security interest in those receivables. Pursuant to this exchange, Daiwa forwarded loan advances to a bank account in the name of MMA Funding. Daiwa and MMA Funding were at all times the only signatories to the loan transaction documents. The loan documents stated that only MMA Funding could borrow and repay the loan. The agreement also required MMA Funding to submit borrowing base certificates to Daiwa in connection with each advance under the loan.

The loan documents also provided that MMA Funding was to designate the account into which Daiwa would transfer loan disbursals. From April 1997 to July 1998, Daiwa transferred borrowings into an account titled in the name of MMA Funding at Grand National Bank. After July 1998, MMA Funding directed that new borrowings be deposited into an account controlled by LaSalle Bank pursuant to the terms of the Nomura loan, discussed below.

D. *The Nomura Loan and HPCH Lease*

In August 1997 Nomura Asset Capital Corporation loaned $50 million to Doctors Hospital through HPHC LLC, the entity from whom Doctors Hospital leased the Hospital property. The obligations of HPHC under the loan were secured by the Hospital property and a lease between HPHC and Doctors Hospital, among other things. The Hospital promised to pay HPHC additional rent. HPHC gave Nomura a security interest in the rent owed by the Hospital. The Nomura loan was securitized and thereafter sold to a third party that bundled several billion dollars of commercial credit for sale to investors. The loan assets were transferred to a trust, of which LaSalle National Bank is the trustee and Orix Capital Markets is the servicer.

If MMA Funding actually was a bankruptcy-remote entity then the Chapter 11 Trustee may be able to recover payments made to LaSalle as fraudulent transfers after July 1998. Again, in July or August of 1997, HPCH acquired legal title to the Doctors Hospital property from HPCH Partners LP. On August 28, 1997, Doctors Hospital entered into an agreement with HPCH to lease the Hospital property for approximately $470,000 per month. On that same date, Nomura made a loan to HPCH in the amount of $50 million. Under its lease with HPCH,

Doctors Hospital paid rent on a net basis equal to the debt service payment owed by HPCH on the Nomura loan. HPCH assigned to Nomura all of its rights in the HPCH Lease and rent due under it. The Nomura Loan was secured by the HPCH lease, the Hospital real estate, hospital equipment, accounts receivable, and other intangibles relating to Doctors Hospital. Doctors Hospital also executed and delivered a Guaranty to Nomura for the entire amount of the loan. The Hospital also executed an "Equity Pledge Agreement" that granted Nomura a security interest and lien on all of Doctors Hospital's 99% interest in MMA Funding.

It was undisputed at the initial trial that although HPCH and Nomura were the parties to the loan agreement and Doctors Hospital the guarantor, the Nomura Loan was intended primarily to benefit Desnick, and initially all proceeds of the Loan were deposited into an account held in the name of Desnick and his spouse. Doctors Hospital received none of the proceeds of the Nomura Loan. HPCH was alone responsible for debt service payments. Absent default of some kind, Doctors Hospital had no obligation to make debt payments.

On October 24, 1997, two months after entering into the loan agreement, Nomura transferred all its rights, title, and obligations under the loan to the Asset Securitization Corporation ("ASC"). ASC then immediately transferred all its rights, title, and obligations under the loan to LaSalle as ASC's Trustee. The Nomura Loan thus became part of a pool of loans owned by LaSalle and serviced by Orix.

### E. *Cash Flow Under the Daiwa and Nomura Loans*

The history of cash flows under the Daiwa Loan and the Nomura Loan transactions can be divided into three periods: the period from the execution of the Daiwa Loan to the execution of the Nomura Loan; the period from the execution of the Nomura Loan, August 28, 1997 to July 7, 1998; and the period after July 7, 1998. For purposes of this Motion, only the only relevant time period is the period after July 7, 1998 because MMA Funding's status as a bankruptcy-remote entity dictates whether Trustee Paloian may recover payments made by MMA Funding to LaSalle because those payments were fraudulent transfers. Information on previous time periods is provided as background.

### 1.  Cash Flow Before the Nomura Loan

Before the execution of the Nomura Loan, repayment of the Daiwa Loan moved through a series of lockboxes and bank accounts. This movement of cash was initially governed by a "Depository Agreement" among MMA, MMA Funding, Daiwa, and Grand National Bank. (Jt.

Ex. 202 P 41.) Cash originating from Medicare and Medicaid receivables first went to a joint Doctors Hospital-Daiwa account at Grand National Bank. These receipts were then "swept" to another account at Grand National Bank in the name of Daiwa only. The Daiwa account also received cash originating from payments made by insurance companies such as Blue Cross/Blue Shield. From the Daiwa-controlled account at Grand National Bank, the funds were swept to another Daiwa Account at the Bank of New York. The Bank of New York account received not only the cash described above, but also funds related to Daiwa's financing arrangements with many other borrowers. (Jt. Ex. 202 P 110.) Daiwa took withdrawals from these commingled funds to retire the debt owed under the Daiwa Loan. (Jt. Ex. 202 P 111.)

