**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | Bankruptcy No. 00 B 11520 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| Gus A. Paloian, Chapter 11 Trustee of | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 02 A 00363 |
| | ) | |
| LaSalle Bank National Association, | ) | |
| f/k/a LaSalle National Bank, as Trustee for | ) | |
| Certificate Holders of Asset Securitization | ) | |
| Corporation Commercial Pass-Through | ) | |
| Certificates, Series 1997, D5, by and through | ) | |
| its servicer, Orix Capital Markets, LLC | ) | |
| | ) | |
| Defendant. | ) | |

**COUNTS VIII, IX AND X**

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**(MODIFYING PARTS I AND II)**

This proceeding was tried on remand after appeals to the Seventh Circuit by both parties from a judgment entered following the first trial. The parties rested after further trial on issues remanded, and final arguments were filed in writing. Findings of Fact and Conclusions of Law are hereby made and entered in the following parts:

I.      Introduction and Summary of Findings and Conclusions ..................... 2

II.     Authority to Enter Final Judgment......................................................... 25

III.    Findings of Fact as to Solvency Issues................................................. 39

IV.     Conclusions of Law as to Solvency Issues........................................... 90

V.      Findings of Fact as to Bankruptcy Remote Entity Issues...................... 147

VI.     Conclusions of Law as to Bankruptcy Remote Entity Issues................. 192

Conclusions: Entry of Judgment on Each Count for Defendant  ................... 233

1

# I.

## INTRODUCTION AND SUMMARY OF FINDINGS AND CONCLUSIONS

Plaintiff seeks to recover allegedly fraudulent transfers made to Defendant during the period from October 1, 1997 through the date of the bankruptcy filing by the Debtor on April 17, 2000, Doctors Hospital of Hyde Park, Inc. The fraudulent transfers were said to have consisted of payments of rent, to the extent that they exceeded fair market value, during a period of time when Doctors Hospital was insolvent. It is claimed that the rent came from the Debtor, while the defense asserts that it mostly came from a separate entity (referred to below as the "bankruptcy remote entity')

After a first trial, it was held that Plaintiff had proved insolvency during the entire period from August 1997 to April 2000, but judgment was entered only as to fraudulent transfers of rent that Doctors Hospital made directly to Defendant before July 1998. As to the transfers after that date, it was determined that the transfers were not made with assets of the Hospital, but were paid with assets of an entity named MMA Funding, LLC. MMA Funding, LLC was created in 1997 to act as a special purpose borrower on a loan from Daiwa-Healthco-2 LLC secured by Doctors Hospital's accounts receivable, an entity whose assets were asserted to be "bankruptcy remote," *i.e.*, intended not to be administered in a possible Doctors Hospital bankruptcy.

Doctors Hospital of Hyde Park, Inc. (the "Hospital") filed its related chapter 11

Bankruptcy case on April 17, 2000. On March 28, 2001, LaSalle filed its proof of claim

in the bankruptcy case in the amount of $60,139,317.04 based on asserted obligations of

Doctors Hospital arising from its guarantee of a loan. Doctors Hospital filed this above

titled adversary complaint pleading twenty-eight counts against a number of individuals

and entities, Dr. James Desnick, and many others.[1] However, Counts VIII, IX, and X of

the adversary complaint asserted claims only against LaSalle Bank National Association,

f/k/a LaSalle National Bank as trustee for certain asset certificateholders of Asset

Securitization Corporation Commercial Mortgage Pass-Through Certificates, Series

1997, D5 ("LaSalle"). Those counts serve as a counterclaim to the LaSalle claim. On

April 22, 2004, Gus A. Paloian (the "Trustee") was appointed as chapter 11 Trustee for

Doctors Hospital, and he pursued those counts.

Counts VIII, IX, and X of this adversary complaint against LaSalle seek (1) to

void as fraudulent transfers a guaranty and related security agreement that Doctors

Hospital made in connection with a loan from LaSalle's predecessor, Nomura Asset

Capital Corporation, to Doctors Hospital's landlord (Count VIII) and (2) to void a lease

held by Defendant as Nomura's assignee or to recover as fraudulent transfers payments

of rent that Doctors Hospital had made to LaSalle in excess of the property's fair market

rental value (Counts IX and X). Count X was brought pursuant to 11 U.S.C.

---

[1] On or about April 1, 2004, Doctors Hospital filed with this Court a Settlement
Agreement between Doctors Hospital, Desnick, and all the other defendants except
LaSalle, Stephen Weinstein, and Robert Krasnow. The Hospital's claims against
Weinstein and Krasnow were severed from Counts against LaSalle for purposes of trial.
*Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park,
Inc.)*, 360 B.R. 787, 798 ¶30 (Bankr. N.D. Ill. 2007). Krasnow was dismissed as a party
to the case and all counts against him dismissed, both with prejudice on May 21, 2007.
(02 A 00363, Dkt. No. 653) Counts against Weinstein were dismissed, and he from the
case, with prejudice on October 22, 2007 (Dkt. No. 702). Additionally, LaSalle filed a
counterclaim in the adversary proceeding, seeking approximately $60 million based on
the guaranty and security agreement related to the loan. (Dkt. No. 183). All Counts of
that Counterclaim were dismissed on February 26, 2004 except for LaSalle's breach of
guaranty claim (Count II) against Doctors Hospital. (Dkt. No. 309). The grant of
Summary Judgment entered against LaSalle on Count II of its counterclaim was affirmed
by the District Court Judge on appeal and was undisturbed on appeal to the Seventh
Circuit. *LaSalle Bank N.A v. Paloian.*, 406 B.R. 299, 310 (N.D. Ill. 2009); *Paloian v.
LaSalle Bank N.A.*, 619 F.3d 682, 692 (7th Cir. 2010).

§ 548(a)(1)(B). Counts VIII and IX were brought pursuant to the Illinois Uniform Fraudulent Transfer Act ("IUFTA") and 11 U.S.C. § 544(b)(1), which is asserted to permit the trustee to avoid a transfer of the debtor's property under applicable non-bankruptcy law. Those three counts were consolidated for trial.

The first trial ("First Trial") on the consolidated counts originally took place in 2006. Findings of Fact and Conclusions of Law were made and entered and a Final Judgment Order entered. *Doctors Hosp. of Hyde Park Inc. v. Desnick, et al., (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787 (Bankr. N.D. Ill. 2007) ("Initial Opinion"). It was held therein that rental payments made after July 7, 1998 were not fraudulent transfers because they were not made with assets of Doctors Hospital. *Id.* at 853. LaSalle's request to void the lease pursuant to which rental payments were made was denied in the Judgment and that ruling was not appealed. For rental payments made prior to July 7, 1998, the Trustee was awarded damages to the extent that rental payments were found to have exceeded fair market value plus interest, resulting in judgment in favor of the Trustee allowing his counterclaim in the amount of $4,342,238.43. Both parties filed motions to alter or amend the judgment, which were denied in Additional Findings of Fact and Conclusions of Law dated July 25, 2007. *In re Doctors Hosp. of Hyde Park, Inc.*, 373 B.R. 53 (N.D. Ill. 2007). Separate appeals were filed and were consolidated by a District Court Judge. That Judge affirmed all Findings and Conclusions. *LaSalle Bank N.A. v. Paloian*, 406 B.R. 299, 366 (N.D. Ill. 2009). Appeal to the Seventh Circuit Court of Appeals followed.

### Remanded Issues and Further Second Trial

The proceeding is now before this court on remand from the Court of Appeals for the Seventh Circuit. *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010) (the "Remand Opinion"). Many adjudications in this Court's Initial Opinion made after the First Trial were accepted by the Remand Opinion and are deemed to continue and apply herein. As stated by the Remand Opinion, issues "pretermitted" by that Opinion have been decided, are law of the case, and are not within the scope of remand. *Id.* at 692.[2] At issue following remand is the holding following the First Trial that post-July 1998 rental payments were not fraudulent transfers. The remand order sought further consideration of two issues: *First*, whether Doctors Hospital was insolvent at any time before filing for bankruptcy. Solvency is a significant issue because if the Hospital was not insolvent when the payments in issue took place, then Trustee Paloian may not recover as fraudulent transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B) the payments that were made to LaSalle even if those payments were found to have been made from property of the Debtor. *Second*, whether there was a true sale to MMA Funding, LLC of accounts receivable from the Hospital, and that issue further involves the question whether MMA Funding, LLC was in fact an actual business entity and not a part, department, or function of the Debtor. *Paloian*, 619 F.3d at 696. The status of MMA Funding, LLC is therefore relevant to Counts IX and X of the adversary complaint, because if it was not a true business entity dealing with its own funds, then payments made by it to LaSalle were from the Hospital's assets and might be recoverable by the Trustee.

All evidence introduced at the original trial was re-offered at the remand trial and admitted without objection. Additional evidence and stipulations were approved and admitted. Pursuant thereto, the following Findings of Fact and Conclusions of Law are made and entered.

---

[2] Issues decided in the *Initial Opinion* and not impacted by the Remand Opinion include findings that: (1) All Lease payments made by the Hospital exceeded reasonably equivalent value; (2) the "Cash Collateral Account" was not a true escrow account; and (3) the parties post-Agreement course of performance did not modify the Daiwa Loan Agreement such that the Hospital should be treated as the actual borrower. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al., (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 838 (Bankr. N.D. Ill. 2007).

## Undisputed Background Facts

### A.      Parties and Related Entities

**Doctors Hospital of Hyde Park, Inc.** was an Illinois Subchapter-S corporation that had its principal place of business at 5800 South Stony Island Avenue, Chicago, Illinois. From approximately August 24, 1992 until April 17, 2000, it was owned and controlled by Dr. James Desnick. (Jt. Ex. 202 ¶ 1)[3]

**James Desnick** was, at all relevant times, the sole shareholder and director of Doctors Hospital. (Jt. Ex. 202 ¶ 2)

**Daiwa Healthco-2 LLC** ("Daiwa") is a Delaware limited liability company with its place of business in New York City, New York. (Jt. Ex. 202 ¶ 3)

**HPCH LLC** ("HPCH") was a Delaware limited liability company that acquired in 1997 the Doctors Hospital property. HPCH was owned 99% by HPCH Partners, L.P and 1% by its managing member, HP Membership. Desnick was HPCH's managing partner, owned 100% of HP Membership and approximately 99% of HPCH Partners, L.P. (Jt. Ex. 202 ¶ 4)

**LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates, Series 1997, D5,** by and through its Servicer, Orix Capital Markets, LLC ("LaSalle"), is a trust whose Trustee, LaSalle Bank National Association is a national banking association with its principal place of business in Illinois. (Jt. Ex. 202 ¶ 2)

---

[3] These Findings of Fact and Conclusions of Law include references to evidence from the first trial (as defined below) as well as new evidence adduced during the trial on remand. All exhibits admitted at the first trial were readmitted pursuant to the Amended Final Pretrial Order on Remanded Hearing dated March 24, 2011 (Dkt. No. 771, the "Pretrial Order"). Citation to the record will be as follows: trial transcript from the first trial in 2006 including the volume number and page number thereof (06 Tr. Vol. __: __); trial transcript from the remand trial, including the volume number and page number thereof (12 Tr. Vol. __: __); joint exhibits from the first trial (Jt. Ex. __); Plaintiff's exhibits from the first trial (Pl. Ex. __); Defendant's exhibits from the first trial (Def. Ex. __); joint exhibits from the remand trial (New Jt. Ex. __); Plaintiff's exhibits from the remand trial (New Pl. Ex. __); Defendant's exhibits from the remand trial (New Def. Ex. __).

**Medical Management of America, Inc.** was a Delaware corporation and purported manager of Doctors Hospital substantially owned and controlled by James Desnick. (*see* Jt. Ex. 202 ¶ 12)

**MMA Funding, LLC** was an Illinois limited liability corporation owned 99% by Doctors Hospital and 1% by MMA Funding, Inc. (also owned and controlled entirely by Desnick), the special purpose manager of MMA Funding, LLC. (Jt. Ex. 202 ¶ 11)

**Nomura Asset Capital Corporation** ("Nomura") is a Delaware corporation with its principal place of business in New York City, New York. (Jt. Ex. 202 ¶ 14)

### B.        History of Doctors Hospital

Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan. The railroad sold the facility in 1960 and it became a not-for-profit community hospital. Dr. James Desnick purchased Doctors Hospital of Hyde Park in 1992 for approximately $2.4 million through an entity he controlled, HPCH Partners, L.P. The real estate and certain fixtures were located at 5800 South Stoney Island Avenue in Chicago and titled to HPCH, LLC.[4] Doctors Hospital ("Debtor" or "Hospital") managed the hospital's business operations. The Hospital leased the hospital property from HPCH.

Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield.

### C.        The Daiwa Loan

Trustee Paloian appealed from the original judgment holding that certain transfers to LaSalle's account were not property of Doctors Hospital and therefore could not be recovered by the Hospital (as debtor) as fraudulent transfers. The transfers at issue arise from a March 31, 1997 loan from Daiwa to MMA Funding, LLC, a wholly-owned

---

[4] 99% of HPCH was owned by HPCH Partners, L.P. The remaining 1% was owned by its managing member, HP Membership. Dr. Desnick owned 100% of HP Membership and a controlling interest in HPCH Partners, L.P.

subsidiary of Doctors Hospital. Loans were made during a period from October 1997 until Doctors Hospital's bankruptcy petition was filed in April 2000. The Daiwa loan was a revolving loan designed as a healthcare securitization program. Under this type of program, Daiwa loaned funds to the wholly-owned subsidiary of participating entities and in exchange, participating entities contributed receivables to their wholly-owned subsidiaries as security for a loan. The Daiwa Loan was memorialized in several documents: (i) The Loan and Security Agreement between MMA Funding, LLC and Daiwa ("Daiwa Loan Agreement"); (ii) The Healthcare Receivables Contribution Agreement between MMA Funding and Doctors Hospital ("Contribution Agreement"); (iii) The Depository Agreement between Doctors Hospital, MMA Funding, LLC, Daiwa and Grand National Bank; and (iv) Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding, LLC in favor of Daiwa ("MMA Funding Assignment"). (Jt. Ex. 202 ¶ 40)

Parties to the Daiwa loan, MMA Funding, LLC and Daiwa, indicated through certain documents that they intended MMA Funding, LLC to be a special purpose vehicle that would protect Daiwa from the possibility of a bankruptcy case to be filed by Doctors Hospital. *See e.g.,* Credit Approval Memorandum Daiwa Securities America Medical Management of America, Inc. (Jt. Ex. ¶ 117); Shefsky and Froelich Legal Opinion (Def. Ex. 16) For this reason, transaction documents identified the subsidiary (MMA Funding, LLC) as the borrower but not the participating entity (Doctors Hospital), and Daiwa as the lender. According to the terms of the transaction documents in this case, Doctors Hospital was to contribute its accounts receivable to MMA Funding, LLC. In return for loan disbursals from March 1997 to March 2000, Doctors Hospital allegedly contributed all of its healthcare receivables to MMA Funding, LLC pursuant to the Contribution Agreement. MMA Funding, LLC then assigned the receivables as collateral security in favor of Daiwa under an agreement titled "Assignment of Healthcare Receivables Contribution as Collateral Security by MMA Funding, LLC in Favor of Daiwa." Daiwa then agreed to loan funds in the amount of $25 million to MMA Funding, LLC in

8

exchange for a security interest in those receivables. Pursuant to this exchange, Daiwa forwarded loan advances to a bank account in the name of MMA Funding, LLC. Daiwa and MMA Funding, LLC were at all times the only signatories to the loan transaction documents. The loan documents stated that only MMA Funding, LLC could borrow and repay the loan. The agreement also required MMA Funding, LLC to submit borrowing base certificates to Daiwa in connection with each advance under the loan.

The loan documents also provided that MMA Funding, LLC was to designate the account into which Daiwa would transfer loan disbursals. From April 1997 to July 1998, Daiwa transferred borrowings into an account titled in the name of MMA Funding, LLC at Grand National Bank. After July 1998, MMA Funding, LLC directed that new borrowings be deposited into an account controlled by LaSalle Bank pursuant to the terms of the Nomura loan, discussed below.

### D.        The Nomura Loan and HPCH Lease

In August 1997 Nomura Asset Capital Corporation loaned $50 million to Doctors Hospital through HPHC LLC, the entity from whom Doctors Hospital leased the Hospital property. The obligations of HPHC under the loan were secured by the Hospital property and a lease between HPHC and Doctors Hospital, among other things. The Hospital promised to pay HPHC additional rent. HPHC gave Nomura a security interest in the rent owed by the Hospital. The Nomura loan was securitized and thereafter sold to a third party that bundled several billion dollars of commercial credit for sale to investors. The loan assets were transferred to a trust, of which LaSalle National Bank is the trustee and Orix Capital Markets is the servicer.

If MMA Funding, LLC actually was a lawful "bankruptcy-remote entity" then the Trustee will not be able to recover payments from the entity made to LaSalle as fraudulent transfers after July 1998. Again, in July or August of 1997, HPCH acquired legal title to the Doctors Hospital property from HPCH Partners LP. On August 28, 1997, Doctors Hospital entered into an agreement with HPCH to lease the Hospital property for approximately $470,000 per month. On that same date, Nomura made a loan to HPCH in

9

the amount of $50 million. Under its lease with HPCH, Doctors Hospital paid rent on a net basis equal to the debt service payment owed by HPCH on the Nomura loan. HPCH assigned to Nomura all of its rights in the HPCH Lease and rent due under it. The Nomura Loan was secured by the HPCH lease, the Hospital real estate, hospital equipment, accounts receivable, and other intangibles relating to Doctors Hospital. Doctors Hospital also executed and delivered a Guaranty to Nomura for the entire amount of the loan. The Hospital also executed an "Equity Pledge Agreement" that granted Nomura a security interest and lien on all of Doctors Hospital's 99% interest in MMA Funding.

It was established at the First Trial that although HPCH and Nomura were parties to the loan agreement and Doctors Hospital the loan guarantor, the Nomura Loan was intended primarily to benefit Desnick, and initially all proceeds of the Loan were deposited into an account held in the name of Desnick and his spouse. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 804 (Bankr. N.D. Ill. 2007). Doctors Hospital received none of the proceeds of the Nomura Loan. HPCH was alone responsible for debt service payments. Absent default of some kind, Doctors Hospital had no obligation to make debt payments.

On October 24, 1997, two months after entering into the loan agreement, Nomura transferred all its rights, title, and obligations under the loan to the Asset Securitization Corporation ("ASC"). ASC then immediately transferred all its rights, title, and obligations under the loan to LaSalle as ASC's Trustee. The Nomura Loan thus became part of a pool of loans owned by LaSalle and serviced by Orix.

### E.   Fraud Allegations Against the Hospital

In an agreement with the United States and the State of Illinois dated May 1999, the Hospital agreed to pay $4.5 million in settlement of allegations by the government that the Hospital had engaged in practices of so-called "up-coding" for services and therefore overcharged for Medicaid and Medicare services. The Hospital was also under

federal investigation for allegedly fraudulent "kickback" schemes involving over $20.1 million of alleged medically unnecessary services billed to Medicaid and Medicare dating from 1993 through 1998.

## Jurisdiction

Under 28 U.S.C. § 1334(a) the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois had referred its bankruptcy cases to the bankruptcy judges of this District. Subject to the discussion below, when presiding over a referred case, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to enter orders and judgments in core proceedings. This adversary proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(H) as a "proceeding[] to determine, avoid, or recover fraudulent conveyances." Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## Authority to Enter Final Judgment

For reasons described more fully in Part II of the Conclusions of Law below, it is held that there is authority for a bankruptcy judge to enter final judgment on this action to recover fraudulent transfers under 11 U.S.C. §§ 544 and 548 notwithstanding *Stern v. Marshall*, 131 S. Ct. 2594 (2011). This adversary proceeding seeks to recover judgment for alleged transfers under those provisions. Some courts have expressed concern that the reasoning of *Stern* calls into question the authority to enter judgment on that issue. (*See* Paloian's Brief Concerning Entry of Judgment, 02 A 00363, Dkt. No. 836, at 2–3) Following an order for briefing on the question, the Trustee indicated by his filing on October 10, 2011 that he does not consent to entry of final judgment on its claims by a bankruptcy judge. (*See* Paloian's Brief Concerning Entry of Judgment, 02 A 00363, Dkt. No. 836, at 3)

11

Although there are opinions going both ways on the issue, the Seventh Circuit has unequivocally found authority for a bankruptcy court to enter final judgment in an action for fraudulent transfer against a creditor who has filed a proof of claim. *Peterson v. Somers Dublin Ltd.*, 12-2463, 2013 U.S. App. LEXIS 18650, at *4 (7th Cir. Sept. 6, 2013) ("The current dispute comes within a bankruptcy judge's authority, notwithstanding *Stern*, because all of the defendants submitted proofs of claim as the Funds' creditors and thus subjected themselves to preference-recovery and fraudulent-conveyance claims by the Trustee.")

If final judgment is appropriately entered, the district court's standard of review will be under the clearly erroneous standard. Fed. R. Bank. P. 8013. If a bankruptcy judge does not have constitutional authority to enter final judgment on fraudulent conveyance claims then under Seventh Circuit law, the forthcoming Findings of Fact and Conclusions of Law may not be treated as proposed under this court's authority over controversies deemed related under 11 U.S.C. § 157(c). *Wellness Int'l Network, Ltd. v. Sharif*, 12-1349, 2013 U.S. App. LEXIS 17553, at *20 *(7th Cir. Aug. 21, 2013)* ("No statutory provision authorizes a bankruptcy court to propose findings of fact and conclusions of law in a core proceeding; such a report and recommendation from the bankruptcy court is statutorily authorized only in noncore proceedings . . ."); *But see Feuerbacher v. Moser*, No. 4:11-CV-272, 2012 WL 1070138, *9 (E.D. Tex. Mar. 29, 2012) (noting that "the vast majority of courts to confront the issue have concluded that bankruptcy courts nonetheless have unquestioned authority to submit proposed findings of fact and conclusions of law.") (citing cases).

### Summary of Key Findings:

For reasons set forth at length in Parts III, IV, V, and VI these Findings and Conclusions it will be held and found that:

1) Doctors Hospital was insolvent at all times from September 30, 1999 through April 17, 2000, not earlier, and therefore the sale in issue was effected prior to insolvency on March 31, 1997.

2) MMA Funding, LLC was a valid bankruptcy remote entity at all times from July 1998 onward.

3) MMM Funding, LLC purchased the Hospital's receivables in a true sale.

## SUMMARY OF FINDINGS AND CONCLUSIONS ON SOLVENCY ISSUES

### Scope of Remand Opinion

The parties disagree in many respects on the meaning and impact of the Remand Opinion on remand. As to solvency, LaSalle argues that Opinion conclusively decided several issues, and in so doing precluded those issues from consideration herein. The Trustee argues that only two discrete issues were remanded on the subject of solvency. For reasons described more fully in Part IV below, on remand, the entire solvency analysis has been reviewed based on all evidence received to determine if and when the Hospital became insolvent before filing for bankruptcy in April 2000. The detailed Findings of Fact and Conclusions of Law pertaining to solvency issues are found in Parts III and IV below. A summary of those Findings and Conclusions are set forth here.

### Count VIII was Removed from Consideration on Remand

For reasons described more fully in Part IV hereinbelow, it is held that Count VIII was removed from consideration on remand. LaSalle asserted that Count VIII of the Trustee's Adversary Complaint "is no longer in play on remand." (Solvency Brief 16 n.5) In Count VIII, the Trustee alleged that the Guaranty and the liens and security interests granted to secure it were avoidable as constructively fraudulent under the Illinois UFTA, 740 ILCS 160/1 et seq. The Trustee argued that a part of Count VIII remains alive on remand. Specifically, the Trustee argues that its request to recover aggregate payments made on the Nomura Loan to the extent those payments exceeded fair market rental value can be resolved on remand. (Trustee's Proposed Findings and Conclusions, Dkt. No. 895, at 36) (Adversary Complaint, 02 A 363, Dkt. No. 1, at 40) However, that request for relief was explicitly waived by the Trustee and was therefore was not preserved for decision on remand. (02 A 363, Dkt. No. 568, at 2)

### Summary of LaSalle's Arguments on Insolvency

LaSalle argues that the evidence on remand does not establish that the Hospital was insolvent at any time prior to its bankruptcy filing on April 17, 2000. It argues, to the contrary, that the evidence establishes that the Hospital was solvent at all times prior to its bankruptcy filing. Therefore, LaSalle argues that the Trustee has failed to establish the transfers in question were fraudulent as defined by 11 U.S.C. § 548 and ILCS 740 160/2.