As contemplated in the Daiwa Loan agreement, Daiwa forwarded new borrowings under the Daiwa Loan's revolving structure during this period to an account titled in the name of MMA Funding. (Jt. Ex. 202 P 112.) Funds transferred to the MMA Funding Account were automatically forwarded to Doctors Hospital's operating/payroll account at Grand National Bank. (Jt. Ex. 202 P 113.).

## 2. Cash Flow After the Nomura Loan and Up to July 7, 1998

The Nomura Loan called for the creation of additional restricted bank accounts and other significant changes in the way that cash flowed through the accounts under the Daiwa Loan. Due to the complexity of the Nomura Loan transaction documents, however, these changes were not implemented until July 7, 1998. (Jt. Ex. 202 P 114.)

The parties executed four documents to integrate the Nomura Loan with the already-existing Daiwa Loan: (1) the Intercreditor Agreement, (2) the Cash Collateral Agreement, (3) the Collection Account Agreement, and (4) the Payment Direction Letter. These documents (collectively the "Cash Flow Agreements") restructured the flow of funds between Daiwa, MMA Funding, Defendant LaSalle, and Doctors Hospital, in part through the creation of two new bank accounts: the "Cash Collateral Account" and the "Collection Account." The "Cash Collateral Account" was located at LaSalle National Bank and was under LaSalle's control, as Nomura's successor in interest. The "Collection Account" was maintained at Grand National Bank in Northwood, Illinois, and was also under LaSalle's control, again as Nomura's successor.

According to the District Court Judge following the initial trial, the cash flow structure's complexity resulted in a failure to comply with the specified procedures. The District Court

Judge explained: "Baffled by the complexity of the Cash Flow Agreements and concerned about complying with their terms, Phillip Robinson, the CFO of MMA, approached the accounting firm of KPMG on November 7, 1997 for help resolving the meaning of the Agreements. John Depa, a KPMG representative, agreed with Robinson that the Nomura documents were extremely difficult to interpret and expressed his opinion that they made cash management needlessly cumbersome and inefficient. Indeed, as described below, cash flow did not strictly comply with the terms of the Cash Flow Agreements. Later in November 1997, Depa proposed amending or simplifying the documents, or in the alternative, suggested that Nomura and HPCH draft a "clarification amendment" to the various documents to articulate plainly all the compliance steps required. AMRESCO, the predecessor to Orix as servicer and special servicer of the pool which included the Nomura Loan, rejected these proposals. AMRESCO instead advised Robinson in June 1998 of the appropriate steps for compliance with the terms of the Cash Flow Agreements and the Nomura Loan. Robinson confirmed the process for compliance with Richard Felbinger, the CFO of Doctors Hospital, and money flows began to adhere to the terms of the Nomura transaction documents beginning July 7, 1998."

Thus, because of confusion between August 28, 1997 and July 7, 1998, the cash flow under the Daiwa Loan and the Nomura Loan transaction documents proceeded as it had done in the period prior to the Nomura Loan. In contravention of the "Cash Flow Agreements," Daiwa forwarded new borrowings to an account titled in the name of MMA Funding, and funds transferred to the MMA Funding Account were automatically forwarded to Doctors Hospital's general payroll account at Grand National Bank. (Jt. Ex. 202 PP 113.) Doctors Hospital then made direct transfers (in the form of rental payments) from its general payroll account to the Trust's Cash Collateral Account at LaSalle National Bank. The Trust used funds from the "Cash Collateral Account" to service HPCH's debt and other obligations on the Nomura Loan until July 1998. (Jt. Ex. 202, P 115.) It was initially found that these payments exceeded fair market value for rent under the HPCH Lease and were made after Doctors Hospital became insolvent. These payments were, therefore, voidable as fraudulent transfers.

### 3. Cash Flow After July 7, 1998

However, beginning July 7, 1998, the parties began to act in conformance with the terms of the Nomura Loan, and as a result, all advances from the Daiwa Loan were made directly from Daiwa to the Trust's "Cash Collateral Account" without first passing through either MMA

14

Funding or Doctors Hospital. This cash flow practice adhered to the terms of the "Intercreditor Agreement" between Daiwa and Nomura and those of the "Cash Collateral Account Agreement," both entered into on August 28, 1997, the date of the Nomura Loan. The Intercreditor Agreement established Daiwa's and Nomura's respective rights and obligations concerning new borrowings under the Daiwa Loan. The Cash Collateral Account Agreement provides: "Daiwa has been instructed by [Doctors Hospital], [MMA Funding] and [Nomura] to deposit all [new borrowings under the Daiwa Loan] directly into the [Nomura Account]." (Jt. Ex. 202 PP 118, 119.) Pursuant to the Intercreditor Agreement, all advances MMA Funding was entitled to under the Daiwa Loan were to be paid into the "Cash Collateral Account." By signing the "Intercreditor Agreement," MMA Funding agreed to the use of its funds to repay the Nomura Loan.