### THE TRUSTEE FAILED TO ESTABLISH THAT THE HOSPITAL WAS INSOLVENT BEFORE SEPTEMBER 30, 1999

On remand, both parties offered extensive evidence consisting primarily of expert reports. The Trustee offered Plaintiff's Expert Report on Remand of Scott Peltz and Michael Lane. LaSalle offered Defendant's Expert Report prepared by Edward McDonough. Peltz and Lane concluded that the Hospital was insolvent by over $17.5 million as of September 30, 1997 and by over $17.2 million as of October 31, 1997 despite a holding in the Remand Opinion based on its review of the First Trial record that the Hospital was "comfortably solvent" as of August 28, 1997. Peltz and Lane reached these conclusions despite their inability to point to any change in the Hospital's financial condition during the period between August 1997 and October 1997.

Edward M. McDonough ("McDonough"), LaSalle's solvency expert on remand, challenged what he viewed as the Peltz and Lane's attempts to circumvent the Remand Opinion. McDonough provided his own calculations of the Hospital's Fair Value of Equity and concluded that the Hospital was solvent for all measurement periods through September 30, 1999. His report also criticized Plaintiff's Expert Report on Remand in several respects as described below.

In Plaintiff's Expert Report on Remand, Peltz and Lane relied on the "Capitalized Cash Flow Method" ("CCF Method") as their primary method for performing a balance sheet test of solvency. In the Initial Opinion, it was found that Peltz and Lane appropriately applied the CCF Method on a going concern basis to compute the balance sheet test. *Doctors Hospital of Hyde Park, Inc. v. Desnick, et al.(In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 854 (Bankr. N.D. Ill. 2007). The first phase of that method of computation normalizes the company's cash flow. The process of

normalization incorporates the value of assets needed to produce cash flow but excludes non-operating assets and liabilities. (12 Tr. Vol. IV: 481–82) Once the cash flow is normalized to reach "Debt-Free Cash Flow," a growth rate and a capitalization multiple are applied to reach an "Indicated Enterprise Value, Before Adjustments." Next, non-operating assets are added to the value to obtain the "Indicated Enterprise Value." Subtracted from that amount are "Claims on Enterprise Value" to reach the final "Indicated Fair Value of Equity" (the ultimate solvency conclusion).

### A.     Period From August to October 1997

On remand, Peltz and Lane concluded that the Hospital was insolvent by over $17.5 million as of September 30, 1997 and by over $17.2 million as of October 31, 1997. LaSalle questions how this could be so because the Remand Opinion found the Hospital to be "comfortably solvent" on August 28, 1997. LaSalle argues this conclusion cannot be correct as neither Peltz nor Lane could identify any change in financial condition of the Hospital between August 28 and October 31 1997.

The Trustee responded that the Hospital's apparent quick descent into insolvency "is simply the result of the Seventh Circuit's unsupported finding" in the Remand Opinion. (Pl.'s Executive Summary of Final Argument, at 6) While agreeing that the Seventh Circuit's fact determination is binding on remand, LaSalle contends that two anomalies in the Opinion create a misleading perception that the Hospital experienced a sudden financial deterioration.

According to the Trustee, the Remand Opinion first incorrectly found that this Court had found the Hospital insolvent only as of August 28, 1997. In fact, insolvency was found by the Opinion following the First Trial from that date to the date of the Hospital's bankruptcy petition in April 2000. Peltz and Lane felt free to examine the Hospital's financial status at any date after August 28, 1997 for that reason. The Trustee now argues that his experts could not ignore evidence of insolvency because the Remand Opinion made a finding limited to one date. The Remand Opinion stated that "[t]he

discounted-cash-flow analysis showed that the Hospital was solvent in August 1997 – indeed, comfortably solvent." *Paloian v. LaSalle Bank N.A.*, 619 F.3d 688, 693 (7th Cir. 2010).

Secondly, the Trustee disputes the Remand Opinion's requirement that Peltz/Lane should add an $18.5 million asset to the Hospital's August 1997 balance sheet in order to offset a liability that Peltz and Lane argue they did not treat as a liability. The Trustee contends that Peltz/Lane had actually made a normalizing adjustment to the Hospital's income for fraudulent earnings, something he argues is quite different from a liability.

For reasons stated more fully in Part IV of the Conclusions of Law hereinbelow, and accepting the Remand Opinion's view of the evidence before it, Peltz and Lane are found to have been unable to explain satisfactorily the Hospital's apparent quick descent into insolvency from August to October 1997. Furthermore, as explained below, Peltz's arguments against consideration of Desnick's wealth were rejected by the Remand Opinion. His attempts to reargue the issue are unavailing in light of that prior ruling that is law of the case.

> **B.    LaSalle's Challenges to Peltz's Trailing-Twelve-Month as Adjusted Methodology**

At the trial on remand, LaSalle objected to the admissibility of Plaintiff's Expert Report on Remand on the grounds that it does not satisfy the test established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). That objection was overruled and Plaintiff's Expert Report on Remand was admitted into evidence. Defendant argues that, even though the Report was admitted at trial, the sufficiency and weight of that Report and supporting testimony should be considered. (Solvency Brief 27) *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 141 (S.D.N.Y. 2003).

McDonough first critiqued Peltz's use of the Trailing-Twelve-Month as Adjusted Methodology ("TTM Methodology") because he concluded it was based on unreliable data and suspect adjustments.[5] Peltz testified that he used a trailing-twelve-month methodology, based on the Hospital's internal monthly financial statements, only to provide a check on their solvency analysis. Though Peltz admitted that the internal statements were unreliable, he used them because, he contended, they were the only records available to determine whether anything had occurred between the year-ends that would change the solvency analysis. In addition, Peltz adjusted the monthly data to match the then current available audited financial statements. Peltz contend that this is an accepted practice for mid-year valuation. For reasons stated more fully in Part IV of the Conclusions of Law hereinbelow, the analysis presented in Plaintiff's Expert Report on Remand using the audited financials is sufficient to reach a conclusion on the date of the Hospital's date of insolvency without addressing the propriety of Peltz's use of the internal financials.[6]

Plaintiff's Expert Report on Remand presents a solvency conclusion based solely on the Hospital's audited financials and solvency valuation dates of September 30, 1997, September 30, 1998, September 30, 1999 and March 31, 2000, with the use of "retrojection" to assess the Hospital's solvency at all points between those measuring dates. This approach is the same as that undertaken by Peltz and Lane in their first expert report used at the First Trial . Plaintiff's Expert Report on Remand treats the TTM Methodology as a test to the main solvency analysis.

---

[5] Lane did not assist Peltz in preparing the TTM as Adjusted Methodology. (12 Tr. Vol. VI: 898–99)

### C.    Challenges to Peltz/Lane's Capitalization of Normalized Cash Flow Analysis

#### (1)    Challenges to Peltz/Lane's Calculation of Normalization of Income

##### (a)    $4.638 Million Adjustment for Fraud

In attempting to normalize the Hospital's cash flow, Peltz/Lane adjusted its income for 1997 by $4.6 million and 1998 by $2.3 million. This adjustment was based on earnings argued to be derived from Medicare/Medicaid fraud. The numbers, based on a contemporaneous calculation made by Coopers & Lybrand, were not treated by Peltz and Lane as liabilities that might be offset by assets such as Desnick's wealth. Instead, Peltz and Lane made the adjustment at what they describe as the "preliminary stage" of their insolvency analysis to reach a normalized income that would appear realistic to a hypothetical buyer. Peltz cited several reasons not to apply Desnick's wealth to offset the deduction, including that he believed that a hypothetical buyer would not assume future payments from Desnick would be forthcoming. Peltz also contended that including income derived from fraud increased and therefore distorted the Hospital's value.

LaSalle argues that in Plaintiff's Expert Report on Remand, Peltz and Lane "zeroed out" the deductions they took from the Hospital's income in 1997 and 1998 for contingent upcoding and kickback liability as required by the Remand Opinion. Peltz and Lane did this by offsetting those deductions against the $18.5 million in settlements paid by Desnick in 1999 and 2000. However, according to LaSalle, Peltz and Lane imposed a similar, but different, deduction in the Hospital's income in 1997 and 1998. In Plaintiff's Expert Report on Remand, Peltz and Lane relied on a $4.638 million "reserve" for contingent future upcoding liability identified in the Coopers & Lybrand Report. That Report was available to Peltz and Lane at the First Trial, and was analyzed and admitted at the First Trial without any deduction from the Hospital's 1997 and 1998 income based on the "reserve." Without this reduction, and keeping all of Peltz and Lane's other calculations constant, the Hospital had a positive Fair Value of Equity as of September 30, 1997 and 1998.

For reasons stated in Part IV of the Conclusions of Law, the reduction in the Hospital's income based on the Coopers and Lybrand reserve for upcoding was improper absent valuing the contingent asset of Desnick's wealth. Because Peltz/Lane valued did not assign any value to Desnick's wealth in their calculation, the reduction in the Hospital's income for upcoding must be erased.

    *(b)    $1.2 Million Add-Back in Litigation Costs*

McDonough included an add-back of $1.2 million in extraordinary litigation expenses in 1999 paid by Desnick. LaSalle argues the amount was extraordinary because it appears only once in the entire history of the Hospital's audited financial records. In preparing his calculation, McDonough assumed that Desnick paid for these litigation costs, further supporting in his view the add-back of the expenses.

Peltz and Lane did not add back the $1.2 million for reimbursement of legal costs in 1999 in Plaintiff's Expert Report on Remand for the following reasons: (1) assuming such a payment from Desnick constitutes impermissible hindsight; (2) McDonough admitted at trial that he does not know whether Desnick ever actually paid this amount; (3) Peltz and Lane, in their calculation of normalized net income, had already made a positive adjustment of $12.997 million in 1999 that renders add back of the litigation expenses duplicative; and (4) the financials audited by KPMG state that the Hospital incurred expense in legal proceedings, claims and litigation expenses in the ordinary course of business, rendering the $1.2 million not extraordinary.

For reasons more fully stated in Part IV of the Conclusions of Law, this expense did not appear in any prior year audited financials and Peltz was wrong to value the potential recovery from Desnick at zero. Peltz/Lane could not adequately explain why this line-item should not be included in adjusting the Hospital's net income for 1999.

### (2)    Reduction of Capitalization Multiplier: Calculation of Weighted Average Cost of Capital

LaSalle argues that Peltz/Lane improperly reduced the capitalization multiplier from the first expert report, this reducing the Hospital's value in his solvency analysis.

The multiplier reduction was from 6.90 to 5.38 (1997); from 6.67 to 5.56 (1998); from 6.54 to 5.38 (1999); and from 6.13 to 5.18 (2000). Peltz/Lane achieved this by making two changes to the capitalization rate calculation. First, Peltz/Lane applied a different tax rate, as required by the Remand Opinion. LaSalle and McDonough do not take issue with this change.

In Plaintiff's Expert Report on Remand, Peltz/Lane also altered the size premium used in calculating the "Weighted Average Cost of Capital" ("WACC"). In a solvency analysis, WACC estimates the cost of equity and cost of debt. In their first report, Peltz/Lane calculated the cost of equity by using the "Adjusted Capital Asset Pricing Model" ("ACAPM") and incorporating a specific company risk premium. ACAPM estimates the required rate of return of an equity investor given a level of risk. This model is the most widely used technique to estimate the cost of equity. In the calculation of WACC in Plaintiff's Expert Report on Remand, Peltz/Lane used the same "Specific Company Risk Premium" as in their first expert report. LaSalle now, as at the First Trial, takes issue with the premium used.

(a)    *Increase in Size Premium*

In calculating WACC, Peltz/Lane applied an equity size premium. In Plaintiff's Expert Report on Remand, they used a "tenth decile premium" rather than the "micro cap" premium they used in their first report. Peltz testified that the reason for this change was the change in the Hospital's tax treatment required by the Remand Opinion. Peltz also testified that he made the change to the size premium because the Hospital's internal financial records reflected great variations from the audited financial records. This, in his view, made it appropriate in his judgment to place the Hospital in a riskier category. LaSalle questions how this change makes sense because Peltz had the same internal financial records to review when he prepared Plaintiff's First Expert Report. (12 Tr. Vol. III: 424–28)

For reasons more fully explained in Part IV of the Conclusions of Law, it is held that Peltz/Lane's change in size premium was unwarranted and must be rejected.