Also on July 7, 1998, a "Collection Account" was created at Grand National Bank to receive "miscellaneous receipts of Doctors Hospital that were not part of the Daiwa receivables borrowing base." (Jt. Ex. 14, sec. 16.) The funds in the Collection Account were then transferred to the Cash Collateral Account pursuant to the Collection Account Agreement among Grand National Bank, HPCH, Doctors Hospital, and Nomura. From July 1998 through April 2000, Doctors Hospital deposited $ 3,712,818.46 in receipts from its accounts into the Collection Account.

The funds in the "Cash Collateral Account" consisted of advances from Daiwa to MMA Funding under the Daiwa Loan Agreement, funds from the "Collection Account," and any interest income received on these combined assets. Each month, the Trust withdrew from the "Cash Collateral Account" amounts sufficient to fund reserve accounts for capital improvements, taxes, and insurance, and the debt service on the Nomura Loan (the "Reserve Accounts"). After July 7, 1998, funds for the debt service payments were forwarded to the Trust's certificateholders. After the payment of expenses and the funding of the Reserve Accounts, any excess funds in the Nomura Cash Collateral Account were then sent to Doctors Hospital's general operating account.

In summary, between August 28, 1997 and July 7, 1998, Doctors Hospital made transfers directly to the Nomura "Cash Collateral Account," controlled by LaSalle, and LaSalle accepted these transfers and used them to make payments on the Nomura Loan. Under the initial Findings

15

and Conclusions, it is these transfers that were void to the extent they excluded fair market value of the rent on the Doctors Hospital property. From July 7, 1998 through April 2000, however, the Trust took payments owed under the Nomura Loan from deposits made by Daiwa into the "Cash Collateral Account" at the direction of MMA Funding. It then forwarded to the certificateholders funds representing debt service payments. It was held that rent payments during this time period were not made with Doctors Hospital's assets but with MMA Funding's and therefore not voidable as fraudulent transfers.

### F.  *Trustee Paloian's Evidence in Support of His Motion*

In support of his Motion for Summary Judgment, Trustee Paloian offers no affidavits or additional evidence. He entirely relies on facts already in the record indicating (he argues) that MMA Funding was not operationally distinct from Doctors Hospital. He first maintains that MMA Funding never carried out the functions it was supposed to carry out as set forth in its Operating Agreement. (Mem. Mot. Support, p. 8.) According to that document, MMA Funding's "business" was to accept contribution of receivables from the Hospital. Yet, Trustee Paloian argues that never happened and MMA Funding never received any contributions of receivables. *Id.* (citing Tr. II: 53, which does not identify the witness purportedly making a statement to this effect). Furthermore, under the Operating Agreement, MMA was to administer the servicing, collection and distribution of the proceeds of receivables, but assertedly never did so. Nor did it conduct any business according to Trustee Paloian. It did not maintain separate checks and stationary, did not maintain its own books of account, financial reports, computer and operating systems, and limited liability company records separate and distinct from the records and systems of related parties – all activities called for by the Operating Agreement. But no new evidence is offered in support of these contentions. Since the Circuit remand Opinion made clear that the prior record and Findings were insufficient as to the issues remanded, the Chapter 11 Trustee can hardly imply that the Circuit Opinion was wrong and the existing record entitles him to prevail.

The Chapter 11 Trustee next relies on facts showing that parties to the Daiwa Loan treated the loan as one between Daiwa and Doctors Hospital, not between Daiwa and MMA Funding. According to Trustee Paloian, the Hospital functioned as the borrower of the Daiwa loan.  He points to the fact that the Hospital's books and records shows the Hospital as borrower of the Daiwa loan, the owner of the healthcare receivables, and the liable party on the Daiwa Loan.

(Mem. Support Mot. Summ. J., p. 8) (citing Jt. Ex. 28.) In addition, there is evidence that the Hospital managed the loan by preparing, twice weekly, requests for a loan advance from Daiwa based on current receivables. *Id.* (citing Tr. I: 72.)

Furthermore, the Trustee Paloian points to a stipulation by LaSalle admitting that Daiwa "loaned money to *Doctors Hospital* secured by its receivables." (emphasis added) (Mem. Mot. Support Summ. J., p. 9) (citing Jt. Ex. 135.) LaSalle also admitted that Nomura was authorized to deduct amounts "from *Doctors Hospital's* loan proceeds." (emphasis added) (Jt. Ex. 142, ¶ 55.) James Desnick, owner of the Hospital, referred to "the contract that Doctors Hospital had with Daiwa" and "the contract between Daiwa and my hospital." (Def. Ex. 37 (Desnick) (1/29/03) at 155, 156.) Trustee Paloian then points to LaSalle's own admission made in its counterclaim against the estate that Desnick "created and utilized" all of the Hospital's related entities, including MMA Funding, as a "single economic unit." (Jt. Ex. 142 at 71, ¶ 110.)