*(b)      Ten Percent Company Specific Risk Premium*

Peltz and Lane applied a ten percent company specific risk premium in Plaintiff's Expert Report on Remand. The Trustee argues that this should be accepted on remand because that risk premium was accepted at the First Trial and is therefore law of the case. Peltz and Lane stand by their use of this figure because, they contend, it is supported by evidence concerning the financial, obsolescence, and numerous other risk factors facing the Hospital compared to guideline companies. The Trustee further argues that LaSalle's solvency expert initially used a ten percent company specific risk premium in making his initial solvency report. The Trustee argues that McDonough only became critical of the premium used by Peltz/Lane after he discovered a mistake in his report that rendered the Hospital insolvent for fiscal year 1999.

For reasons more fully described in Part IV of the Conclusions of Law, LaSalle has not provided any persuasive reason to discard the finding from the Initial Opinion. Choice of risk premium is indeed subjective and no facts have changed to alter the previous ruling on this issue.

**(3)      Challenges to Peltz/Lane's Calculation of Claims on Enterprise Value**

*(a)      Net Working Capital Excess/Shortfall*

McDonough's criticized Peltz and Lane's calculation of Net Working Capital ("NWC"), which is included in "Claims On Enterprise Value" to reach the Hospital's Fair Value of Equity. NWC is calculated by deducting current liabilities from current assets and then comparing that result to the Industry Level of Working Capital. LaSalle argues that Peltz improperly included a NWC for the Hospital that resulted in a reduction in enterprise value and resulting Fair Value of Equity. McDonough proposed the following modifications to Peltz/Lane's calculation: (1) inclusion of amounts due from Desnick as a working capital asset; (2) inclusion of *qui tam* settlement obligations that were ultimately paid by Desnick; (3) inclusion of $1.2 million in litigation expenses (also paid by Desnick) from working capital. McDonough also questioned Peltz's use of

"industry level of working capital" for purposes of calculating NWC. The "industry level of working capital" indicates that the figures represent the medial level of working capital for the industry according to the Risk Management Association.

In turn, Peltz and Lane criticized McDonough's calculation of NWC. The Trustee contends that McDonough improperly assumed that Desnick would pay the Hospital's liability for settlement of the government's *qui tam* fraud claims. Peltz/Lane contend that Desnick had no obligation to pay those claims and no hypothetical buyer would assume that Desnick would pay it after a sale. They also contend that Desnick did not sign the settlement agreement in his personal capacity and that he did not pay the entire amount.

For reasons stated more fully in Part IV of the Conclusions of Law, neither the Trustee's experts nor LaSalle's experts' calculation of NWC excess/shortfall is satisfactory. The Trustee's experts were wrong to exclude amounts due from Desnick. However, in his own Report, McDonough double-counted the $1.2 million in litigation expenses ultimately paid by Desnick. However, Peltz's use of the industry level of working capital was explained at trial and is therefore adopted.

### (b)   Treatment of Over-Market Lease Payments

The Initial Opinion concluded that the Hospital did not receive "reasonably equivalent value" for its monthly lease payments to Nomura because the payments far exceeded the fair market rental value of the Hospital property. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al.*, 360 B.R. 787, 840–41 (Bankr. N.D. Ill. 2007). In calculating insolvency, Peltz/Lane adjusted the Hospital's net income by excluding from expenses the excess market-value lease payments. They also capitalized the excess lease payments and deducted that amount from the "Indicated Enterprise Value" of the Hospital. Peltz and Lane treated the lease payments in this way because they did not believe that a hypothetical buyer would assume the payment of over-market rent in assessing the value of the Hospital. Peltz and Lane made the same adjustments in their first expert report. That reasoning and the adjustments were originally accepted here.

As at the First Trial, LaSalle proffers several arguments against the treatment Peltz/Lane give to the lease payments. First, LaSalle argues that Peltz/Lane's treatment is not in accordance with GAAP treatment for operating leases and it is not how the Hospital's auditor treated the payments. It next argues that bifurcation of the lease payments is not supported by any valuation methodology and that Peltz himself has not used this approach before. Finally, LaSalle argues that any hypothetical buyer would be bound by the terms of the lease and would require that the full lease payments be deducted as a current expense. Peltz/Lane made adjustments for the Hospital's lease payments, because those payments were found in the First Trial to be substantially over market value. Peltz/Lane justified their adjustments by stating that a hypothetical buyer would not agree to pay a price for the Hospital that is based on a valuation using over market lease payments. Although a buyer might be bound to make the payments under the lease, Peltz/Lane contend that a buyer would only pay a price for the Hospital business that compensated by a price reduction for paying the over-market rent.

For reasons stated more fully in the Conclusions of Law, Peltz/Lane's treatment of the over-market lease payments is once again accepted and adopted in the solvency calculation.

### The Trustee Cannot Rely on Previous Findings as to Alternative Tests of Insolvency

### 1.    Paying Debts as they Came Due

Following the First Trial, it was determined that the Hospital had debts beyond its ability to pay as they matured at all times from August 28, 1997 to April 17, 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick*, 360 B.R. at 868. That conclusion was based on several exhibits admitted in to evidence at the First Trial and re-admitted at the Remand Trial. LaSalle instead relies on its contention that the Remand Opinion and the Rehearing Denial Order indicate a determination by the Seventh Circuit that the Hospital was paying its debts as they became due up to the filing of its bankruptcy petition. (Solvency Brief 24) (citing *Paloian*, 619 F.3d at 692–93; Def. Ex. 81) On remand, the

Trustee argues that he has presented evidence on this alternative test of insolvency.
(Reply 14) (citing Pl. Br. 40–42; Jt. Ex. 72, at 20; New Pl. Ex. 1, at 10–15, 22) He argues
that instead of dealing with this evidence head on, LaSalle relies on a mischaracterization
of the Remand Opinion. Indeed, LaSalle states, without citation to any particular piece of
evidence, that it does rely on evidence presented at both the First and Remand Trials.

However, for reasons more fully described in Part IV of the Conclusions of Law,
the Trustee has not met his burden of proof on remand on this test of insolvency. The
weight of evidence as viewed in the Remand Opinion contradicted any possible finding
that the Hospital was not paying its debts as they came due.

### 2.    Unreasonably Small Capital Test

After the First Trial, it was determined that the Trustee proved that the Hospital
was engaged in business for which its remaining property constituted unreasonably small
capital from August 1997 to April 2000. *Doctors Hosp. of Hyde Park, Inc. v. Desnick, et
al.*, 360 B.R. 787, 870 (Bankr. N.D. Ill. 2007). However, as more fully described in the
Conclusions of Law, that conclusion was secondary to the balance sheet analysis.
Accordingly, analysis was sparse such that discussion of this test occupied half a page of
an eighty-five page opinion. On remand, the parties barely addressed the issue and the
Trustee's experts simply reiterated their findings from the First Trial. (New Pl. Ex.1 ¶ 43)
As a result, any conclusion as to solvency based solely on this test would be inadequate
in light of the Remand Opinion's mandate that the question of insolvency be reviewed on
remand.

### THE TRUSTEE ESTABLISHED INSOLVENCY AFTER SEPTEMBER 30, 1999

McDonough offered no opinion that the Hospital was solvent after September 30,
1999 because, he stated, there were no audited financial records for that period. However,
even accepting each of his modifications to Defendant's Supplemental Expert Report on
Remand, the Hospital is found to have been insolvent beginning September 30, 1999 up
until the date it filed for bankruptcy in April 2000. Peltz/Lane concluded that the Hospital
remained insolvent during that seven-month period.

## SUMMARY OF FINDINGS AND CONCLUSIONS ON BANKRUPTCY REMOTE ENTITY ISSUES

This dispute centers on two loan transactions involving the Hospital and two of its affiliates. The first transaction involved MMA Funding, LLC, a "special purpose entity" ("SPE") created as part of a receivables-financing transaction. The Hospital obtained a revolving line of credit from Daiwa Healthco-2, LLC (the "Daiwa Loan"), pursuant to which (i) the Hospital contributed its healthcare receivables on an ongoing basis to MMA Funding, LLC, (ii) MMA Funding, LLC granted a security interest in those healthcare receivables to Daiwa, (iii) Daiwa loaned funds to MMA Funding, LLC, and (iv) MMA Funding, LLC disbursed those funds to the Hospital and to the Hospital's creditors as the purchase price of the receivables.

The second transaction involved a $50 million loan from Nomura Asset Capital Corp. to HPCH, LLC ("HPCH"), another affiliate of the Hospital. The Hospital operated in facilities that it leased from HPCH. Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Nomura Loan"). In exchange, HPCH granted Nomura security interests in the facilities it leased to the Hospital and the rent payments it received from the Hospital. The Hospital guaranteed HPCH's obligations to Nomura and secured that guaranty by granting Nomura security interests in certain of its personal property. The flow of funds used to pay HPCH's obligations under the Nomura Loan was complex and changed over time. *See Doctors Hosp. of Hyde Park, Inc. v. Desnick, et al. (In re Doctors Hosp. of Hyde Park, Inc.)*, 360 B.R. 787, 811–12 (Bankr. N.D. Ill. 2007). Initially, the Hospital paid HPCH's obligations under the Nomura Loan from cash that the Hospital received various third parties. Later, MMA Funding, LLC paid HPCH's obligations from proceeds of the Daiwa Loan. Nomura sold the Nomura Loan (together with the related security and credit enhancements) to Asset Securitization Corporation, which in turn sold it as part of a mortgage securitization pool to LaSalle as trustee. The parties have stipulated that the payments made to LaSalle beginning in July 1998 were made from loan advances by Daiwa under the Daiwa Loan Agreement. (New Def. Ex. 82 ¶¶ 194, 198) Daiwa advanced funds that were paid into the Cash Collateral Account and from that account to LaSalle. (*Id.*)

As noted earlier, in the Opinion issued after the First Trial, it was held that the debtor did not receive a reasonable equivalent value for the rental payments made under the lease and the lease was not an arm's length transaction. Therefore, all rent transfers made before July 1998 were voidable to the extent that they exceeded reasonable fair rental value because it was held that the Hospital was insolvent at the time of those transfers. It was also held that the post-1998 rent payments were not made with the debtor's funds and could not be recovered as fraudulent transfers.

The principal non-solvency issue on remand is whether MMA Funding, LLC or the Hospital owned the funds transferred to LaSalle on a monthly basis beginning in July 1998. The parties have stipulated that the transfers of funds beginning in July 1998 were advances by Daiwa under the MMA Funding, LLC Loan Agreement.[7] The parties dispute the existence of MMA Funding, LLC as an entity separate and distinct from the Hospital. If MMA Funding, LLC existed as a separate entity, then as borrower on the MMA Funding, LLC Loan, the funds were its funds and not the Hospital's. Those funds would then not be recoverable by the Trustee through this adversary proceeding. As the Remand Opinion stated, "the parties agree that, if MMA Funding became a legitimate bankruptcy remote vehicle as part of the Daiwa loan, this prevents recovery of payments made on the Nomura loan from July 1998 forward." *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 695 (7th Cir. 2010). The Remand Opinion stated that based on what it could "tell from this record" there was "scarcely any evidence in this record that LLA Funding even *existed*."

---

[7] In summary, between August 28, 1997 and July 7, 1998, the Hospital made transfers directly to a "Cash Collateral Account," controlled by LaSalle, and LaSalle accepted these transfers and used them to make payments on the Nomura Loan. Under the Initial Findings and Conclusions, it is these transfers that were void to the extent they excluded fair market value of the rent on the Doctors Hospital property. From July 7, 1998 through April 2000, however, the Trust took payments owed under the Nomura Loan from deposits made by Daiwa into the "Cash Collateral Account" at the direction of MMA Funding. It then forwarded to the certificateholders funds representing debt service payments. It was held that rent payments during this time period were not made with Doctors Hospital's assets but with MMA Funding LLC's and therefore not voidable as fraudulent transfers. See generally Findings of Fact Nos. 295–303.