Finally, the Chapter 11 Trustee relies heavily on the remand Opinion and argues that "[f]or all practical purposes, the Seventh Circuit found that MMA Funding was not a bankruptcy remote entity and thus there was no true sale of accounts receivable to MMA Funding." (Mem. Mot. Support Summ. J., p. 9.) In response to a set of interrogatories from LaSalle, Trustee Paloian stated again that the Seventh Circuit "found that MMA Funding was not a Bankruptcy Remote Entity on March 31, 1997" and referred to the remand Opinion and facts cited therein for the conclusion that MMA Funding was not a bankruptcy remote entity. (Ans. First Set of Interrog. ¶ 4.) But that very issue was remanded for an opportunity to both parties to offer more evidence and for further consideration of remanded issues in light of both the prior record and new evidence.

G. *LaSalle's New Evidence*

In opposing the Chapter 11 Trustee's Motion for Summary Judgment, LaSalle's new evidence in support of its position consists of three affidavits and additional documents either not admitted or not presented in the initial trial. The first affidavit comes from Issac Soleimani, the former Senior Vice President of Daiwa, the lender in the MMA Funding Loan. (Def. Ex. 11.) Soleimani says he has extensive experience in healthcare securitization transactions such as the one in this case. Soleimani described the "two-tier" loan structure used by Daiwa and MMA. According to Soleimani, "two-tier" structures are designed "so that the special purpose entity [has] no operations, no purpose other than to own the receivables and be the borrower . . . ."

(Soleimani Aff. ¶ 6.) Soleimani also states that Daiwa relied on MMA's representations of separateness, would not have loaned the money unless the entities were separate, and throughout the loan Daiwa understood the entities to be separate. (Soleimani Aff. ¶ 14, 16.) In its brief, LaSalle repeatedly emphasizes that Daiwa relied on MMA remaining separate and that it specifically required corporate separation in making loan distributions. Soleimani was a witness in the first trial and testified to the bona fides of the loan transaction. *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. at 801.

Soleimani's affidavit is bolstered by a second affidavit from LaSalle's securitization expert, Craig A. Wolson, who states that the MMA transaction "was consistent with the general securitization structure" typical of such transactions. (Wolson Aff. ¶ 18.) According to Wolson, once formed, a "special purpose entity does not engage in "operations" but, rather, is formed for the sole and exclusive purpose of owning the receivables and borrowing funds from the lender. Because of the special purpose entity's very limited function, there is no need for the special purpose entity to have its own employees." (Wolson Aff. ¶ 14.) Beyond these references, Wolson's affidavit does not speak to the separateness standard suggested in the Seventh Circuit remand opinion.

Finally, LaSalle offers the affidavit of Seth Gillman, general counsel to Medical Management of America, Inc., Doctors Hospital's management company. In 1998 he became the registered agent for MMA Funding, LLC. ( Def. Ex. 21; Gillman Aff. ¶ 6.) Aside from describing how he became familiar with the Daiwa loan, his affidavit otherwise simply maintains "MMA Funding LLC was a separate legal entity from Doctors Hospital during the period of time in which I served as a registered agent for MMA Funding LLC." (Gillman Aff. ¶ 8.)

The documents offered by LaSalle consist of the following:

- Certificate of James Desnick, delivered in connection with an opinion by Chuhak & Tecson, P.C. regarding the Daiwa loan closing containing various representations that do nothing to address the Seventh Circuit opinion. (Def. Ex. 7, tab 15.)
- Articles of Incorporation, By-laws, and certain resolutions of MMA, Inc. (Def. Ex. 7, tab 17.)
- Articles of Incorporation and Certificate of Dissolution of MMA Funding, LLC. (Def. Ex. 9.)
- State of Illinois Domestic Corporation Annual Reports, years 1998-2000. (Def. Ex. 10.)

18

- Additional Borrowing Base Certificates. (Def. Ex. 18.) (Trustee Paloian points out that these are the same, or very similar to those presented at the first trial. Mem. Support. Mot. Summ. J., at 17.)
- MMA Funding's Annual Reports filed with Illinois Secretary of State.

It may be observed that views expressed in the remand Opinion as to the "usual attributes" of a bankruptcy-remote entity are different from that proposed by LaSalle's affiants. The Opinion requires analysis of whether the entity was *operationally* distinct from the Debtor, and requires evidence that MMA managed in its own assets and observed corporate formalities. The Opinion questioned whether MMA Funding lacked the "usual attributes" of a bankruptcy remote vehicle because:

- 99% of the equity was owned by Doctors Hospital, with the remaining owned by a trust controlled by Desnick;
- MMA Funding had no office, phone number, or letterhead of its own;
- MMA Funding did not have its own checking account;
- MMA Funding did not file tax returns or prepare financial statements; and
- Doctors Hospital carried the accounts receivables on its books as a corporate asset.

*Paloian*, 619 F.3d at 696.

Earlier opinions by this court and the District Judge relied on a law review article by University of Tennessee law professor Thomas Plank entitled partly "The Security of Securitization and the Future of Security" in determining whether MMA Funding was effectively a bankruptcy-remote vehicle. Those opinions analyzed whether MMA should have been treated as an alter ego of Doctors Hospital. Important to prior decision that MMA was not an alter ego of the Hospital was Daiwa's reliance on MMA's separateness as evidenced by an officer's certificate and legal opinions attesting to MMA's separateness. The test in those opinions was whether MMA Funding was a distinct legal entity, not whether it was operationally separate from Doctors Hospital. However, the remand Opinion suggested in this Circuit an expanded legal criterion for entities seeking bankruptcy remote status, i.e., a need to show an operational function and independence as well as intent and documentary formalities.