*Id.* at 696 (emphasis in original). The Opinion left for remand the questions of whether "there was a bona fide sale of accounts receivable from the Hospital to MMA Funding" and whether "MMA Funding was more than a name without a business entity to go with it." *Id.*

On remand, the Trustee principally argued that the Remand Opinion articulated the following test to determine whether an entity is legitimately a "bankruptcy remote entity" ("BRE"):

1. The BRE must be independent of the entity that generates the receivables and of the owner of that entity;

2. The BRE must remain separate from the generator of the receivables after the closing of the transaction;

3. The BRE must observe corporate formalities;

4. The BRE must exhibit indicia of separateness such as its own office, phone number, checking account, and stationary;

5. The BRE must prepare financial statements and tax returns;

6. The accounts receivable or loan obligation should not be carried on the records of the entity generating the receivables;

7. The BRE "must buy assets (here accounts receivable)" and "must manage [those assets] in its own interest rather than the debtor's."

These factors focused the analysis on whether MMA Funding, LLC was "operationally distinct" from the Hospital.

### Part I Conclusions

LaSalle argued and offered evidence to show that MMA Funding, LLC functioned exactly as it was intended. The sole purpose of the entity was to buy and hold receivables from the Hospital that served as collateral for the Daiwa Loan. LaSalle offered testimony of Daiwa officials familiar with transaction involving bankruptcy remote entities showing that MMA Funding, LLC actually had the characteristics typical of those entities. Furthermore, LaSalle offered evidence that MMA Funding, LLC purchased the receivables from the Hospital.

LaSalle is found and held in Parts V and VI below to have proven that MMA
Funding, LLC was a real entity that engaged in a true sale. For reasons stated more fully
in the Findings of Fact (Part V) and the Conclusions of Law as to Non-Solvency Issues
(Part VI), it is found and held that the Trustee has not met his burden to establish that
MMA Funding, LLC was not separate from the Hospital or that no "true sale" of the
Hospital's Receivables occurred.

In Parts III and IV it is found and held that the sale took place before Doctors
Hospital became insolvent. Therefore, judgment will separately be entered in favor of
LaSalle on Counts IX and X of this adversary proceeding, and Count VIII that was
abandoned by the Trustee Plaintiff will be dismissed with prejudice.

In Part II, authority is cited for the undersigned to enter Final Judgment.

## II.

## AUTHORITY TO ENTER FINAL JUDGMENT

As Counts VIII, IX, and X comprise counterclaims to the LaSalle claim against
the Bankruptcy Estate and to recover fraudulent conveyances, statutory "core" authority
lies under 28 U.S.C. § 157(b)(2)(C) and (H) to adjudicate those Counts. Some questions
might have been raised until recently as to whether a bankruptcy judge still has authority
to enter final judgment in this adversary proceeding in light of the Supreme Court holding
in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  A recent decision has settled that question
in this Circuit. *Peterson v. Somers Dublin Ltd.*, No. 12-2463, 2013 U.S. App. LEXIS
18650 (7th Cir. Sept. 6, 2013)

After Findings of Fact and Conclusions of Law were initially entered herein on
July 17, 2013 (Docket No. 953), but before final judgment issued, two Seventh Circuit
panels decided cases impacting the authority of bankruptcy judges to enter final judgment
in light of *Stern*.  *See Wellness Int'l Network, Ltd. v. Sharif*, No. 12-1349, *2013 U.S. App.
LEXIS 17553* (7th Cir. Aug. 21, 2013) and *Peterson v. Somers Dublin Ltd.*, No. 12-2463,

2013 U.S. App. LEXIS 18650 (7th Cir. Sept. 6, 2013). The parties here were therefore invited to submit oral argument on the effect of those decisions. That argument was heard and considered.

Under 28 U.S.C. § 157(b)(2)(H), fraudulent conveyance actions are core proceedings, which by statute permit a bankruptcy judge to enter final judgment on the action. 28 U.S.C. § 157(b)(1). Some have considered whether that authority was called into question by the Supreme Court decision in *Stern v. Marshall*. That decision held that the Constitution requires the "removal of [certain trustee] counterclaims . . . from core bankruptcy jurisdiction" and placed within the purview of an Article III judge for entry of final judgment. 131 S. Ct. at 2620. The *Stern* holding was directed at non-bankruptcy law counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim. *Id.* at 2619–20. For discussion of possible consequences of that decision, see University of Illinois law professor Ralph Brubaker's argument prior to *Peterson* that § 157(b)(2)(H) is likewise unconstitutional to the extent it would allow a bankruptcy judge to enter final judgment. Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judge's Core Jurisdiction*, Bankr. L. Letter, Sept. 2011, at 1–2.

In *Stern*, the Supreme Court held that a bankruptcy judge, lacking life tenure and guaranteed compensation, does not have constitutional authority to enter final judgment on a state law counterclaim advanced by a debtor in response to a creditor's claim unless the counterclaim will necessarily be resolved in ruling on the creditor's claim. 131 S. Ct. at 2618. In so holding, the *Stern* Opinion described its holding as "narrow" and limited to the constitutionality of 11 U.S.C. § 157(b)(2)(C), which authorizes bankruptcy judges to enter final judgments on "counterclaims by the estate against persons filing claims against the estate." *Stern*, 131 S. Ct. at 2620. Congress was held to have violated Article III separation of powers principles by authorizing a bankruptcy judge to exercise authority over a common law tort claim. *Id.* at 2600–01.

29

Following *Stern*, a bankruptcy judge may not simply rely on whether a matter is "core" under § 157 but must also examine the matter to determine whether there is also constitutional authority to enter final judgment. *E.g.*, *Steinle v. Trico Real Estate, L.P. (In re CCI Funding I, LLC)*, Adv. No. 10-1418, 2012 WL 3421173, at *6 (Bankr. D. Colo. Aug. 15, 2012); *Somerset Props. SPE, LLC v. LNR Partners, Inc. (In re Somerset Props. SPE, LLC)*, Adv. No. 11-00053, 2012 WL 3877791, at *4 (Bankr. E.D.N.C. Sept. 6, 2012). To determine whether there is constitutional authority to enter final judgment on a matter, the bankruptcy judge must consider whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. at 2618.

Although, by its terms, *Stern* only ruled on the constitutionality of 11 U.S.C. § 157(b)(2)(C), some opinions and commentators have argued that *Stern's* reasoning calls for greater application and that its separation of powers analysis applies to other subsections of § 157. *E.g.*, *FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 476 B.R. 535, 538 (N.D. Ill. 2012); *Murphy v. Felice (In re Felice)*, Adv. No. 08-01355, 2012 WL 4757791, at *10 (Bankr. D. Mass. Oct. 5, 2012); J. Richard Leonard, *Introduction*, 86 Am. Bankr. L.J. 1, 1–2 (2012); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 Am. Bankr. L.J. 627, 635 (2012). Court opinions have been divided on whether bankruptcy judges still have constitutional authority to enter final judgment on fraudulent transfer actions; there are opinions going both ways on the issue. *See, e.g.*, *Kelley v. JP Morgan Chase & Co.*, 464 B.R. 854, 863 (D. Minn. 2011) (holding that *Stern* did not warrant withdrawal of reference in adversary proceeding in which trustee asserted fraudulent transfer claims); *Official Comm. Of Unsecured Creditors of Appalachian Fuels, LLC v. Energy Coal Res., Inc. (In re Appalachian Fields, LLC)*, 472 B.R. 731, 741 (E.D. Ky. 2012) ("Plaintiff's fraudulent transfer and preference claims are statutorily defined core claims to which the holding of *Stern* does not apply, and therefore the Bankruptcy Court has authority to enter final orders and judgments on such claims pursuant to 28 U.S.C. § 157(b)(1)); *Fox v. Picard (In re Madoff)*, 2012 WL 990829 (S.D.N.Y. Mar. 26, 2012) (in *dicta*); *Walker,*

*Truesdell, Roth & Assoc. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*, 466 B.R.
188 (S.D.N.Y. 2011) ("*Stern* does not affect the ability of the bankruptcy court to rule on
state law fraudulent conveyance claims . . . ."); *Burtch v. Seaport Capital, LLC (In re
Direct Response Media, LLC)*, 466 B.R. 626 (Bankr. D. Del. 2012); *but see Heller
Ehrman, LLP v. Arnold & Porter, LLP, et al., (In re Heller Ehrman)*, 464 B.R. 348 (N.D.
Cal. 2011) (holding that withdrawal of reference was unwarranted despite finding that
bankruptcy court lacked constitutional authority to enter final judgment on a debtor's
fraudulent transfer claims).

Opinions ruling under *Stern* that bankruptcy judges cannot enter final judgments
in proceedings to recover fraudulent transfers under 11 U.S.C. §§ 544 and 548 have
reached that conclusion because *Stern* noted that its holding was consistent with
*Granfinanceria, S.A. v. Nordberg*, 492 U.S. 33 (1989). In *Granfinanceria* the Supreme
Court held that a non-claimant defendant to a fraudulent conveyance action under the
Bankruptcy Code has a right to a jury trial. *Id.* at 36. *Stern* equated the state law
counterclaim at issue in *Stern* to the fraudulent transfer claim at issue in *Granfinanceria*,
stating that both claims involved "private rights" and therefore do not fall within the
"public rights" exception to Article III. *Stern*, 131 S. Ct. at 2614. In a footnote, the *Stern*
Opinion discussed the Supreme Court's conclusion in *Granfinanceria* "that fraudulent
conveyance actions were 'more accurately characterized as a private than public right as
we have used those terms in our Article III decisions." That footnote read in full:

> We noted that we did not mean to "suggest that the restructuring of
> debtor-creditor relations is in fact a public right." Our conclusion was that,
> "even if one accepts this thesis," Congress could not constitutionally
> assign resolution of the fraudulent conveyance action to a non-Article III
> court. Because neither party asks us to reconsider the public rights
> framework for bankruptcy, we follow the same approach here.

*Stern*, 131 S. Ct. 2594, 2614 n.7 (2011).

That footnote and other language in *Stern* analogizing the claim at issue in
*Granfinanceria* to the claim at issue in a fraudulent conveyance action has been cited in
support of the conclusion that bankruptcy judges do not have constitutional authority to
enter final judgment on fraudulent transfer claims, at least when the creditor has not filed

a proof of claim against the estate. Those opinions holding that fraudulent conveyance claims are beyond the adjudicatory powers of a bankruptcy judge reason that "[t]o now conclude that the very claim presented in *Granfinanceria* – a fraudulent conveyance claim – is a 'public rights' claim would be totally at odds with the Stern Court's analogy to *Granfinanceria*." *Kirschner v. Agoglia*, 476 B.R. 75, 80 n.3 (S.D.N.Y. 2012).

The distinction between public rights and private rights originates in another Supreme Court opinion, *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In *Marathon*, a plurality of the Court agreed that assignment of the debtor's pre-petition breach of contract and warranty claims for resolution by a bankruptcy judge violated Art. III of the Constitution. *Marathon*, 458 U.S. at 87. The *Marathon* plurality Opinion recognized three limited exceptions the Art. III requirement: territorial courts, military tribunals, and cases involving "public" as opposed to "private" rights. *Id.* at 64–67. The *Marathon* Opinion explained, "[o]ur precedents clearly establish that only controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination. Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power." *Id.* at 70 (citations and footnote omitted).

Although the *Marathon* plurality could not agree on the precise scope of the public rights exception those Justices agreed that the state-law breach of contract and warranty claims did not fit within the exception. *See id.* at 69. Nevertheless, the *Marathon* Opinion suggested that some bankruptcy proceedings might fit within the public rights exception, stating: "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a 'public right,' but the latter obviously is not." *Id.* at 71. Following *Marathon*, the Supreme Court issued several opinions seeking to further define the exception but no defined rule was ever established. *See Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 560 (9th Cir. 2012) (citing and describing cases), *cert granted Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 133 S. Ct. 2880 (2013).

After *Stern*, a panel of the Ninth Circuit Court of Appeals concluded that *Stern* and *Granfinanceria* "together point ineluctably to the conclusion that fraudulent conveyance claims, because they do not fall within the public rights exception, cannot be adjudicated by non-Article III judges." *Bellingham*, 702 F.3d at 561.