Commentary following the Panel's Opinion supports Trustee Paloian's assertion that the Opinion detailed a new and incorrect separateness standard for entities seeking to become and remain "bankruptcy-remote." In an article in the New York Law Journal, that article's authors

19

observe that Judge Easterbrook (author of the remand Opinion) "examined the extent to which MMA was operationally separate from Doctors Hospital." Aaron R. Cahn, et al., "When Assets are 'Sold' to Special Purpose Entities; Seventh Circuit Sheds Light on When Transaction May be Considered a Loan" N.Y.L.J (Dec. 13, 2010). The authors find this notable because that sort of analysis typically appears in case law addressing substantive consolidation.

Similarly, in the Commercial Finance Newsletter, the author comments that the Panel opinion "calls into question many factually similar transactions, in which the [bankruptcy remote entity] is closely connected to the entity that generated the securitized assets (such as accounts receivable). If this [bankruptcy remote entity] did not pass muster, many others will be similarly vulnerable." Dan Schecter, *Indenture Trustee Receiving Payments on Behalf of Investors is "Initial Transferee" of Fraudulent Transfer, Rather Than Mere Conduit; Bankruptcy-Remote Entity May be Disregarded If it is Not Sufficiently Separate from Bankrupt Operating Corporation* [Paloian vs. LaSalle Bank, N.A. (7th Cir.).], 71 Com. Fin. Newsl. 1, 3 (2010). Despite such disapproval, however, the standard indicated in the remand Opinion must be applied here.

## IV.    Discussion

### A.    *What is a Bankruptcy Remote Entity?*

No authoritative precedence or statute appears to exist for bankruptcy remote entities. Some courts have accepted the existence of "bankruptcy remote" entities, and typically rely on outside commentary and literature as to the characteristics of those entities. *See, e.g., In re General Growth Properties, Inc.*, 409 B.R. 43, 49 (Bankr. S.D.N.Y. 2009) (citing David B. Stratton, *Special-Purpose Entities and Authority to File Bankruptcy*, 23-2 AM. Bankr. Inst. J. 36 (March 2004); Standard and Poor's, *Legal Criteria for Structured Finance Transactions* (April 2002)); *In re LTV Steel Co. Inc.*, 274 B.R. 278, 280 (Bankr, N.D. Ohio 2001); *Roseton OL, LLC v. Dynegy Holdings Inc.*, C.A. No. 6689-VCP, 2011 Del. Ch. LEXIS 113, at *12–15 (Del. Ch. July 29, 2011) (citing 1 Com. Real Estate Forms 3d § 4:2, and Drafter's Note). Most commentary on these entities discuss the legal structure and not operational activity required to achieve and retain bankruptcy-remoteness.

Although a "bankruptcy remote entity" is not defined in the Bankruptcy Code, it is recognized in the business world and literature as a structure designed to hold a defined group of

assets and to protect those assets from being administered as property of a bankruptcy estate in event of a bankruptcy filing. Comm. Bankr. & Corp. Reorganization of Ass'n of Bar of N.Y.C., *Structured Financing Techniques*, 50 Bus. Law. 527, 528–29 (1995). A form of structured financing, the idea is to separate the credit quality of identified assets upon which financing is based from the credit and bankruptcy risks of any entity involved in the financing. *Id.* at 529. To function properly, the entity must be legally separate from all related entities so that its property can be distinguished from property of a bankruptcy estate as defined in the Code in 11 U.S.C. § 541. The entity, if actually created, is a type of special purpose vehicle that holds the isolated assets being financed. *Id.*

The parties involved in a structured financing typically include:

- "An entity that has financing needs and that also has assets capable of serving as the basis for a structured financing . . . .This entity parts absolutely with ownership of the assets in the structured financing and is typically referred to as the 'originator' or 'transferor.'"
- One or more entities created for the structured financing that acquire ownership of the transferred assets. These are typically referred to as "special purpose vehicles' or 'SPVs.'" *Id.*

A "bankruptcy remote special purpose vehicle" is an entity that is unlikely to become insolvent as a result of its own activities and that is adequately insulated from the consequences of another party's bankruptcy. *Id.* at 533. There are a few generally requirements for creating a bankruptcy remote entity. First, the transfer of assets that are the basis of the financing must be a "true sale," as opposed to a transfer of assets that serving as collateral for a loan. *Id.* This transfer should be structured so that the originator retains no legal or equitable interests in the assets following transfer. *Id.* Second, the activities and relationship with the originator should be structured so that the special purpose vehicle's assets should not appear to be among assets of the originator and therefore relied on by creditors in event of the originator's bankruptcy. *Id.* Usually counsel for the borrower is asked for an opinion as to each of these concerns as a prerequisite to financing. *Id.*at 537.