As described previously, this adversary proceeding comprises a counterclaim that sought recovery that might offset and reduce LaSalle's proof of claim. A Seventh Circuit panel has recently held that a bankruptcy court has broad authority to enter final judgment in a fraudulent conveyance claim by a creditor who has filed a proof of claim. *Peterson*, at *4. The opinion relied on Katchen v. Landy, 382 U.S. 323, 329–36, (1966), and Langenkamp v. Culp, 498 U.S. 42, 44–45, (1990) for the proposition "that Article III authorizes bankruptcy judges to handle avoidance actions against claimants." *Id.* The Opinion further cited to *Granfinanciera* to support its reasoning that the key distinction is whether a proof of claim has been filed by the defendant claimant. *Peterson* reasoned that neither *Stern* nor *Wellness* held to the contrary. *Peterson* at *4. Indeed, both *Stern* and *Wellness* involved claims that went beyond the issue that would be passed on when ruling on the creditor's proof of claim. In *Stern*, the counter-plaintiff's tortious interference claim raised several additional issues including whether tortious interference with an *inter vivos* gift was recognized under Texas state law. *Stern*, 131 S. Ct. at 2617. In *Wellness*, in addition to the issues to be decided under counts that would have been constitutionally permissible, there were several additional issues, including whether Illinois state law recognizes an alter-ego theory in trust law. *Wellness*, at *19. Thus, the counterclaim in both *Stern* and *Wellness* involved distinct, articulable state law issues that were not necessary to resolving the creditor's proof of claim.

As earlier noted, the Supreme Court ruled in *Stern* that for a bankruptcy court to have constitutional authority to enter final judgment in an action under *Katchen* and *Langengcamp*, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern* at 2618. The *Stern* court did not give further guidance regarding what "stems from the bankruptcy itself," or regarding necessity, except that holding the tortious interference claim was

deficient. While the *Peterson* Opinion did not refer to "necessity," it does point to 11

U.S.C. § 502(d), which provides,

> Notwithstanding subsections (a) and (b) of this section, the court shall
> disallow any claim of any entity from which property is recoverable under
> section 542, 543, 550, or 553 of this title or that is a transferee of a transfer
> avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a)
> of this title, unless such entity or transferee has paid the amount, or turned
> over any such property, for which such entity or transferee is liable under
> section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502. The mandatory language "shall" makes it necessary to resolve the issues

referred to in the statute unless the party filing a proof of claim either turns over the

property or pays for it.  Section 544(b)(1) gives the trustee authority to avoid a transfer of

the debtor's property under applicable non-bankruptcy law, while § 548 is the

Bankruptcy Code's fraudulent conveyance statute. Here, LaSalle filed a proof of claim

for $60,139,317.04 on March 10, 2004. Claim 529-1. Counts VIII and IX were brought

pursuant to § 544(b)(1), and Count X was brought pursuant to § 548. Therefore, under

both *Stern* and *Peterson*, final judgment may be entered here because the issues are

necessarily involved in the claims allowance process.

　　　　The Sixth Circuit has similarly held it to be "crystal clear" that bankruptcy judges

have constitutional authority to enter final judgments on state law fraudulent transfer

claims when the defendant has filed a proof of claim sufficiently related to the fraudulent

transfer. *Onkyo Eur. Elecs. GMBH v. Global Technovations, Inc. (In re Global

Technovations)*, 694 F.3d 705, 722 (6th Cir. 2012).  *Global Technovations* expressly

relied upon the fact that the defendant filed a proof of claim against the bankruptcy estate

such that the case was "fundamentally unlike *Granfinanceria*, where the bankruptcy

estate reached out to file a fraudulent-transfer claim against a party who had filed no

claim against the estate." *Id.* The Opinion reasoned that the defendant "brought itself

voluntarily into the bankruptcy court." *Id.* Furthermore, the fraudulent transfer claim was

a defense to the defendant's proof of claim. *Id.* Therefore, the Opinion reasoned, "'it was

not possible . . . to rule on [the defendant's] proof of claim without first resolving' the

fraudulent transfer issue.'" *Id.* (*citing Stern*, 131 S. Ct. at 2616).

The Ninth Circuit's decision in *In re Bellingham* does not compel a contrary result. In *Bellingham*, it was held that bankruptcy judges do not have constitutional authority to enter final judgments on fraudulent conveyance actions asserted against non-creditors to the bankruptcy estate. *Bellingham*, 702 F.3d at 565. However, *Bellingham* involved facts that were similar to facts in *Granfinanciera*, whereas here, LaSalle has filed a proof of claim against the Hospital's bankruptcy estate and the present case is a counter-claim to the LaSalle claim.

### If Permitted by Future Rulings, Waiver Would Apply to Bar the Parties from Asserting Lack of Bankruptcy Court Authority

In *Wellness Int'l*, it was held that objections to a bankruptcy judge's authority to enter final judgment under Article III are not waivable by the parties. The Opinion began with the proposition that Article III serves two distinct interests, "litigants' right to have their cases decided by independent and impartial judges, and it also operates as an inseparable element of separation of powers by protecting the judicial branch from encroachment by the political branches." *Wellness Int'l*. at \*14 (citing *Stern*). In answering whether the right to an Article III adjudication is more personal or structural, the Opinion looked to *Commodities Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), a case involving an executive agency's adjudication of a state law counterclaim. *Schor* held whether a statute violates Article III depends on "an examination of the relative allocation of powers." *Schor*, 489 U.S. at 851. Relevant factors to be considered are said to include whether the forum "dealt only with a particularized area of law," how far its powers departed from the traditional agency model, the authority to enforce orders, and the standard of review by an Article III court. *Wellness Int'l* at \*15 (citing *Schor*). The Wellness Opinion then addressed a split of authority between two circuit courts on whether Article III protections are waivable, *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012), and *In re Bellingham Ins. Agency Inc.* 702 F.3d 553 (9th Cir. 2012).

*Wellness* agreed with *Waldman* that the right to adjudication by an Article III judge cannot be waived. *Wellness Int'l* at \*16. The *Wellness* Opinion emphasized that "the issue here is not so much the aggrandizement of the Legislative or Executive

Branches, as it is the diminution of the Judicial one." *Waldman.* at 918. However, that conclusion conflicts with that of the Ninth Circuit panel, which ruled in *Bellingham* that the defendant consented to adjudication of the fraudulent conveyance action by failing to object until the case reached the circuit level. 702 F.3d 553, 567 (9th Cir. 2012). *Bellingham* held that Article III bars a bankruptcy judge from entering final judgments in such actions absent the parties' consent as described above, but held that the defendant to the fraudulent conveyance action in that case waived its right to final adjudication by an Article III judge. *Id.* at 565.

In reaching that conclusion, *Bellingham* reasoned that

> [t]he waivable nature of the allocation of adjudicative authority between bankruptcy courts and Article III courts is well established. . . . Following the genesis of the modern bankruptcy system, the Supreme Court clarified that "Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United States . . . serves to protect primarily personal, rather than structural, interests." *Schor*, 478 U.S. at 848. *Stern* further made clear that § 157 "does not implicate questions of subject matter jurisdiction." 131 S. Ct. at 2607. Accordingly, "as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver." *Schor*, 478 U.S. at 848; *see also Daniels-Head & Assocs. v. William M. Mercer, Inc. (In re Daniels-Head & Assocs.)*, 819 F.2d 914, 918 (9th Cir. 1987). And in fact, § 157(c)(2) expressly provides that bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2).

*Wellness Int'l* and *Waldman*, reasoned that the Supreme Court has already ruled that § 157(b) violates structural protections of Article III. *Wellness Int'l* at *17 (citing *Stern*). Therefore, the current law of this Circuit is that waiver by the parties is not effective to give a bankruptcy court Article III constitutional authority over § 157(b) core matters. *Id.*

The law regarding consent and waiver is in a state of flux. The issue of whether consent or waiver may give bankruptcy courts authority to enter final judgment is before the Supreme Court in *Executive Benefits Insurance Agency v. Arkison*, 133 S. Ct. 2880 (2013) (granting certiorari). Further, a party in *Wellness* is seeking a rehearing or rehearing en banc of the panel opinion.

This adversary proceeding was originally tried and decided pre-*Stern*, and remanded to the undersigned Bankruptcy Judge also pre-*Stern* on designated issues. Plaintiff originally demanded trial by jury. (02 A 00363, Complaint, Dkt. 1, at 1) That right was definitively waived in open court at the beginning of the Remand Trial. (12 Tr. Vol. I: 9–10)

After remand, the bankruptcy judge invited comment of the parties on possible application of *Stern* to this case. While Plaintiff expressed concern as to potential application of the decision, his counsel it did not express any claim that the remanded proceeding be heard by an Article III judge, nor has either party asserted such right or sought withdrawal of the reference. There was no motion asserting such a right or requesting removal for trial by a District Judge. Trial on remanded issues went forward here long after *Granfinanceria* was decided and was completed long after *Stern* was decided. Should it ultimately be decided that waiver by the parties is a viable answer to the issue of bankruptcy authority, this case would qualify.

### These Findings and Conclusions May not be Treated as Proposed on Appeal

The Seventh Circuit also ruled in *Wellness Int'l* that "[n]o statutory provision authorizes a bankruptcy court to propose findings of fact and conclusions of law in a core proceeding; such a report and recommendation from the bankruptcy court is statutorily authorized only in noncore proceedings." *Wellness* at \*20 (Petition for Rehearing en banc pending). *But see Feuerbacher v. Moser*, No. 4:11-CV-272, 2012 WL 1070138, \*9 (E.D. Tex. Mar. 29, 2012) (noting that "the vast majority of courts to confront the issue have concluded that bankruptcy courts nonetheless have unquestioned authority to submit proposed findings of fact and conclusions of law.") (citing cases). As stated above, this proceeding is undoubtedly core under § 157(b)(2)(H) as a proceeding to avoid fraudulent conveyances and final judgment may be entered. If it were not so, this court would certainly recommend these Findings and Conclusions to the reviewing District Judge. However, there is currently no authority in this Circuit to recommend proposed findings

of fact and conclusions of law if the case is under core but unconstitutional authority. If there were is no constitutional authority under *Stern* to enter final judgment on a fraudulent conveyance against a creditor who has filed a proof of claim, these Findings of Fact and Conclusions of Law could not be used for any purpose and the parties would be obliged to start the litigation over after many years of work.

The issue of whether a bankruptcy courts may submit proposed findings of fact and conclusions of law in a core but unconstitutional case is before the Supreme Court in *Executive Benefits Insurance Agency v. Arkison*, 133 S. Ct. 2880 (2013) (granting certiorari).

## CONCLUSION AS TO AUTHORITY TO ENTER FINAL JUDGMENT

In light of the foregoing, authority in this Circuit allowing a bankruptcy judge to enter final judgment in this proceeding to recover fraudulent transfers will be followed., and final judgment will be entered.

## III.

## FINDINGS OF FACT ON SOLVENCY ISSUES

1.     These Findings include citations to evidence from the First Trial as well as new evidence admitted at the Remand Trial.

### PARTIES AND RELATED PERSONS AND ENTITIES

2.     Doctors Hospital of Hyde Park, Inc. was an Illinois Subchapter S corporation that had its principal place of business at 5800 South Stoney Island Avenue, Chicago, Illinois.   At all relevant times, it operated hospital facilities at that address. (New Def. Ex. 82 ¶1)

3.     Defendant LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates, Series 1997, D5, by and through its Servicer, ORIX Capital Markets, LLC, is a trust that has elected to be treated as a Real Estate Mortgage Investment Conduit under the Internal Revenue Code of 1986, whose Trustee, LaSalle Bank National Association is a national banking association with its principal place of business in Illinois.   (Def. Ex. 82 ¶2) In *Paloian v. LaSalle*, 619 F.3d 688, 691–692 (7th Cir. 2010), the Court of Appeals determined that Defendant was the initial transferee under Section 550(a) of the Bankruptcy Code of the challenged transfers in this case.

4.     Daiwa Healthco-2 LLC (*"Daiwa"*) was a Delaware limited liability company with a place of business located in New York, New York   (New Def. Ex. 82, ¶3), and was the lender on the MMA Funding, LLC Loan (as defined below).   In March 1998, the MMA Funding, LLC Loan was transferred to Daiwa Healthco-3, which became the successor lender on the MMA Funding, LLC Loan.