However, the remand Opinion found that other "usual attributes" of a bankruptcy remote entity that might be lacking in this case. *Paloian*, 619 F.3d at 696 (quoted *supra*). According to one commentator, some aspects of the remand opinion expanded on prior case law on issues of

corporate separateness. Debora Hoehne, *Has Bankruptcy Remoteness Become, Well, More Remote in the Seventh Circuit?*, Bankruptcy Blog, http:// http://business-finance-restructuring.weil.com (last visited Oct. 31, 2011). Ms. Hoehne writes that special purpose entities do not often send out correspondence, so they may not need their own stationary. But, these entities typically segregate their funds in separate accounts, which MMA may not have done. She also notes that bankruptcy remote vehicles are sometimes part of a consolidated group for purposes of financial reporting and filing tax returns (LaSalle has not yet established whether this is what occurred in this case). Finally, she notes that when the transferor of a financial asset holds the equity in a special purpose vehicle it does not always receive the purchase price in cash but instead may receive a combination of subordinated notes and cash. It was not clarified in the remand Opinion whether a cash purchase is required to find the bankruptcy-remote entity separate from the transferor of assets.

The latter commentary and others have opined that the Panel Opinion did not clearly involve substantive consolidation – as the Opinion does not use that language nor cite to case precedent on the subject. *See also* Aaron R. Cahn et al., *When Assets are "Sold" to Special Purpose Entities; Seventh Circuit Sheds Light on When Transaction May be Considered a Loan*, N.Y.L.J. (Dec. 13, 2010), *available at* http://www.newyorklawjournal.com/PubArticleNY.jsp?id=1202476011056. Rather, the Opinion looked beyond the form of the transaction and focused on the substance of it. Hoehne, *supra*. The remand Opinion may be said to have used in its reasoning some factors often considered in cases determining whether corporate entities should be substantively consolidated. In deciding whether two entities should be consolidated in bankruptcy, for example, opinions have examined at a variety of issues including: compliance with corporate formalities, separateness of decision-making, separateness of operations (including offices and financial statements), possession of assets, and whether the entities acted at arms-length in their dealings. Comm. Bankr. & Corp. Reorganization of Ass'n of Bar of N.Y.C., *Structured Financing Techniques*, 50 Bus. Law. 527, 560 (1995).

The ALI-ABA Course of Study Materials cited in the remand Opinion explains how special purpose vehicles ("SPVs") can be "bankruptcy proofed." Kenneth N. Klee & Brendt C. Butler, *Asset-Backed Securitization, Special Purpose Vehicles and Other Securitization Issues*, ALI-ABA Course of Study Materials SJ082 (June 2004). Recognizing that an SPV can never be

fully shielded from the prospect of bankruptcy, the ALI-ABA materials nevertheless provide guidance on how to enhance the chance of a bankruptcy remote entity being recognized. Those materials suggest that treatment as if substantively consolidated can be avoided if:

> . . . the organizational documents . . . require that the [special purpose vehicle] maintain all corporate formalities, such as maintaining separate books and records, maintaining separate accounts, preparing separate financial statements, avoiding commingling of its assets with those of any other person, acting solely in its own corporate name and through its own officers and agents, and conducting only arm-length transactions with affiliated entities.

*Id.*

One tactic in bankruptcy-proofing a special purpose vehicle is to limit the purpose and activities of the SPV to the purchase and ownership of securitized assets and any other functions related to these functions. According to Professor Plank, limiting the entity's functions is intentional – "because there should be no other activities or significant debt, the SPE [special purpose entity] will not have creditors other than the holders of the asset-backed securities." Thomas E. Plank, *The Security of Securitization and the Future of Security*, Cardozo L. Rev. 1655, 1665 (2004). This argument would support a holding that MMA was a distinct entity despite having no function other than owning Doctors Hospital's receivables.

Other published commentary concerning bankruptcy-remote entities does, however, conform to the Opinion's view. For example, in the law review relied on by this court and the District Court Judge after the initial trial, Professor Plank discussed the trend of precedent to disregard the express form of a transaction when the substance of the transaction does not match that form. Thomas Plank, *The Security of Securitization and the Future of Security*, Cardozo L. Rev. 1655, 1683 (2004). While he opined that courts are correct to collapse a sale transaction where the seller retains all of the benefits and burdens of ownership, he argued that securitization transactions similar to the one in this case should be viewed differently because of the process that isolates assets sold from the seller's other creditors. *Id.* at 1684. Professor Plank emphasized the legal characteristics and form of bankruptcy remote entities. Nonetheless, it appears the remand Opinion has suggested a broader standard for testing the legitimacy of purported bankruptcy-remote entities. That Opinion is "law of the case" that clearly applies here.

Detailed evidence as to indicia of entity operations is yet to be produced. The evidence LaSalle has now submitted in opposition to the Motion for Partial Summary

Judgment is largely the same as that it presented in the first trial. The affidavits filed by it speak only to the ways MMA Funding was a distinct legal entity; they do not show that MMA Funding had a distinct set of operations. While MMA Funding's structure may have in many respects fit the pre-*Paloian* understanding of requirements for bankruptcy-remoteness, it cannot yet be determined from evidence whether or not it operated as a distinct business entity under the standard stated in the remand Opinion. Therefore, LaSalle and Trustee Paloian, in failing to submit evidence of MMA's operational separateness, have not yet given clarity to the aspects that must be reviewed after remanded trial.