5.     HPCH, LLC was a Delaware limited liability company.   In approximately July or August 1997, HPCH acquired the record title of the Hospital Property (as defined below) from HPCH Partners, L.P.   (New Def. Ex. 82 ¶4)

6.     At all relevant times, Dr. James H. Desnick (*"Desnick"*) an individual, was the sole shareholder and a director of Doctors Hospital of Hyde Park.   (New Def. Ex. 82 ¶5).   Desnick never participated in the accounting department or accounting functions of the hospital (New Def. Ex. 143, at 133, 167)

7.   Desnick Descendants Irrevocable Trust is a trust created by Dr. Desnick and the owner of 1,305 shares of stock in Medical Management of America, Inc. (New Def. Ex. 82 ¶6)

8.   Desnick Family Irrevocable Trust is a trust created by Desnick and the owner of 137 shares of stock in Medical Management of America, Inc. (New Def. Ex. 82 ¶7)

9.   HPCH Partners, L.P. was an Illinois limited partnership. (New Def. Ex. 82 ¶8)

10.   HP Membership Inc. was a special purpose Delaware Corporation. This corporation may have been dissolved for failure to file annual franchise reports. (New Def. Ex. 82 ¶9)

11.   Medical Management of America, Inc. was a Delaware corporation and was a purported manager of Doctors Hospital and HPCH. Desnick, Desnick Trust 1, and Desnick Trust 2 owned 100% of MMA. (New Def. Ex. 82 ¶10) Medical Management oversaw the different entities owned by Desnick. (New Def. Ex. 8)

12.   MMA Funding, Inc. was a special purpose Delaware corporation and the special purpose manager of MMA Funding, L.L.C. Desnick was 100% owner of MMA Funding, Inc. (New Def. Ex. 82 ¶11)

13.   MMA Funding, LLC was an Illinois limited liability corporation. MMA Funding, LLC was owned 99% by Doctors Hospital and 1% by Medical Management. (New Def. Ex. 82 ¶12)

14.   HPCH was owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick owned 100% of HP Membership and a controlling interest in HPCH Partners, L.P. (New Def. Ex. 82 ¶13)

15.   Nomura Asset Capital Corporation ("Nomura") is a Delaware corporation with its principal place of business located in New York, New York. (New Def. Ex. 82 ¶14)

16.   ORIX Capital Markets LLC ("ORIX") is special servicer of a pool of loans owned by the Trust, including the Nomura Loan (defined below). As special servicer, ORIX attempts to maximize the collection of principal and interest and other amounts due under the loan documents. (New Def. Ex. 82 ¶15)

17.   Philip Robinson ("Robinson") was CFO of Medical Management beginning in April 1997.  Desnick viewed Robinson as his troubleshooter and "right hand man" with respect to accounting, but not legal, matters.  (New Def. Ex. 143, 154, 209) Robinson described himself as Desnick's "right hand man" regarding Desnick's financial interests.  (New Def. Ex. 144, at 47–48) Robinson was responsible for helping Desnick with the financial and accounting side of all businesses under Desnick's control.  (New Def. Ex. 144, at 10–11)  Robinson reported to Desnick.  (New Def. Ex. 143, at 152–153)

18.   Nelson Vasquez ("Vasquez") is an individual who is or was residing in Chicago, Illinois and was a financial officer of Doctors Hospital from approximately 1998 to the closing of the hospital.  (New Def. Ex. 82 ¶16)

19.   Michael Nelson ("Nelson") is a former chief financial officer of Doctors Hospital.  (New Def. Ex. 82 ¶17)

20.   Richard Felbinger ("Felbinger") is a former chief financial officer of Doctors Hospital.  (Pl. Ex. 26, at 10)

21.   Stephen Weinstein ("Weinstein") was the Chief Executive Officer of Doctors Hospital from September 1994 to September 1998.  Weinstein left the employ of Doctors Hospital in September 1998.  (New Def. Ex. 82 ¶18)

22.   Seth Gillman ("Gillman") served as staff attorney for Medical Management from 1996-1998 and General Counsel from 1998–2001.  (New Def. Ex. 88; 12 Tr. Vol. VIII, 1050–51, 1054)  Gillman also served as the registered agent of MMA Funding, LLC for a period of time. (12 Tr. Vol. VIII, 1072)

23.   At all relevant times Desnick owned and/or controlled Doctors Hospital, HPCH, MMA Funding, Inc., MMA Funding, LLC, HP Membership, and HPCH Partners, L.P. (New Def. Ex. 82 ¶19)

### SOLVENCY WITNESSES AT THE REMAND TRIAL

24.   In addition to all of the witnesses who testified at the First Trial on behalf of Plaintiff, at the Remand Trial Plaintiff introduced the expert reports and testimony of Scott Peltz ("Peltz") and Michael Lane ("Lane"). Peltz and Lane's opinions are contained in their first expert report ("First Expert Report"), dated February 4, 2005 (Jt. Ex. 72), their testimony at the First Trial, and their November 15, 2011 supplemental expert report

41

(New Pl. Ex. 1) ("Plaintiff's Expert Report on Remand"), and their testimony at the Remand Trial.

25.    In addition to all of the witnesses who testified at the First Trial on behalf of the Defendant, at the Remand Trial Defendant introduced the expert reports and testimony of Edward McDonough ("McDonough"), a Managing Director at Alvarez & Marsal's Dispute Analysis & Forensic Services, LLC. McDonough submitted an initial report and thereafter a brief supplemental report on remand on behalf of the Defendant, which provide both a criticism of the expert report prepared for Plaintiff by Plaintiff's experts, Scott Peltz and Michael Lane (New Pl. Ex. 1) the same experts who testified on behalf of the Plaintiff at the First Trial, as well as McDonough's own conclusions of solvency as to Doctors Hospital during the relevant time period. (New Def. Ex. 66 and 130)

26.    At the Remand Trial, Defendant introduced the deposition testimony of Robinson. (New Def. Ex. 144) Robinson's deposition was taken in this case on November 29, 2011. Robinson also testified at the First Trial.

27.    At the Remand Trial, Defendant introduced the deposition testimony of Desnick. (New Def. Ex. 143) Desnick's deposition was taken in this case on November 17, 2011.

PROCEDURAL BACKGROUND

28.    Doctors Hospital filed a petition under Title 11 of the United States Code on April 17, 2000 (the "Petition Date"). (New Def. Ex. 82 ¶ 20)

29.    On April 29, 2004, Gus A. Paloian was appointed Trustee of the Debtor. (New Def. Ex. 82 ¶ 22) By Order dated March 6, 2006 (Dkt. No. 504), Gus A. Paloian as Chapter 11 Trustee of the Debtor was substituted as party plaintiff in this case.

30.    On April 15, 2002, Doctors Hospital filed an adversary complaint, No. 02 A 00363, against Defendant. (New Def. Ex. 82 ¶ 21)

31.    Trial was first conducted in this proceeding from March 20, 2006 to March 31, 2006. On March 23, 2007, an Amended Final Judgment Order (Dkt. No. 599, the "Judgment") was entered on Counts VIII, IX and X of the Complaint. The Judgment was premised on the Findings of Fact and Conclusions of Law dated March 2, 2007, reported at 360 B.R. 787 (Bankr. N.D. Ill. 2007). Additional Findings of Fact and

Conclusions of Law dated July 25, 2007, reported at 373 B.R. 53 (Bankr. N.D. Ill. 2007) were also entered.

32.    On appeal, the District Court affirmed. *LaSalle Bank, N.A. v. Paloian,* 406 B.R. 299 (N.D. Ill. 2009).

33.    On August 27, 2010, the Court of Appeals for the Seventh Circuit handed down its decision in *Paloian v. LaSalle Bank, N.A.,* 619 F.3d 688 (7th Cir. 2010). The decision vacated the judgment of the District Court and remanded the case to the District Court with instructions to remand the case to this Court for further proceedings consistent with the decision. *Id.* at 696.

34.    On September 10, 2010, the Plaintiff filed his Petition for Rehearing with the Court of Appeals.

35.    By Order dated October 15, 2010, the Court of Appeals denied the Rehearing Petition (New Def. Ex. 81, the "Rehearing Denial Order") In the Rehearing Denial Order, the Court of Appeals stated:

> [Plaintiff] contends that the panel overlooked two alternative grounds for the bankruptcy judge's finding of insolvency: that the Hospital failed to pay its debts as they came due and had unreasonably little capital. Yet the bankruptcy judge found that the Hospital *did* pay its debts in timely fashion until its bankruptcy filing; these "alternative grounds" turn out to be restatements of the bankruptcy court's principal finding and are inadequate for the reasons given in the panel's opinion. The petition for rehearing is denied.

36.    The District Court remanded the case to this Court on October 26, 2010 (*see* 02 A 00363, Dkt. No. 728)

37.    On April 7, 2011 this Court entered an order (Dkt. No. 780, New Def. Ex. 86, the "Motion in Limine Order") determining, for purposes of remand, that (a) Doctors Hospital was solvent as of August 28, 1997 on all insolvency theories, (b) Plaintiff was barred from introducing evidence on remand seeking to demonstrate that Doctors Hospital was insolvent on any theory as of August 28, 1997, and (c) Plaintiff was barred on remand from seeking to avoid the Guaranty, the Assignment, the Pledge and Security Agreement and/or the Equity Pledge Agreement (all as defined in Judgment) as fraudulent transfers.

38.    This Court conducted the remand trial from January 9, 2012 to February 2, 2012 (the *"Remand Trial"*).

## BACKGROUND OF THE HOSPITAL

39.   Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan.  In 1960 the railroad sold the facility, and it became a not-for-profit community hospital named Hyde Park Community Hospital.   After the not-for profit community hospital ceased operations, HPCH Partners, L.P., an entity controlled by Desnick, purchased the real estate and facilities for approximately $2,400,000.00 in 1992.  (New Def. Ex. 82 ¶ 32)

40.   Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield (the *"Receivables"*).  (New Def. Ex. 82 ¶ 33)

41.   On August 24, 1992, HPCH Partners, L.P. leased the real estate located at 5800 South Stoney Island Avenue, Chicago, Illinois (the *"Hospital Property"*) to Doctors Hospital.  Doctors Hospital leased and utilized the Hospital Property as a hospital. (New Def. Ex. 82 ¶ 34)

42.   In early 1997, Doctors Hospital was obligated on loans made by First National Bank of Northbrook.  (New Def. Ex. 57) The loans were secured by the Receivables and by a mortgage on the Hospital Property.  (New Def. Ex. 61–63)

### The Daiwa Securitization

43.   On March 31, 1997, Daiwa, pursuant to a healthcare receivables securitization program (the "Daiwa Securitization"), agreed to lend up to $25,000,000 to MMA Funding, LLC (the "Daiwa Loan").   Under the language of the loan transaction documents, Doctors Hospital contributed its receivables to MMA Funding, LLC, and Daiwa, in turn, loaned funds to MMA Funding, LLC according to specified formulae. (New Def. Ex. 82 ¶ 41; Jt. Ex. 202 ¶ 40; Pl. Ex. 33, at 11–12, 21–25; Jt. Exs. 1, 5, 117, 118).