This emphasis on the operational aspects of MMA Funding at and after its purported inception presents questions. If MMA Funding existed at its inception and there was then a "true sale" of receivables to it, it may have to be determined when if ever it ceased to exist. In addition, the remand Opinion specifically directed that on remand, "[t]he second question is whether the transfer of the accounts receivable was a true sale." *Paloian*, 619 F.3d at 692.

### B. *What is a "True Sale"?*

For a special purpose entity to be bankruptcy remote, the transfer of assets from the debtor must be an actual sale under applicable law and not a disguised loan. There is a dearth of precedent on what constitutes a "true sale" in securitization transactions. Once again, the source of reasoning on this issue comes mostly here from published literature, not from case precedent. *See, e.g.*, Stephen J. Lubben, *Beyond True Sales: Securitization and Chapter 11*, 1 N.Y.U.J.L. & Bus. 89, 92–97 (2004). If the transfer is a true sale the assets transferred should not be considered assets of the estate of the transferor under 11 U.S.C. § 541, and the transfer should not be subject to revocation as a fraudulent conveyance. So in this case, if it is found that there was a valid bankruptcy remote vehicle, and if there was a true sale of assets to it, the Chapter 11 Trustee will have no recourse against assets sold to the bankruptcy remote entity.

To create a true sale, the parties must take steps evidencing that a true sale is intended. A court must look to the substance of the transaction, rather than its form. *Structured Financing Techniques*, *supra*, at 542. In general, review focuses on the economic substance of the transfer, particularly whether sufficient indicia of ownership of the assets shifted from the seller to the special purpose vehicle, ignoring the labels attached to the transaction by the parties. *Id.*

24

Therefore, it is important to focus on whether a transaction was at arms-length and commercially reasonable. Typically, the issues involved in determining whether a true sale occurred include:

- <u>Recourse:</u> The nature and extent of the recourse, direct and indirect against the transferor, to determine whether the risk of loss is transferred to the BRE. The originator must retain little if any of the benefits and burdens of owning the receivables. If the originator retains too much risk or benefit from the receivables and later becomes a debtor in bankruptcy, there is a risk that the receivables will be included in the bankruptcy estate. *E.g., Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 269 (9th Cir. 1987);

- <u>Post-transfer control over the assets and administrative activities</u>: Whether the transferor is permitted to service or collect the assets but must be removed if it defaults on those duties;

- <u>Accounting treatment</u>: Whether the transfer must be treated as a sale on the transferor's books;

- <u>Adequacy of consideration</u>: Whether the transaction is at arms-length for adequate consideration (meaning full market value) received by the transferor;

- <u>Parties intent</u>: It is suggested that the transfer documents contain a section saying "the parties intend a sale" or that the terms of the transaction otherwise describe it as a sale.

*See Structured Financing Techniques*, *supra*, at 566.

Trustee Paloian explicitly states that he is not questioning whether a true sale occurred in this case. He argues that the issue is irrelevant and that "[t]he Seventh Circuit's analysis does not even suggest that Defendant could salvage MMA Funding simply by offering evidence that it was separate at its inception." (P. Mem. Support Mot. Summ. J., at 11). This stance presents some difficulties. First, the Panel Opinion explicitly remanded the issue of whether there was a bona fide sale of receivables. Second, if it were found here that there was a "true sale" of accounts receivable to MMA Funding and if MMA Funding is found to exist as a legitimate special purpose vehicle on March, 31, 1997, the loan closing date, then there might be a further issue as to when if ever its separate existence ended.

In response to "contention interrogatories" issued by LaSalle, Trustee Paloian contended that MMA Funding was not a separate entity on March 31, 1997 and never became a separate entity after that date. (Ans. Interrog. ¶ ¶ 3, 5.) He further contends that the period of time after

March 31, 1997 is not applicable. (*Id.* ¶¶ 6–9.) This position is at odds with the Seventh Circuit Opinion ruling that " . . . . if MMA Funding became a bankruptcy-remote vehicle as part of the Daiwa loan, this prevents recovery of payments made on the Nomura loan from July 1998 forward." *Paloian*, 619 F.3d at 695. Although the Opinion went on to question whether MMA Funding ever existed, it left to this court the determination whether there was a true sale of accounts receivable. *Id.* at 696.

The remand Opinion did not find from the earlier rulings any record of a purchase price or actual payment by MMA to Doctors Hospital for the assets. *Id.* While further evidence may clarify this, it may be that MMA Funding simply took a share from proceeds of receivables every month to cover its own operating costs and left the remainder with Doctors Hospital rather than buying the assets at the outset. LaSalle insists that Doctors Hospital received from the arrangement a 99% equity interest in MMA, payment of a loan taken out for Doctors Hospital's benefit, and $1.3 million given to the Hospital by MMA. (Def.'s Resp., at 26–27.) The parties also stipulated that when the Daiwa Loan closed, a balance sheet for MMA Funding was prepared that showed that MMA Funding was the owner of the receivables. (Jt. Stipulation for Purposes of Remand ¶ 95.)  LaSalle argues that this was "true sale" of Doctors Hospital's receivables that took place in March 1997.