44.   In approximately July or August 1997, HPCH acquired the record title of the Hospital Property from HPCH Partners, L.P.  (New Def. Ex. 82 ¶ 4)

45.   HPCH leased the Hospital Property to Doctors Hospital pursuant to a Lease Agreement dated August 28, 1997 (the "Lease").  (New Def. Ex. 82 ¶ 122)

**The Nomura Loan**

46.    On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the "Nomura Loan") to HPCH.  The obligations of HPCH under the Nomura Loan were secured, *inter alia,* by the Hospital Property and an assignment of rents under the Lease. (New Def. Ex. 82 ¶ 102)

47.    Desnick received almost all of the proceeds of the $50 million Nomura Loan when it closed. (New Def. Ex. 82 ¶103; Jt. Ex. 202 ¶ 85)

48.    On October 24, 1997, Nomura and Asset Securitization Corporation ("ASC") entered a Mortgage Loan Purchase and Sale Agreement ("MLPSA").  Under Section 1 of the MLPSA, Nomura sold and transferred all of its right, title and interests in and to the Nomura Loan, along with numerous other mortgage loans, to ASC.  (New Def. Ex. 82 ¶142)

49.    Contemporaneously with the execution of the MLPSA, on October 24, 1997 ASC, LaSalle National Bank and others entered into a Pooling and Servicing Agreement (the "PSA").  (New Def. Ex. 82 ¶ 154)

50.    In Section 2.01 of the PSA, ASC as "Depositor" sold to the Trust all of ASC's "right, title and interest … in and to [the Nomura Loan]" along with all of the various other mortgage loans.  (New Def. Ex. 82 ¶ 155)

51.    Section 1.01 of the PSA originally named AMRESCO Services, L.P. (*"AMRESCO"*) as the Special Servicer.  (New Def. Ex. 82, ¶ 157)

52.    ORIX Capital Markets, LLC is the successor-in-interest to AMRESCO Management, Inc. in its role as Special Servicer under the PSA.  (New Def. Ex. 82 ¶ 158)

53.    The Nomura Loan was evidenced by, *inter alia*, a Promissory Note in the principal sum of $50,000,000 in favor of Nomura (the "Promissory Note").  (New Def. Ex. 82 ¶ 109)

54.    Exhibit B to the Nomura Loan Agreement established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan.  (New Def. Ex. 82 ¶ 106)

55.    The monthly lease payments under the Lease were approximately the same amount as Doctors Hospital had been paying since 1992. (New Def. Ex. 82 ¶¶ 35–40)

45

56.    The Lease provided for "an initial term beginning August 29, 1997 and ending on August 29, 2012." (New Def. Ex. 82, ¶ 129)

57.    The Nomura Loan matured on September 11, 2017. (Jt. Ex. 11, at 20) (defining "Maturity Date") However, there was an "Optional Prepayment Date" of September 12, 2012 on the Nomura Loan. (Jt. Ex. 11, at 23) (defining "Optional Prepayment Date")

### Proceeds of MMA Funding, LLC Loan

58.    Approximately $7.9 million was funded upon closing of the Daiwa Securitization in March, 1997. (Jt. Ex. 202 ¶ 61) Approximately $1.4 million of the $7.9 million initial funding was made available to the Hospital. (*Id.*; Jt. Ex. 37)

### Upcoding and Kickback Allegations and Settlements

59.    "Upcoding" occurs when a healthcare provider receives reimbursement from Medicare and Medicaid based on a more acute (and therefore more costly) diagnosis than the patient's condition warranted. (New Def. Ex. 82 ¶ 394; 06 Tr. IV: 30; Jt. Ex. 147, at 9 n.15)

60.    In March 1999 the federal and state governments reached a settlement with Doctors Hospital concerning overcharges due to "upcoding" on patient billings submitted to Medicare and Medicaid. Doctors Hospital agreed to pay a fine of $4.5 million. (New Def. Ex. 82 ¶396; Jt. Ex. 161; New Pl. Ex. 1 ¶ 22.2) The overbilling related to this settlement occurred from January 1993 to June 1997.

61.    A separate investigation focused on (1) kickbacks paid to Doctors Hospital's physicians in exchange for medically unnecessary patient admissions, and (2) the hospital's inability to establish medical necessity and Medicare eligibility requirements for certain physicians' services. (New Def. Ex. 82 ¶ 397) All of these activities occurred during the period 1993 – 1998. (New Def. Ex. 82 ¶ 397; Jt. Ex. 72, Tab B4)

62.    In December 2000 the federal government reached a settlement with Desnick regarding the kickback and other fraud allegations. (New Def. Ex. 82 ¶ 398; New Pl. Ex. 1 ¶ 22.3) He agreed to pay $14.5 million. (Jt. Ex. 162)

63.    The notes to Doctors Hospital's audited financial statements for fiscal year
1999 contain the following statement:

> The hospital is involved in a *qui tam* legal action that was
> filed against a number of hospitals across the country
> concerning certain billing practices. In 1999, the Hospital
> executed an agreement (Settlement Agreement) with the
> United States Attorney's Office for the Northern District of
> Illinois, Civil Division; the United States Department of
> Health and Human Services, Office of Inspector General;
> the State of Illinois; and the Realtor, Health Outcome
> Technologies. The Settlement Agreement requires the
> Hospital to pay $4,500,000 over a twenty-four month
> period. At September 30, 1999 and 1998, the amount of
> this settlement obligation outstanding was $3,100,000 and
> $4,500,000, respectively, and is included with estimated
> third-party payor settlements in the accompanying balance
> sheets.

(New Def. Ex. 82 ¶ 401)

### Financial Performance of Doctors Hospital
### as Disclosed by Audited Financials

64.    From its incorporation in 1992 through 1999, the Debtor prepared annual
financial statements that were audited by KPMG. (Jt. Ex. 28) These audited financial
statements contain yearly comparative balance sheets, income statements, and cash flow
data in dollars, percentages, and ratios. (*Id.*)

65.    The Debtor reported increases in revenues from $29.4 million in 1993 to
$68.1 million in 1996. (Ex. 31, at 3; *see generally* Jt. Ex. 28)

66.    The Debtor had positive net income from 1993 to 1998. (Jt. Ex. 28; Ex. 31
at 3) In 1997, the reported net income reflected a $7.4 million management fee that was
actually a distribution to the owner. (Jt. Ex. 28 (KPMG Audit Report for Sept. 30, 1998),
at 10; Jt. Ex 31, at 3)

67.    In its startup year of fiscal 1993, the Debtor had an operating cash flow
deficit of $.6 million. (Jt. Ex. 31, at 3) However, from 1994 through 1998, the Debtor
had positive operating cash flows (after reclassifying the management fee of $7.4 million
in 1997 as a distribution to owner). (Jt. Ex. 28 (KPMG Audit Report for Apr. 27, 1999),
at 10; Jt. Ex. 31, at 3)

47

68.   Total liabilities of the Debtor increased with the size of the business from $6.9 million in 1993 to $12.6 million in 1996. (Jt. Ex. 28). In 1997, liabilities as listed on the audited financials increased to a total of $25 million. (Jt. Ex. 28; Jt. Ex. 31 at 3) Total liabilities increased in 1998 to $25.5 million. (Jt. Ex. 28)

69.   KPMG's audited financials of Doctors Hospital for the years ending September 30, 1997 and 1998 did not contain any going concern qualifications. (Jt. Ex. 37)

**Financial Performance of Doctors Hospital after Daiwa and Nomura Transactions**

70.   After the MMA Funding, LLC and Nomura loans were consummated on March 31, 1997 and August 28, 1997, respectively, Doctors Hospital continued in operation before filing for bankruptcy on April 17, 2000, and was able to make all of its rental payments and meet all of its other obligations through March 2000. (New Def. Ex. 82 ¶ 232; Jt. Ex. 202 ¶¶ 20, 70–84)

71.   The payments called for under the HPCH Lease were at a level equal to what Doctors Hospital was paying for use of its facility since 1992 under prior leases. (*See* Jt. Exs. 18, 154, 155; New Def. Ex. 82 ¶¶ 35, 36, 37, 38, 39, 40)

72.   There were no defaults on any payments under the MMA Funding, LLC Loan or HPCH Lease; some initial capital contributions due under the Nomura transaction were inadvertently not paid, but were made up in May 1998. (New Def. Ex. 82 ¶233; 06 Tr. Vol. II: 70–71; 06 Tr. Vol. IV: 206; 12 Tr. Vol. III: 324–325; 12 Tr. Vol. VI: 921)

73.   There was a renewal of the Daiwa Securitization between MMA Funding, LLC and Daiwa in February, 1999 for two more years. (Jt. Exs. 4, 28, and 31, at 3; New Def. Ex. 82 ¶234)

**PLAINTIFF'S SOLVENCY MEASUREMENT DATES AND SOLVENCY CONCLUSIONS**
**Plaintiff's Expert Witnesses on Remand**

74.   Michael Lane, one of Plaintiff's insolvency experts, is an expert in the healthcare industry, healthcare financing (including receivables financing), Medicare/Medicaid (including Medicare/Medicaid Reimbursement), and the Chicago metropolitan area healthcare market. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 49–50,

61–62) Lane, who now leads the healthcare corporate restructuring practice at Navigant Capital Advisors, has over twenty-five years of experience in banking and accounting aspects of healthcare. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 22–49) He became familiar with the Hospital during the course of his work with its creditors committee and counsel beginning in August 2000. (New Def. Ex. 82 ¶ 221; 06 Tr. Vol. III: 64–67)

75.    Peltz and Lane also provided in Plaintiffs' Expert Report on Remand calculations of Doctors Hospital's Indicated Fair Value of Equity as of the audited year ends for September 30, 1997, 1998 and 1999, based on the same audited financials Peltz and Lane used to reach their solvency conclusions in Plaintiff's First Expert Report, and further as of March 31, 2000. (New Pl. Ex. 1 and Tab 11 thereto; 12 Tr. Vol. I: 52)

76.    Tab 11 to Plaintiff's Export Report on Remand summarizes the methodology used and concludes that Doctors Hospital had a negative Indicated Fair Value of Equity as of September 30, 1997, 1998, 1999, and as of March 31, 2000, as follows:

| September 30, 1997 | September 30, 1998 | September 30, 1999 | March 31, 2000 |
|---|---|---|---|
| $(17,502) | $(5,817) | $(19,507) | $(24,293) |

(New Pl. Ex. 1, Tab 11)

77.    Neither Peltz nor Lane could identify any material changes in Doctors Hospital's financial condition from August 28, 1997 to October 31, 1997, which would have rendered Doctors Hospital insolvent, or any other test for insolvency, as of September 30, 1997, and over $17.2 million as of October 31, 1997. (12 Tr. Vol. VI: 896–97, 12 Tr. Vol. IX: 1188–91)

78.    Neither Peltz nor Lane had reviewed or were even aware of this Court's Motion in Limine Order before preparing Plaintiff's Expert Report on Remand, and it is not referenced in that report. (New Pl. Ex. 1; 12 Tr. Vol. II: 290–91)

79.    Peltz testified that the internal financials for Doctors Hospital reflect that for the period August 1997 through October 1997, Doctors Hospital's financial performance actually improved. (Jt. Ex. 195; 12 Tr. Vol. III: 328–29)

80.    Peltz testified that the execution of the HPCH Lease did not render Doctor's Hospital insolvent between August 28, 1997 and September 30, 1997 (12 Tr.

Vol. II: 292–93), and while Peltz could not recall what rent Doctors Hospital was paying prior to August 28, 1997, the parties stipulated that Doctors Hospital was paying approximately the same amount of rent for the years prior to and after the HPCH Lease was entered into. (New Def. Ex. 82 ¶¶ 35, 36, 37, 38, 39, 40; 12 Tr. Vol. III: 323)

81.   Both methodologies used by Peltz and Lane in Plaintiff's Expert Report on Remand, as described above, reflect the Remand Opinion by: (i) adding back to the audited financial statements the amounts deducted from normalized income via imposition of a 40% tax rate on Doctors Hospital's income (the "tax effecting" which the Court of Appeals ruled was improper); and (ii) adding back the amounts which Peltz and Lane had deducted from Doctors Hospital's income for 1997 and 1998 based on a proration of the upcoding and kickback settlements for those years, which the Court of Appeals ruled was improper by failing to also take into account the contingent asset of Desnick's ability to pay any such contingent liabilities. (New Pl. Ex. 1, Ex. 1 n.6 and n.11; New Pl. Ex. 1, Ex. 11 n. 2 and n.5)

1.   **Same Division of Responsibility by Peltz and Lane in Plaintiff's Expert Report on Remand as with Plaintiff's First Expert Report**

82.   Peltz and Lane authored Plaintiff's Expert Report on Remand dated November 15, 2011. (New Pl. Ex. 1) As with Plaintiff's First Expert Report, Peltz was responsible for all aspects of the solvency section of Plaintiff's Expert Report on Remand, with Lane providing input on the healthcare industry, particularly as it related to the company specific risk premium applied to Doctors Hospital. (12 Tr. Vol. II: 275–76; 12 Tr. Vol. VI: 850–52)

83.   Peltz/Lane's starting point for their analysis was their calculation of insolvency presented at the First Trial. (New Pl. Ex. 1, Tab 10) That calculation was based on the fiscal year-end audited financial statements as of September 30, 1997, 1998, and 1999, and the monthly statements for the partial year 2000. The revised calculation, with footnotes showing the adjustments, appears in Exhibit 11 of Plaintiff's Expert Report on Remand.

84.   As with Plaintiff's Expert Report on Remand, Plaintiff's First Expert Report reflects a fair market value balance sheet methodology, as well as cash flow and