LaSalle's view of the transaction is different from that of Trustee Paloian who reasons as follows:

On March 25, 1997, MMA Funding was newly formed as an Illinois limited liability company under Illinois law. (Def. Ex. 3.) On March 31, 1997, pursuant to a Healthcare Receivables Contribution Agreement ("Contribution Agreement") executed by Doctors Hospital in favor of MMA Funding, Doctors Hospital agreed to transfer ownership of all of its healthcare receivables, on an ongoing basis, to MMA Funding. (Def. Ex. 4.) Also on March 31, 1997, Daiwa made a $25,000,000 revolving loan to MMA Funding pursuant to a Loan and Security Agreement dated March 31, 1997. (Def. Ex. 4.) The transaction contemplated by the MMA Funding Loan Agreement was a "securitization" transaction. (Def. Ex. 4.) To secure the MMA Funding Loan, MMA Funding granted to Daiwa security interests in the healthcare receivables which MMA Funding acquired from Doctors Hospital pursuant to the Contribution Agreement." LaSall has provided "a complete set" of MMA Funding loan closing documents in support of its position that MMA Funding was a separate entity as of the loan closing date. As part of the

transaction, Doctors Hospital was made servicer of the accounts and the accounts remained on its balance sheet because a transfer would be "administratively burdensome." (Desnick Officer Certificate, Def. Ex. 15, pp. 1, 7–8.)

In Section 1.01 of the Contribution Agreement between Doctors Hospital and MMA Funding, "[Doctors Hospital] agrees . . . to contribute all of its receivables to [MMA Funding], and [MMA Funding] agrees . . . to accept the Contribution by [Doctors Hospital] of such Receivables." (Def. Ex. 7, tab 1.). In exchange for its contribution of receivables, Doctors Hospital received a 99% equity interest in MMA Funding, retirement of an existing line of credit taken out on the Hospital's behalf, in the amount of $6,524,000.00. (Evidence of this comes in the form of a letter from Grand National Bank to Daiwa acknowledging that payment will be made on an outstanding balance from the loan proceeds) (Def. Ex. 7, tab 7.) Finally, $1,372,000.00 was made available (at MMA Funding's direction) to Doctors Hospital. *LaSalle N.A. v. Paloian*, 406 B.R. 299, 315 (N.D. Ill. 2009).

The Seventh Circuit's Opinion questioned whether a true sale occurred but did not specify particular failings of the transaction in this case. The Opinion's reference to lack of purchase price did not address whether the grant of an equity interest, the loan satisfaction, and some cash made available to Doctors Hospital was an inadequate consideration. The parties to the loan clearly and repeatedly asserted in documents they executed, such as the Shefsky & Froelich Legal Opinion and Daiwa Loan documents, that the transaction contemplated was a true sale. (Def. App. Ex. 5, 6, 7 tab. 11.) After the first trial, it was concluded here that Doctors Hospital transferred all of its receivables on a continuing basis to MMA Funding as a "true sale." *In re Doctors Hospital of Hyde Park, Inc.*, 360 B.R. at 848. In sum, some "elements" of a true sale are present while others may ultimately be found to be lacking. The remand opinion does not specify any factor(s) that would be dispositive in the analysis on this issue. That, it appears, is to be determined here after reviewing all available evidence relevant to whether a true sale occurred.

## Conclusion

For reasons set forth in the forgoing Opinion, the Motion for Summary Judgment will be denied by separate order.

The forthcoming trial on remanded issues will therefore still include all of the issues remanded:

27

1. Was MMA Funding a valid bankruptcy remote entity when assets were transferred to it by the future Debtor?

2. If so, were those assets transferred to it by a true sale?

3. Did the asset transfer have the effect of rendering the future Debtor insolvent, and so, when did that result?

ENTER:

_____
Jack B. Schmotterer
United State Bankruptcy Judge

Entered this _____ day of December, 2011.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | Bankruptcy No. 00 B 11520 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Gus A. Paloian, Chapter 11 Trustee of | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 02 A 00363 |
| | ) | |
| LaSalle Bank National Association, | ) | |
| f/k/a LaSalle National Bank, as Trustee for | ) | |
| Certificate Holders of Asset Securitization | ) | |
| Corporation Commercial Pass-Through | ) | |
| Certificates, Series 1997, D5, by and through | ) | |
| its servicer, Orix Capital Markets, LLC | ) | |
| | ) | |
| As Defendant to Counts VIII, IX, and X. | ) | |

**ORDER DENYING PLAINTIFF TRUSTEE'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Memorandum Opinion of this date, the Motion of Plaintiff Trustee Paloian
for Partial Summary Judgment is hereby denied.

ENTER:

Jack B. Schmetterer
United State Bankruptcy Judge

Entered this 2nd day of December, 2011.